UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
MARCOS DaSILVA and MATTEUS       )
FERREIRA, on behalf of themselves )
and all others similarly situated, )
                                )
                Plaintiffs,      )
                                )                Civil Action
v.                               )                No. 16-11205
                                )
BORDER TRANSFER OF MA, INC.,     )
and PATRICK McCLUSKEY,           )
                                )
                Defendants.      )
_____ )


**MEMORANDUM AND ORDER**

November 9, 2017

Saris, C.J.

**INTRODUCTION**

   Plaintiffs DaSilva and Ferreira used to work as delivery
drivers for Defendant Border Transfer. They claim that Border
Transfer improperly treated them as independent contractors when
they were, in fact, employees, and that, as a result, Border
Transfer unlawfully deducted certain business expenses from
their pay under the Massachusetts Wage Act. Plaintiffs now seek
certification of a class of similarly situated current and
former drivers under Fed. R. Civ. P. 23. For the reasons
discussed below, Plaintiffs have met the Rule 23 requirements.

1

Thus, after hearing, the Court **ALLOWS** the motion for class

certification (Docket No. 73).

**BACKGROUND**

## I.   Factual Allegations

Border Transfer is a broker registered with the Federal

Motor Carrier Safety Administration ("FMCSA"). Docket No. 9-2 at

1; see also 49 U.S.C. § 13102(2). As a broker, Border Transfer

arranges home delivery services for large retail stores such as

Sears.

Border Transfer itself does not deliver goods. Instead,

Border Transfer contracts with FMCSA-authorized motor carriers

to perform the home deliveries. Border Transfer's contracts with

each motor carrier, which Border Transfer calls Contract Carrier

Agreements ("CCAs"), are all substantially the same. Docket No.

74-3 at 11 ("Matos Dep." at 33:17–18). Each of the CCAs states

that the motor carrier is considered to be an independent

contractor of Border Transfer. E.g., Docket No. 74-4 at 5

("DaSilva CCA" ¶ 8).

Border Transfer only enters into CCAs with business

entities. Docket Nos. 74-7 at 7, 74-8 at 2 (Border Transfer's

"Carrier File Requirements," which require motor carriers

signing CCAs to provide Border Transfer with a "copy of LLC or

incorporation"). Drivers who wish to deliver for Border Transfer

but who do not already have a corporate entity must create one;

in at least one instance, Border Transfer helped a driver form a corporate entity and complete the steps to comply with federal regulations covering motor carriers. Docket No. 74-9 at 7–8.

In some cases, Border Transfer contracts with motor carrier companies that consist solely of a single driver who personally performs the delivery services. That was the case with named plaintiff Marcos DaSilva, who entered into a CCA with Border Transfer through Alpha Logistics Trucking, LLC ("Alpha Logistics"). Docket No. 74-4 at 9. DaSilva applied for a job as a delivery driver with Border Transfer. Docket No. 74-11 ¶ 4. A Border Transfer manager told him that he needed to form a company to sign a contract with Border Transfer, and the manager helped him fill out the necessary forms to create Alpha Logistics. Docket No. 74-11 ¶ 4. Alpha Logistics only ever operated one truck, and DaSilva was the sole driver for that truck. Docket No. 74-9 at 18.

In other cases, Border Transfer contracts with motor carrier companies that employ multiple drivers. That was the case with Matteus Ferreira, the other named plaintiff. Matteus Ferreira was the joint owner of Father & Son Transporting LLC with his father, Marcos Ferreira. Docket No. 74-10 at 9. Father & Son Transporting LLC was formed before the father, Marcos Ferreira, signed a CCA with Border Transfer. Docket No. 9-2 at 12; Docket No. 74-10 at 7. Father & Son Transporting LLC began

by operating one truck for Border Transfer but eventually operated three trucks for Border Transfer. Docket No. 74-10 at 12-13. Those three trucks were operated by Matteus Ferreira, Marcos Ferreira, and several other persons hired by Father & Son Transporting LLC. Docket No. 74-10 at 13.

The motor carriers under contract with Border Transfer perform their deliveries from Sears' Westwood, Massachusetts facility. The CCAs require that all drivers who have an assigned route on a particular day attend a morning "stand-up" meeting at the facility. Docket No. 9-2 at 13; Docket No. 74-3 at 13. At the meeting, drivers might receive instructions on new installation processes, be informed of recurrent customer complaints, or receive training on how to communicate with customers. Docket No. 74-3 at 13, 29. The CCAs require drivers to wear a uniform each day, and drivers are not allowed to leave the facility if they do not comply with that mandate. Docket No. 9-2 at 17-18; Docket No. 74-3 at 14.

Delivery procedures are spelled out in the CCAs as well. Docket No. 9-2 at 14. Among the requirements is that the drivers "must run all delivery routes exactly as specified in the manifest." Docket No. 9-2 at 14. Those manifests are provided to drivers by Border Transfer and contain the order of deliveries and time windows for each delivery. Docket No. 74-3 at 22;

4

Docket No. 74-14. Drivers must log deliveries as they happen by recording them on a smartphone app. Docket No. 74-3 at 17.

## II.  **Procedural History**

The plaintiffs filed the proposed class action complaint in this case on June 23, 2016. Docket No. 1. The original complaint named Border Transfer as the sole defendant and contained two counts: violation of the Massachusetts Wage Act and unjust enrichment.

Border Transfer moved to dismiss, arguing that the Wage Act claim was preempted by the Federal Administration Authorization Act of 1994, 49 U.S.C. § 14501(c). Docket No. 8. On January 5, 2017, the Court denied the motion as to the Wage Act claim but dismissed the unjust enrichment claim. Docket No. 49.

The operative complaint is the amended complaint, which was filed on May 1, 2017. Docket No. 65. The amended complaint names the President of Border Transfer, Patrick McCluskey, as an additional defendant and contains a single count for violation of the Wage Act.[1] In substance, the plaintiffs allege that their

---

[1]     The defendants argue that a class should not be certified against Defendant McCluskey because none of the plaintiffs' arguments related to him. However, the Massachusetts Wage Act creates liability for him as president of Border Transfer. Mass. Gen. Laws ch. 149, § 148B(d) ("The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section.").

misclassification resulted in unlawful deductions from their pay, including damage claims and uniforms, as well as unlawful requirements that they pay for workers' compensation coverage and cargo insurance.

Now pending before the Court is the plaintiffs' motion for class certification, filed on June 19, 2017. Docket No. 73. The proposed class is defined as follows:

> All individuals who 1) entered into a Contract Carrier Agreement (or similar agreement) directly or through a business entity; 2) personally provided delivery services for Border Transfer on a full-time basis in Massachusetts; and 3) who were classified as independent contractors, at any time since June 23, 2013.

Docket No. 73 at 1. This class definition excludes so-called secondary drivers, who provided delivery services for Border Transfer under contracts between Border Transfer and other persons, and so-called absentee contractors, who held contracts with Border Transfer but did not drive a truck themselves. Docket No. 74 at 4 n.6, 23.

## DISCUSSION

### I. Legal Framework

#### A. Massachusetts Wage Law

The Massachusetts Wage Act requires prompt and full payment of wages due. It provides that "in no event shall wages remain unpaid by an employer for more than six days from the

termination of the pay period in which such wages were earned by the employee." Mass. Gen. Laws ch. 149, § 148. The Massachusetts Supreme Judicial Court has interpreted the statute as banning improper wage deductions, even where the employee has given his or her assent. Camara v. Attorney Gen., 941 N.E.2d 1118, 1121–22 (Mass. 2011).

The scope of covered employees for the Massachusetts Wage Act is governed by the Massachusetts Independent Contractor Statute:

> [A]n individual performing any service,
> except as authorized under this chapter,
> shall be considered to be an employee under
> those chapters unless:
>> (1) the individual is free from control
>> and direction in connection with the
>> performance of the service, both under
>> his contract for the performance of
>> service and in fact; and
>> (2) the service is performed outside
>> the usual course of the business of the
>> employer; and,
>> (3) the individual is customarily
>> engaged in an independently established
>> trade, occupation, profession or
>> business of the same nature as that
>> involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a). Under the statute, a worker is an employee and not an independent contractor if any one of the three prongs is not met. In other words, "to rebut the presumption of employment, an employer must satisfy all three of these prongs." Chambers v. RDI Logistics, Inc., 65 N.E.3d 1, 8

(Mass. 2016). The three prongs are referred to as Prongs A, B, and C (or, occasionally, Prongs 1, 2, and 3) in the case law.

The First Circuit held last year that Prong B is preempted by federal law as applied to motor carriers such as Border Transfer. <u>Schwann v. FedEx Ground Package Sys., Inc.</u>, 813 F.3d 429, 442 (1st Cir. 2016). As such, for the defendants to defeat the presumption of employment, they must prevail on both Prongs A and C. The plaintiffs can prevail by showing that either Prong A or C is not satisfied.

**B.    Class Certification**

Federal Rule of Civil Procedure 23(a) imposes four "threshold requirements" applicable to all class actions:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 613 (1997).

In addition to the requirements of Rule 23(a), the moving party must establish the elements of Rule 23(b)(1), (2), or (3). <u>Amchem</u>, 521 U.S. at 614. Plaintiffs seek certification under Rule 23(b)(3). Rule 23(b)(3) permits a class action when common

questions "predominate over any questions affecting only
individual members," and class resolution is "superior to other
available methods for fairly and efficiently adjudicating the
controversy." Fed. R. Civ. P. 23(b)(3). Matters "pertinent" to
evaluating predominance and superiority include:

> (A) the class members' interests in
> individually controlling the prosecution or
> defense of separate actions;
> (B) the extent and nature of any litigation
> concerning the controversy already begun by
> or against class members;
> (C) the desirability or undesirability of
> concentrating the litigation of the claims
> in the particular forum; and
> (D) the likely difficulties in managing a
> class action.

Fed. R. Civ. P. 23(b)(3).

The plaintiffs have the burden of an initial showing that
the proposed class satisfies the Rule 23 requirements. In re
Nexium Antitrust Litig., 777 F.3d 9, 27 (1st Cir. 2015). If
factual premises are disputed at the class certification stage,
the Court may "'probe behind the pleadings' to 'formulate some
prediction as to how specific issues will play out' in order to
assess whether the proposed class meets the legal requirements
for certification." In re New Motor Vehicles Canadian Exp.
Antitrust Litig., 522 F.3d 6, 17 (1st Cir. 2008) (quoting Gen.
Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982); Waste Mgmt.
Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000)). A
class should be certified only if "the trial court is satisfied,

after a rigorous analysis," that the Rule 23 requirements have been met. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013).

## II. Analysis

### A. Numerosity

Numerosity is a "low threshold." Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Id. (quoting Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001)).

The plaintiffs claim that the numerosity requirement is met because the defendants utilized fifty-nine contractors from June 1, 2013 to April 8, 2017. Docket No. 74-6 at 2. The defendants do not appear to contest that the plaintiffs meet the numerosity requirement. However, it bears mentioning that not all fifty-nine of Border Transfer's contractors during the time period fall within the plaintiffs' class definition. The plaintiffs' class definition is narrow: drivers who, in the relevant time period, "personally provided delivery services for Border Transfer on a full-time basis in Massachusetts." The record does not make it clear how many of the fifty-nine contractors utilized by Border Transfer during that time period personally

delivered for Border Transfer on a full-time basis -- but it is
certainly not all fifty-nine. The defendants have put evidence
in the record that at least three contractors, Humberto Chantre,
Jose Pinto, and Naila Brito, did not personally drive full-time
for Border Transfer and would be excluded from the class
definition. Docket Nos. 81-3 at 2; 81-6 at 2, 4; 81-7 at 1.
Rogerio Matos, a Border Transfer assistant manager, remembered
two additional contractors who did not drive their own trucks.
Docket No. 74-3 at 4-5, 9. Thus, at least five of the fifty-nine
contractors would be excluded from the proposed class
definition. Regardless, it is likely that more than forty of
Border Transfer's contractors fall within the class definition.

   **B.    Commonality**

   Commonality requires the identification of an issue that is
by its nature "capable of classwide resolution -- which means
that determination of its truth or falsity will resolve an issue
that is central to the validity of each one of the claims in one
stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350
(2011). Plaintiffs must raise not only common questions, but
also common answers that help resolve the litigation. Id. Even a
single common issue may suffice. Id. at 359; see also Parsons v.
Ryan, 754 F.3d 657, 675 (9th Cir. 2014); Crowe v. Examworks,
Inc., 136 F. Supp. 3d 16, 47 (D. Mass. 2015).

1.  Choice of Law

Defendants argue that individualized evidence is required
to determine whether Massachusetts law applies to all putative
class members' claims.

If different state laws apply to different members of a
putative class and there are relevant differences between those
state laws, commonality may be defeated.[2] See Gariety v. Grant
Thornton, LLP, 368 F.3d 356, 370 (4th Cir. 2004) ("The
plaintiffs have the burden of showing that common questions of
law predominate, and they cannot meet this burden when the
various laws have not been identified and compared.");
Grandalski v. Quest Diagnostics Inc., 767 F.3d 175, 180 (3d Cir.
2014).

The first step is to determine whether there is an actual
conflict between the laws of the possibly governing
jurisdictions. "It is a well-established -- and prudential --
principle that when the result in a case will not be affected by

---

[2]     The choice-of-law issue is potentially also relevant to
other Rule 23(a) and 23(b)(3) requirements. That different
putative class members' claims are governed by different state
laws may be a mere manageability problem, considered as just one
factor of the predominance and superiority inquiries. Fed. R.
Civ. P. 23(b)(3)(D). If varying state laws can be grouped
according to common elements, division of the class into
subclasses may alleviate manageability concerns. In re Warfarin
Sodium Antitrust Litig., 391 F.3d 516, 529-30 (3d Cir. 2004).
However, "there may be situations where variations in state laws
are so significant so as to defeat commonality." Id. at 529.

the choice of law, an inquiring court, in its discretion, may simply bypass the choice." <u>Lexington Ins. Co. v. Gen. Acc. Ins. Co. of Am.</u>, 338 F.3d 42, 46 (1st Cir. 2003). Beyond Massachusetts, the other potentially relevant jurisdictions are Rhode Island and Connecticut. Docket No. 80 at 15; <u>see also</u> Docket No. 81-16 at 13. The defendants point out, correctly, that there are potentially material differences in the wage laws of Massachusetts, Rhode Island, and Connecticut.[3] For example, while each state considers the level of control as a part of its independent contractor test, the control test in Massachusetts is different from that of Rhode Island and Connecticut. As described in the following section on commonality and Prong A, the control test in the Massachusetts Wage Act is conjunctive and requires a company using an independent contractor to show that the contractor was free from its control both as a matter of contract and as a matter of fact. Both the Rhode Island and Connecticut independent contractor tests focus solely on the existence of a contractual right to control rather than the exercise of actual control. <u>Absi v. State Dep't of Admin.</u>, 785

---

[3] At the hearing, the defendants raised for the first time that the CCAs contain a choice-of-law clause pointing to Tennessee law. Because the defendants failed to raise that issue prior to the hearing, that argument is waived, The Court need not determine whether a Massachusetts court would refuse, as against public policy, to apply Tennessee law to the plaintiffs' misclassification claim.

13

A.2d 554, 556 (R.I. 2001); Tianti, ex rel. Gluck v. William

Raveis Real Estate, Inc., 651 A.2d 1286, 1290 (Conn. 1995).

Having found at least one potentially relevant difference

among the state laws, the Court must undertake a choice-of-law

analysis. A federal court sitting in diversity, as in this case,

must look to the forum state's choice-of-law rules to determine

the controlling substantive law. See Klaxon Co. v. Stentor Elec.

Mfg. Co. Inc., 313 U.S. 487, 496 (1941). The relevant inquiry is

whether, when Massachusetts choice-of-law rules are applied to

each of the members of the putative class, the result would be

the application of the Massachusetts Wage Act.

"Massachusetts state courts apply 'a functional choice of

law approach that responds to the interests of the parties, the

States involved, and the interstate system as a whole.'" Reicher

v. Berkshire Life Ins. Co. of Am., 360 F.3d 1, 5 (1st Cir. 2004)

(quoting Bushkin Assocs., Inc. v. Raytheon Co., 473 N.E.2d 662,

668 (Mass. 1985)). The approach, which is guided by the

Restatement (Second) of Conflict of Laws, is a multifactor

analysis that chooses the "State with the greatest 'interest' in

the particular issue." Bushkin, 473 N.E.2d at 668–69.

The defendants point out that at least seventeen of the persons

that fall within the proposed class definition listed a state

other than Massachusetts as the location of their business.

Docket No. 81-18 at 1-2. DaSilva delivered to Rhode Island and

14

Connecticut "frequently," and he averaged nine to ten hours a day delivering to Rhode Island and Connecticut. Docket No. 81-16 at 13. Ferreira estimated that he delivered half of his loads outside of Massachusetts. Docket No. 81-15 at 25.

The plaintiffs respond by pointing out that all delivery drivers report to Border Transfer's Westwood facility every morning to receive the products to be delivered and the routes that they would take. Docket No. 81-16 at 12.

The choice-of-law question can be distilled to: whether the Massachusetts Wage Act would apply to a driver who signed a contract with Border Transfer (a Michigan corporation headquartered in Tennessee that operates in Massachusetts) through a Rhode Island corporate entity to deliver goods from a Massachusetts facility to a mix of Massachusetts and out-of-Massachusetts customers. The plaintiffs rely on Dow v. Casale, 989 N.E.2d 909 (Mass. App. Ct. 2013), in which Massachusetts wage law was applied to a Florida resident who worked as a mobile salesperson that traveled throughout the country on behalf of a Massachusetts-based company but intermittently worked in the company's Massachusetts office. Id. at 914. The Massachusetts Appeals Court's reasoning was that "given the particular nature of [his] work, his employment with [the company] had no substantial relationship to any place but Massachusetts." Id. Similarly, the Court finds that because the

15

proposed class members' relationship with Border Transfer
centered on the Westwood facility, where they met every morning
to get instructions, Massachusetts wage law applies even to
drivers from out of state who spent much of their time
delivering out of state. Thus, the Massachusetts Wage Act would
apply to all of the members of the putative class, and there is
no choice-of-law obstacle to certification.

### 2.   Prong A: Control

As described above in the subsection on the statutory
framework, the plaintiffs need only prevail on either Prong A or
Prong C of the Massachusetts Wage Act. Prong A itself contains a
conjunctive test under which the plaintiffs need only prevail on
one branch. Under Prong A, an individual is an independent
contractor only if "the individual is free from control and
direction in connection with the performance of the service,
both under his contract for the performance of service and in
fact." Mass. Gen. Laws ch. 149, § 148B(a)(1). Due to the
conjunctive nature of this test, a company asserting that a
worker is an independent contractor must show that the
individual was free from its control both as a matter of
contract and as a matter of fact.

The plaintiffs argue that because only a single common
issue is necessary to meet the commonality requirement of Rule
23(a), they satisfy the requirement by showing that either

contractual control or actual control can be adjudicated on a
class-wide basis.

i.   Control as a Matter of Contract

The plaintiffs argue that whether an individual is free
from control under the terms of his or her contract can be
resolved through common evidence such as the uniform provisions
of the CCAs. The plaintiffs are correct. The defendants do not
appear to contest the plaintiffs' characterization that the CCAs
contain standard terms for all of Border Transfer's drivers.
Docket No. 74-3 at 11. Examining the standard terms to determine
the extent of Border Transfer's contractual control is an
exercise that appears to lead to common answers. As such, the
Third Circuit decided that the extent of a company's right to
control its workers could be resolved by examination of the
franchise agreement, policies manual, and training manual that
were common to the class. Williams v. Jani-King of Phila. Inc.,
837 F.3d 314, 321-22 (3d Cir. 2016).

The defendants' argument in response seems to be that, for
various reasons, the contract does not contain as much right of
control as the plaintiffs claim. Docket No. 80 at 19. But that
is a merits question. The only question at this point is whether
the extent of Border Transfer's contractual right of control
over its delivery drivers is determinable on the basis of common
evidence. The answer is yes.

17

## ii. Control as a Matter of Fact

The defendants argue that determining the extent of Border Transfer's actual control over its delivery drivers requires an individualized factual inquiry. The plaintiffs respond that evidence of common practices can establish common answers as to control as a matter of fact.

As common evidence of actual control, the plaintiffs argue that Border Transfer had a policy that required all of its drivers to attend morning meetings to receive delivery instructions, that all of the drivers were subject to a customer rating system that could influence route assignment, that all drivers were required to wear uniforms, and that Border Transfer issued manifests to each driver containing a mandated order of delivery and delivery timeframes.

The defendants' response wades too often into the merits. The defendants expend significant effort arguing that, as a practical matter, Border Transfer's control over its drivers was less than the plaintiffs make it seem: that drivers' amount of communication with Border Transfer throughout a delivery day was not so significant; that the morning meeting requirement was not strictly enforced; that the customer rating system had little impact on drivers' routes; that drivers did not have to make deliveries in the order listed in the manifest; and that contractors could work when they wanted and that there were no

limitations on the amount of time they could take off. But the question at this stage is whether the level of actual control can be determined by common evidence on how Border Transfer dealt with its drivers, or whether different putative class members were treated differently. The defendants have put forward some "happy camper" affidavits presenting that some drivers have some flexibility, but this does not defeat commonality or predominance.

### iii. Incorporation

The defendants argue that even if Massachusetts law applies to all of the members of the putative class, and even if there is common evidence regarding control under Prong A, commonality does not exist because individual adjudication is necessary to determine whether the Massachusetts Wage Act even applies to each proposed class member. Border Transfer did not contract with drivers directly but instead contracted with drivers through the corporate entities owned by the drivers. The Massachusetts Wage Act does not "expressly exclude individuals who provide services through a corporation." Chambers, 65 N.E.3d at 14 (citing Advisory 2008/1, Attorney General's Fair Labor and Business Division on Mass. Gen. Laws ch. 149 § 148B) (available at Docket No. 84-7). The Attorney General articulated factors relevant to a determination of whether the "worker's use of the corporate form was at the worker's behest or forced upon the

worker by an employer in order to misclassify him." Id. These

nonexclusive factors include:

> [Whether] the services of the alleged
> independent contractor are not actually
> available to entities beyond the contracting
> entity, even if they purport to be so;
> whether the business of the contracting
> entity is no different than the services
> performed by the alleged independent
> contractor; or the alleged independent
> contractor is only a business requested or
> required to be so by the contracting entity.

Id. (quoting Advisory 2008/1). The defendants argue that these

fact-specific inquiries must be conducted on an individual basis

to determine whether the Massachusetts Wage Act applies.

The defendants point to the named plaintiff DaSilva, who

testified at his deposition that he formed "Alpha Logistics

Trucking, LLC" at the request of Border Transfer in October 2014

and that the company remained in business for six months. Docket

No. 81-16 at 6. However, the defendants claim that Alpha

Logistics Trucking's business records show otherwise: that Alpha

Logistics Trucking operated well past that date transporting

products brokered by companies other than Border Transfer.

Defendants argue that the other named plaintiff, Ferreira,

presents different potential issues regarding application of the

Wage Act. Ferreira's corporate entity (Father & Son Trucking)

existed two to three months prior to the CCA with Border

Transfer, and it employed multiple drivers to complete Border

Transfer's jobs in a third truck Father & Son Trucking owned.
There is also evidence in the record of at least four other
contractors who formed corporations before contracting with
Border Transfer and for reasons other than Border Transfer's
alleged requirement of incorporation. Docket No. 81-1 at 2 (Rosa
declaration: "Prior to [Border Transfer], Antonio Rosa
Transportation LLC provided delivery services to Spirit
Delivery."); Docket No. 81-2 at 1 (Martins declaration: "I own
Martins Trucking LLC, a company I formed for tax reasons.");
Docket No. 81-6 at 2 (Pinto declaration: "I formed my company in
2009" and began contracting with Border Transfer in 2011);
Docket No. 81-5 at 1 (Medina declaration: "I formed Medina
Trucking LLC because I wanted increased protection for my
company."). For these drivers, defendants make a colorable
argument that incorporation is not a sham to permit
misclassification.

However, incorporation cannot be a shield to prevent
liability under the Wage Act. The plaintiffs point to evidence
in the record that Border Transfer required all drivers to form
corporations as a prerequisite to signing a contract. Docket No.
74-3 at 10-11; Docket No. 74-11 at 2; Docket No. 74-13 at 2.
Thus, regardless of whether a full-time driver formed a
corporation prior to his engagement with Border Transfer, the
class only involves full-time drivers for Border Transfer. Thus,

the analysis for Wage Act purposes is whether the individual driver was an employee with Border Transfer.

Other courts in this District have similarly found that individual questions of incorporation did not defeat commonality or predominance for a class of drivers. See Martins v. 3PD, Inc., No. CIV.A. 11-11313-DPW, 2013 WL 1320454, at *7, *9 (D. Mass. Mar. 28, 2013) ("Martins I") (allowing class certification on section 148B misclassification claim despite named plaintiff's incorporation because "an individual can bring a claim under Section 148B even if he has incorporated his business and his putative employer's formal relationship is with the corporate entity[;]" therefore he "stands in the same position as" other class members)[4]; see also Vargas v. Spirit Delivery & Distribution Servs., Inc., 245 F. Supp. 3d 268, 287 (D. Mass. 2017) ("[T]he issue of when/if the drivers created corporate entities and whether those corporate entities continued to exist after the relationship with Spirit ended is ultimately of minimal relevance to the proposed classes'[Wage Act] claim."); De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D.

---

[4]    Although Judge Woodlock denied class certification on the Wage Act claims in Martins I citing predominance concerns, on reconsideration he certified the class's Wage Act claim after excluding "secondary drivers" from the class. Martins v. 3PD Inc., No. CIV.A. 11-11313-DPW, 2014 WL 1271761, at *11 (D. Mass. Mar. 27, 2014) ("Martins II"). "Secondary drivers" are excluded from the plaintiffs' proposed class in this case.

71, 86 (D. Mass. 2009) (certifying class of franchisees). These cases found that when it comes to the merits of the Massachusetts Wage Act inquiry into employee classification, the common issue of control would predominate.

The defendant relies on two cases from this District for the proposition that the individualized Chambers inquiry cannot be avoided. See Anderson v. Homedeliveryamerica.com, Inc., No. CIV.A. 11-10313-GAO, 2013 WL 6860745, at *2 (D. Mass. Dec. 30, 2013) (stating that in determining whether the Massachusetts Wage Act applies to an individual who has incorporated his business and contracted with an alleged employer through that business, "[t]here is no convenient bright line to be used, and each case must be determined on its own facts"); see also Chebotnikov v. LimoLink, Inc., No. 14-13475-FDS, 2017 WL 2888713 at *7-8 (D. Mass. July 6, 2017). These cases do not support the defendants' proposition. In Anderson, the court granted summary judgment for the plaintiffs, finding that they were employees under section 148, because "[t]hey worked as individual truck drivers performing full-time personal services exclusively for HDA." 2013 WL 6860745, at *2-*3. So too with the proposed class in this case. Chebotnikov is distinguishable on its facts. In that case, the defendant operated a mobile application, similar to Uber, for limousine drivers to pick up passengers. Chebotnikov, 2017 WL 2888713, at *1. The drivers were not

obligated to pick up the passengers referred to them by LimoLink (although they might stop receiving referrals if they did), nor were they prohibited from driving non-LimoLink customers while under contract, nor did LimoLink set drivers' routes. Id. at *2, *4.

### 3. Prong C: Independently Established Business

Under Prong C, a worker is not an independent contractor unless "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." Mass. Gen. Laws ch. 149, § 148B(a)(3).

The defendants suggest that this prong requires individualized evidence about each putative class member's history and custom of work for other brokers. Indeed, that is what the statutory text would seem to require. But there is Massachusetts case law suggesting that the statutory inquiry is not into whether putative employees actually engaged in an independent business, but whether they had the opportunity to do so. In Athol Daily News v. Bd. of Review of the Div. of Emp't and Training, 786 N.E.2d 365 (Mass. 2003), the Supreme Judicial Court ("SJC") considered identical language from the third prong of the independent contractor definition under the unemployment compensation benefits statute, Mass. Gen. Laws ch. 151A, § 2. The SJC wrote:

> "The better approach to the evaluation
> required by part (c) is to consider whether
> the service in question could be viewed as
> an independent trade or business because the
> worker is capable of performing the service
> to anyone wishing to avail themselves of the
> services or, conversely, whether the nature
> of the business compels the worker to depend
> on a single employer for the continuation of
> the services."

786 N.E.2d at 373. The SJC held that newspaper carriers were
customarily engaged in an independently established trade
because they were "free to deliver newspapers (or other
publications, such as advertising flyers) for anyone who wishes
to contract with them" and that "several of the carriers in fact
act as carriers for other publishers." Id. at 374 (emphasis
added). In other words, the SJC has treated an analogous test as
an inquiry into whether a worker has the opportunity to engage
in an independently established business, not whether they did
in fact. This makes sense on a practical level, as the
defendants point out: a contrary statutory meaning would
implausibly require a business that wanted to engage with an
independent contractor to ensure that the contractor was also in
fact contracting with another business.

Whether contractors with Border Transfer had the
opportunity to engage in an independently established business
is, as the plaintiffs argue, susceptible to common proof. The
plaintiffs argue that Border Transfer assigned its drivers full-

time work four to six days a week, see Docket No. 74-3 at 11,
leaving drivers with minimal time, if any, to perform deliveries
for any other business as a practical matter. Moreover, the
plaintiffs argue that drivers could not work concurrently for
Border Transfer and another business because they were required
to be in uniform for Border Transfer, Docket No. 74-3 at 14, and
because "co-loading" of other merchandise alongside Sears
merchandise was prohibited, Docket No. 74-1 (SLS-BTMI Contract
at 8). The defendants respond that there were many examples of
contractors who also delivered for companies other than Border
Transfer and that co-loading was not actually prohibited.
Whatever the resolution of this dispute on the merits, the key
point at this stage is that this question appears susceptible to
resolution by common evidence about Border Transfer's general
customs and policies. The defendants have put forth no evidence
that different putative class members -- at the individual
worker level -- had different opportunities to engage in an
independently established business.

### 4.   Establishing Violation of the Wage Act

Although the class definition avoids the individualized
Chambers inquiry into applicability of the Wage Act, Plaintiffs
still must show that Border Transfer took deductions that were
improper under the Wage Act. The plaintiffs argue that Border
Transfer took the same types of deductions from each of its

contractors and that those deductions are outlined in the CCAs
and other Border Transfer documents. The defendants do not seem
to contest this point. The propriety of deductions under the
Wage Act can be resolved on common evidence.

### 5.    Summing up Commonality

Commonality is met for a class of drivers who personally
drove for Border Transfer on a full-time basis.

### C.    Typicality

Typicality requires that the named plaintiffs' claims
"arise[] from the same event or practice or course of conduct
that gives rise to the claims of other class members, and . . .
are based on the same legal theory." Garcia-Rubiera, 570 F.3d at
460 (alterations in original) (quoting In re Am. Med. Sys.,
Inc., 75 F.3d 1069, 1082 (6th Cir. 1996)). "Under the Rule's
permissive standards, representative claims are 'typical' if
they are reasonably coextensive with those of absent class
members; they need not be substantially identical." Torres v.
Mercer Canyons Inc., 835 F.3d 1125, 1141 (9th Cir. 2016)
(quoting Parsons, 754 F.3d at 685). "Even relatively pronounced
factual differences will generally not preclude a finding of
typicality where there is a strong similarity of legal theories
or where the claim arises from the same practice or course of
conduct." In re Nat'l Football League Players Concussion Injury
Litig., 821 F.3d 410, 428 (3d Cir. 2016) (quoting In re

Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 311 (3d Cir. 1998)).

The plaintiffs argue that typicality is met because their claims and the putative class members' claims arose from the same CCAs and class-wide treatment, and the plaintiffs and the class members assert the same legal theory of Wage Act misclassification.

The defendants respond that typicality is defeated for several reasons. They point out that Ferreira did not sign the CCA himself (his father did); his testimony about his company's operations is contradicted by others; his company existed before it signed the CCA with Border Transfer; and his business grew to operate three trucks for Border Transfer. They also point out that DaSilva's business only operated one truck, that his business was formed when he signed the CCA with Border Transfer, and that some of his testimony is contradicted by testimony of others (thus casting doubt on his credibility).

None of these problems defeats typicality. DaSilva and Ferreira's experiences, although different in some ways from each other's, are reasonably coextensive with those of other motor carriers who contracted with Border Transfer. All of the motor carriers are pursuing the same Wage Act theory.

### D. Adequacy

To meet the adequacy requirement, the "moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." Lannan v. Levy & White, 186 F. Supp. 3d 77, 89 (D. Mass. 2016) (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)).

Both prongs are met. There is no conflict because the named plaintiffs and the putative class members share an interest in recovering wages lost as a result of misclassification. There is no conflict from the fact that some of the contractors are content with the status quo, since any such contractor has the right to opt out of the class. "The availability of this option is an important factor in weighing the effect of a largely hypothetical conflict on a class-certification decision." Matamoros v. Starbucks Corp., 699 F.3d 129, 139 (1st Cir. 2012); see also Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 43 (1st Cir. 2003) (finding hypothetical conflict to not be a basis for decertification where conflict could be solved by opt-out).

The plaintiffs' attorneys are highly experienced in class-action employment litigation and specifically in Wage Act

misclassification claims. The defendants do not contest their qualifications.

**E.   Predominance**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. "While 'the predominance criterion is far more demanding' than the commonality requirement, it presumes that individual issues will exist." Donovan v. Philip Morris USA, Inc., 268 F.R.D. 1, 28 (D. Mass. 2010) (quoting Amchem, 521 U.S. at 624). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2012); 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005)).

The plaintiffs must take the following steps to prevail: (1) show that Massachusetts is the correct choice of law; (2)

show that while they signed CCAs with Border Transfer through their corporate entities, they are still entitled to protection as "individuals" under the Wage Act; (3) prove misclassification by showing that one of the two control tests in Prong A is not met or that the independently established business test in Prong C is not met; (4) show that deductions were taken that were unlawful for employees under the Wage Act; and (5) show a measure of damages. Steps 1, 2, 3, and 4 in that chain appear to be provable by common evidence which predominates over any individualized issues identified by the defendants. Step 5 will require individual inquiry into each class member's alleged deductions. The question is whether that inquiry defeats predominance.

The need for individual damage determinations in step 5 does not alone defeat predominance. See Vaquero v. Ashley Furniture Indus., Inc., 824 F.3d 1150, 1155 (9th Cir. 2016) ("Under Tyson Foods and our precedent, therefore, the rule is clear: the need for individual damages calculations does not, alone, defeat class certification."); Garcia v. E.J. Amusements of New Hampshire, Inc., 98 F. Supp. 3d 277, 291 (D. Mass. 2015) ("Calculating the precise amount of damages owed to each class member may also require some individualized inquiry. But this task also does not stand in the way of class certification.").

**F.    Superiority**

The plaintiffs argue that the class action vehicle is superior to individual adjudication because it provides efficiency by avoiding duplicative discovery and inconsistent results; individual claims may only result in small damages; and the fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis, see Overka v. American Airlines, Inc., 265 F.R.D. 14, 24 (D. Mass. 2010).

While the defendants quibble about the amount of recovery that each putative class member might achieve in individual litigation, they do not seriously contest the superiority prong. The plaintiffs are correct that efficiency and the policy considerations unique to the employment context make class adjudication superior.

**G.    Ascertainability**

The defendants raise an argument that is best understood under the label of ascertainability: that it is not clear how to determine who worked on a "full-time basis" during the relevant time period. The First Circuit (and most other circuits) adds an ascertainability requirement to the class certification analysis. "[T]he definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable." In re Nexium, 777 F.3d at 19; see also Matamoros, 699 F.3d at 139 (holding that a class was not

"unascertainable and overbroad" where it was defined in terms of an "objective criterion"). The defendants fail to fully develop this argument but Border Transfer's driver records should allow an objective determination of who qualifies under that class requirement, which the certified class defines as "at least 40 hours per week."

## ORDER

Plaintiffs' motion for class certification (Docket No. 73) is **ALLOWED**. Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), the Court certifies the following class for liability:

> All individuals who 1) entered into a Contract Carrier Agreement (or similar agreement) directly or through a business entity; 2) personally provided delivery services for Border Transfer on a full-time basis in Massachusetts (at least 40 hours per week); and 3) who were classified as independent contractors, at any time since June 23, 2013.

The Court appoints Marcos DaSilva and Matteus Ferreira as class representatives, and Lichten & Liss-Riordan, P.C. as class counsel.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge