**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MARCOS DaSILVA and MATTEUS FERREIRA, on behalf of themselves and all others similarly situated,<br>    Plaintiffs,<br>v.<br><br>BORDER TRANSFER OF MA, INC., And PATRICK McCLUSKEY,<br><br>    Defendants. | Case No.: 1:16-cv-11205-PBS |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

ARGUMENT SUMMARY...................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................................. 2

STANDARD OF REVIEW ...................................................................................................... 5

ARGUMENT ............................................................................................................................ 5

    A.    Plaintiffs and Class Members are not entitled to recover expenses
        they agreed to bear in the Agreement............................................................................ 5

        1.   An individual subject to the Wage Act may agree to cover certain out-of-pocket
           expenses ............................................................................................................... 5

        2.   Plaintiffs' requested recovery of deductions for "damages claims" is
           preempted by the Carmack Amendment and FAAAA ...................................... 10

        3.   Deductions for "unfinished deliveries" are not recoverable ............................... 13

    B.    Chantre is not an Employee under Section 148B........................................................ 13

        1.   Section 148B does not apply to Chantre Delivery or Chantre........................... 14

        2.   Prong 1—Chantre was free from BTMI's direction and control ....................... 16

           a.  The Agreement between Chantre Delivery and BTMI evidences
               absence of control.................................................................................... 17

           b.  BTMI did not control Chantre Delivery's business .................................. 18

        3.   Prong 3—Chantre operated an independently established business................... 19

CONCLUSION ...................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alpine Fresh, Inc. v. Jala Trucking, Corp.*, 181 F. Supp. 3d 250 (D.N.J. 2016) ...........................1, 12

*Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) ...........................................................13

*Ameriswiss Tech., LLC v. Midway Line of Illinois, Inc.*, 888 F. Supp. 2d 197 (D.N.H. 2012) 1, 11, 12

*Athol Daily News v. Bd. of Review of the Div. of Emp't & Training*, 786 N.E.2d 365 (Mass. 2003) 19

*Atlantis Exp., Inc. v. LL Transport Svc., Inc.*, 481 N.W.2d 79 (Minn. Ct. App. 1992)......................7

*AVX Corp. v. Cabot Corp.*, 251 F.R.D. 70 (D. Mass. 2008) ...............................................6

*Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890 (Mass. 2011)......................................8, 13

*Belnick, Inc. v. TBB Glob. Logistics, Inc.*, 106 F. Supp. 3d 551 (E.D. Pa. 2015) ............................13

*Burdick v. Union Sec. Ins. Co.*, 2009 WL 6541608 (C.D. Cal. Apr. 2, 2009) ..................................14

*Camara v. Attorney Gen.*, 941 N.E.2d 1118 (Mass. 2011) ...........................................6, 13

*Chambers v. RDI Logistics, Inc.*, 65 N.E.3d 1 (Mass. 2016) ........................................14, 15

*Cook v. Estes Express Lines, Corp.*, 2018 WL 1773742 (D. Mass. Apr. 12, 2018) ..........2, 15, 16, 20

*Debnam v. FedEx Home Delivery*, 2013 WL 5434142 (D. Mass. Sept. 27, 2013) ................2, 15, 16

*Depianti v. Jan-Pro Franchising Int'l, Inc.*, 39 F. Supp. 3d 112 (D. Mass. 2014) ...........................18

*Driscoll v. Worcester Telegram & Gazette Corp.*, 2009 WL 3839067
   (Mass. Dist. Ct. Sept. 28, 2009) .........................................................................6

*Fleming v. Shaheen Bros., Inc.*, 881 N.E.2d 1143 (Mass. App. Ct. 2008)....................................9

*Fraelick v. PerkettPR, Inc.*, 989 N.E.2d 517 (Mass. App. Ct. 2013) ........................................7

*Gallagher v. Cerebral Palsy of Massachusetts, Inc.*, 86 N.E.3d 496 (Mass. App. Ct. 2017)..............5

*Georgia Nut Co. v. C.H. Robinson Co.*, 2017 WL 4864857 (N.D. Ill. Oct. 26, 2017) .....................13

*Gurry v. Cumberland Farms, Inc.*, 550 N.E.2d 127 (Mass. 1990) ........................................9

*Jan-Pro Franchising Int'l, Inc. v. Depianti*, 712 S.E.2d 648 (Ga. Ct. App. 2011)............................18

*Kashala v. Mobility Servs. Int'l, LLC*, 2009 WL 2144289 (D. Mass. May 12, 2009) .......1, 10, 11, 12

*Kattar v. Demoulas*, 739 N.E.2d 246 (Mass. 2000) ........................................................10

*Layton v. DHL Express (USA), Inc.I*, 686 F.3d 1172 (11th Cir. 2012) ............................................. 18

*Mass. State Police Commissioned Officers Ass'n v. Commonwealth*, 967 N.E.2d 626 (Mass. 2012) ................................................................................................................ 1, 7, 13

*Micciche v. N.R.I. Data & Bus. Prods., Inc.*, 2011 WL 4479849 (D. Mass. Sept. 27, 2011) ............. 5

*Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221 (10th Cir. 1999) ................... 6

*Non Typical, Inc. v. Transglobal Logistics Grp., Inc.*, 2012 WL 1910076 (E.D. Wis. May 28, 2012) ................................................................................................................ 1, 12, 13

*Penn v. Va. Int'l Terminals, Inc.*, 819 F. Supp. 514 (E.D. Va. Apr. 12, 1993) ........................... 18, 19

*Pierce v. Visteon Corp.*, 843 F. Supp. 2d 936 (S.D. Ind. 2011) ................................................ 14

*Police Comm'r of Boston v. Cecil*, 727 N.E.2d 846 (Mass. 2000) ............................................ 8

*Raposo v. Garelick Farms, LLC*, 288 F.R.D. 8 (D. Mass. 2012) ................................................ 9

*Remington v. J.B. Hunt, Inc.*, 2016 WL 4975194 (D. Mass. Sept. 16, 2016) ............................... 7

*Reyes v. XPO Last Mile, Inc.*, 2016 WL 4063454 (E.D. Pa. July 26, 2016) ................................. 16

*Rini v. United Van Lines*, 104 F.3d 502 (1st Cir. 1997) ..................................................... 1, 11

*Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104 (D. Mass. 2015) ................... 5, 17, 18, 20

*Schenley Distillers Corp. v. United States*, 326 U.S. 432 (1946) ........................................... 9

*Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429 (1st Cir. 2016) ............................... 14

*Sebago v. Boston Cab Dispatch, Inc.*, 28 N.E.3d 1139 (Mass. 2015) .................................. 17, 19, 20

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ........................ 14

*Stellar Ins. Grp., Inc. v. Cent. Cos., LLC*, 2006 WL 2862218 (W.D.N.C. Sept. 12, 2006) ............... 16

*Tvedt v. Farmers Ins. Grp. of Cos.*, 91 P.3d 1 (Mont. 2004) ................................................. 16

*Wachovia Secs., LLC v. Loop Corp.*, 726 F.3d 899 (7th Cir. 2013) ......................................... 9

*Weinberg v. Grand Circle Travel, LCC*, 891 F. Supp. 2d 228 (D. Mass. 2012) ........................... 14

*York v. Day Transfer Co.*, 525 F. Supp. 2d 289 (D.R.I. 2007) ............................................. 1, 11

## Statutes

49 U.S.C. § 13102 ........................................................................................................ 11

49 U.S.C. § 13906 ......................................................................................................... 7

49 U.S.C. § 14501 ........................................................................................................1, 12

49 U.S.C. § 14706 ...............................................................................................................1

Mass. Gen. Laws ch. 149, § 148 ......................................................................................1, 6

Mass. Gen. Laws ch. 149, § 148B ...............................................................................passim

Mass. Gen. Laws ch. 149, § 150 .........................................................................................1

Mass. Gen. Laws ch. 149, § 159 .........................................................................................7

Mass. Gen. Laws ch. 152 § 1 ...........................................................................................8, 9

## Rules

Fed. R. Civ. P. 56 ...............................................................................................................5

## Regulations

28 C.F.R. § 50.6 .................................................................................................................7

452 Mass. Code Regs. § 8.07 .............................................................................................8

454 Mass. Code Regs. § 27.05 ...........................................................................................7

52 Pa. Code § 32.13 ...........................................................................................................7

Ala. Admin. Code r. 770-X-10-.04-.09 ..............................................................................7

*Cargo Ins. for Property Loss or Damage*, 75 FR 35319-01, 2010 WL 2481141 (June 22, 2010) ......7

S.C. Code Ann. Regs. 103-173 (2018)................................................................................7

## Other Authorities

*Federal Preemption in Motor Carrier Selection Cases Against Shippers and Brokers*, 39 Transp. L.J. 77 (2012) ...............................................................................................................17

Response Letter from the Dep't of Justice to Am. Trucking Ass'ns, Inc. (Aug. 10, 2006) (2006 WL 2460184)..............................................................................................................7

## ARGUMENT SUMMARY

This motion presents three questions for resolution: (1) whether the Wage Act, Mass. Gen. Laws ch. 149, §§ 148, 150 precluded property-broker Border Transfer of MA, Inc. ("BTMI") from making deductions Plaintiffs authorized; (2) whether the Wage Act provides Plaintiffs with a basis to recover any cargo insurance and workers' compensation premiums their motor-carrier businesses paid; and (3) whether class member Humberto Chantre is an "individual" covered by the Wage Act or qualifies as an employee. The answer to all three questions is no.

The Agreements between BTMI and the motor carriers Plaintiffs owned, as explained in Section A(1), reflect the parties' understanding that the motor carriers were responsible for their respective business expenses. The Wage Act does not provide a basis on which to override the Agreements' terms.

Section A(2) explains why the Carmack Amendment, 49 U.S.C. § 14706, preempts Plaintiffs' use of state law to avoid their obligations for cargo and property damage.[1] Also addressed in Section A(2) is how the FAAAA, 49 U.S.C. § 14501(c)(1), likewise preempts the request for damage claim deductions because of the claims' "connection with" and "reference to" property-broker BTMI's "price, route, or service."[2]

"Unfinished deliveries" are another specific category of deductions Plaintiffs cannot recover under the Wage Act for the independent reason, as addressed in Section A(3), that such deductions reflect services that were either not rendered or not completed. Accordingly, there was no "labor, service, or performance" that would entitle Plaintiffs to any "earned wages" under the Wage Act.[3] Nor can the

---

[1] *Rini v. United Van Lines*, 104 F.3d 502, 504 (1st Cir. 1997); *Ameriswiss Tech., LLC v. Midway Line of Illinois, Inc.*, 888 F. Supp. 2d 197 (D.N.H. 2012); *York v. Day Transfer Co.*, 525 F. Supp. 2d 289, 297–302 (D.R.I. 2007).

[2] *Alpine Fresh, Inc. v. Jala Trucking, Corp.*, 181 F. Supp. 3d 250, 257 (D.N.J. 2016); *Ameriswiss Tech., LLC*, 888 F. Supp. 2d 197; *Non Typical, Inc. v. Transglobal Logistics Grp., Inc.*, 2012 WL 1910076, at *3 (E.D. Wis. May 28, 2012); *Kashala v. Mobility Servs. Int'l, LLC*, 2009 WL 2144289, at *7 (D. Mass. May 12, 2009).

[3] *Mass. State Police Commissioned Officers Ass'n v. Commonwealth*, 967 N.E.2d 626, 632 (Mass. 2012) (defining "earned wages" as acquiring "by labor, service or performance" and concluding that only once "an employee has *completed* the labor, service, or performance required of him" may wages be considered earned

Wage Act upend the Agreement providing for payment upon completion of a stop without running afoul of the FAAAA's preemption scope.

On the third issue of whether the Wage Act applies to Humberto Chantre, for the reasons discussed in Section B(1), Chantre does not qualify as an "individual" subject to Section 148B of the Wage Act. Chantre, through his business Chantre Delivery LLC, simultaneously owned and operated multiple trucks, hired drivers and helpers to operate his business, and ran multiple trucks not only under the Agreement, but also under contract with another property broker. Like the District Court of Massachusetts concluded in *Cook v. Estes Express Lines* and *Debnam v. FedEx Home Delivery*, the undisputed facts demonstrate the work performed by Chantre and his company are part of a business-to-business relationship not covered by the Wage Act.[4]

Finally, if Mr. Chantre were nevertheless considered an "individual" covered by the Wage Act, he does not qualify as an employee under Section 148B given the absence of control (Section B(2)) and his operation of Chantre Delivery LLC as an independently established business (Section B(3)).

## STATEMENT OF UNDISPUTED FACTS[5]

**Property-broker, BTMI.**   BTMI is a federally registered property broker that organizes and coordinates delivery services for its customers. *SOF* ¶ 1, 9. One of BTMI's customers is Innovel Solutions, Inc. ("Innovel"). *SOF* ¶ 2. Innovel contracts with retailers such as Sears, Costco, BJ's, and Amazon to consolidate the retailers' products for delivery, and arranges the orders for delivery (and installation as needed) into routes according to the retail customer's delivering location and preferred time window. *SOF* ¶ 4. In constructing the route schedule, Innovel takes into account various factors, including capacity of individual trucks, the volume and weight of items to be delivered, the location of deliveries, and the delivery window promised to the retailers' customer. *SOF* ¶ 5.

---

(emphasis in original)).

[4] *Cook v. Estes Express Lines, Corp.*, 2018 WL 1773742 (D. Mass. Apr. 12, 2018); *Debnam v. FedEx Home Delivery*, 2013 WL 5434142 (D. Mass. Sept. 27, 2013).

[5] BTMI incorporates its Statement of Undisputed Material Facts (the "*SOF*") filed contemporaneously with this Memorandum pursuant to Local Rule 56.1.

Based on the routes Innovel organizes (sometimes with BTMI's input), BTMI brokers the consolidated products to motor carriers that have the equipment (trucks) and labor to physically deliver and install retailers' goods. *SOF* ¶ 6. After the motor carriers have agreed to deliver these products, BTMI provides updates about the delivery status to Innovel and the customers who will take delivery. *SOF* ¶ 7. BTMI can provide these updates on the deliveries completed based on information the motor carrier inputs into an application on departure from the retail customer's house. *SOF* ¶ 8. If a delivery update is requested regarding service failures (delivery delays), other delivery problems (such as Innovel's customer rejecting the delivery or not being home to accept the delivery), and in-home damage claims, BTMI will contact the motor carrier's owner or, at the motor carrier's request, other company representatives to get delivery updates. *SOF* ¶ 10. BTMI communicates this information to Innovel as required by their contract. *SOF* ¶ 10.

Terms of the relationship between BTMI and each motor carrier are set out in the Contract Carrier Agreements ("Agreements") they sign. *SOF* ¶ 11. Terms of the relationship between Innovel and BTMI are contained in the Home Delivery and Shuttle Logistics Agreement they sign. *SOF* ¶ 14.

**Humberto Chantre, owner of Chantre Delivery, LLC.** After working for Father & Son Moving, LLC, Mr. Chantre decided he wanted to start his own trucking business. *SOF* ¶ 16. He proceeded to form Chantre Delivery LLC in 2013, and obtained the federal motor carrier operating authority needed to transport interstate freight. *SOF* ¶ 17. Chantre Delivery entered into an Agreement with BTMI on May 13, 2013. *SOF* ¶ 18. As of May 3, 2017, Chantre Delivery ran three trucks, which delivered freight it accepted from property brokers. *SOF* ¶¶ 19–21.

Chantre Delivery typically used one truck to deliver property it accepted from BTMI. *SOF* ¶ 20. Chantre deployed Chantre Delivery's two remaining trucks to provide delivery services for XPO, a competitor of BTMI's. *SOF* ¶ 21. Chantre owns all three of the trucks and interchanges their dispatch to effectuate the deliveries he accepted from XPO and BTMI. *SOF* ¶¶ 20–22. The truck Chantre Delivery uses for its business with BTMI has Chantre's company's name on it and not BTMI's. *SOF*

¶ 24.

Chantre personally drove a truck as of May 3, 2017 to complete deliveries Chantre Delivery accepts from XPO and hires a driver and helper for the trucks Chantre Delivery uses to transport BTMI-brokered product. *SOF* ¶¶ 25–26. From approximately July of 2013 through January of 2016, however, he elected to personally drive one of the trucks to transport BTMI-brokered product. *SOF* ¶ 18, 27. During the time that he personally drove a truck to deliver BTMI brokered property, he updated his progress through a phone application or scanner after each delivery stop but, unless there was a problem, would not talk to anyone during the day from BTMI. *SOF* ¶ 28. Chantre Delivery accepted property from BTMI pursuant to bills of lading. *SOF* ¶ 29.

The Agreement Chantre Delivery signed is nonexclusive and Chantre Delivery hauled freight for other property brokers while it delivered property for BTMI. *SOF* ¶ 21, 30–31. Chantre Delivery always had the option to either accept or turn down property BTMI offered to him. *SOF* ¶ 32. And Chantre negotiated at times with BTMI about adding stops to a Chantre Delivery driver's route. *SOF* ¶ 33. Chantre would accept stops for the route if he could come to an agreement with BTMI on the extra stop pay his company would receive and turn down the deliveries if he and BTMI could not agree on the financial terms. *SOF* ¶ 34.

**Plaintiffs' motor-carrier business expenses and settlement deductions.** The Agreement reflects the parties' promise that the motor carrier would remain responsible for its own business expenses. *SOF* ¶ 37. Plaintiff Marcos DaSilva signed an Agreement with BTMI on behalf of his company, Alpha Logistics Trucking LLC. *SOF* ¶ 39. Plaintiff Matteus Ferreira did not sign or otherwise enter an Agreement with BTMI; rather, Ferreira's father signed an Agreement with BTMI on behalf of Father & Son Transporting LLC, a company Ferreira and his father own. *SOF* ¶¶ 40, 54–56.

Notwithstanding the terms of the Agreement, Plaintiffs are requesting reimbursement of two categories of business expenses they claim to have incurred: (1) payments for workers' compensation

premiums, and (2) payments for cargo insurance. *SOF* ¶ 41. Plaintiffs are also seeking recovery of deductions they authorized to be taken from settlements paid to Father & Son Transporting LLC and Alpha Logistics Trucking LLC including: (1) noncompliance, (2) uniforms, (3) damage claims, (4) unfinished deliveries, and (5) performance bonds. *SOF* ¶ 42. These are the same reimbursement and deduction expenses Plaintiffs seek on behalf of other class members. *SOF* ¶ 43. Plaintiffs have represented that they have completed discovery. *SOF* ¶ 57.

## STANDARD OF REVIEW

A court must grant summary judgment on a claim, or part of a claim, when the moving party demonstrates that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiffs have the burden of demonstrating every class member is an "individual" covered by Section 148B, and, if Plaintiffs are able to meet that burden, BTMI then has the onus of establishing that each class member is an independent contractor.[6] For any class member deemed covered by Section 148B and deemed an employee, Plaintiffs then have the burden of proof to establish BTMI is liable to each class member for the deductions and business expenses sought under the Wage Act, along with the damage amount.[7]

## ARGUMENT

**A.    Plaintiffs and Class Members are not entitled to recover expenses they agreed to bear in the Agreement**

**1.    An individual subject to the Wage Act may agree to cover certain out-of-pocket expenses**

Plaintiffs' lone claim alleges that if deemed to be employees under the Wage Act, then Sections 148 and 150 entitle them to recover "certain expenses [deducted] from its worker's pay."[8] Through

---

[6] *See Gallagher v. Cerebral Palsy of Massachusetts, Inc.*, 86 N.E.3d 496, 501 (Mass. App. Ct. 2017) (Chapter 149, § 148B, "creates a two-step inquiry" that first requires proof that the plaintiff provided services as an individual, and "[i]f this threshold is met, the individual is presumed to be an employee" unless the employer rebuts the presumption); *see also Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 113 (D. Mass. 2015).

[7] *Micciche v. N.R.I. Data & Bus. Prods., Inc.*, 2011 WL 4479849, at *6 (D. Mass. Sept. 27, 2011).

[8] Am. Compl. ¶¶ 25–27.

discovery, Plaintiffs have identified the specific deductions sought as those made from settlements "for damage claims, non-compliance, uniforms, performance bonds, and for unfinished deliveries," along with reimbursement for "worker's compensation coverage and cargo insurance." *SOF* ¶¶ 41–42.

Two guiding principles preclude recovery of the deductions along with reimbursement of out-of-pocket workers' compensation and cargo insurance sought even if, over BTMI's objections, Section 148B coverage existed and Plaintiffs were found to be its employees.[9]

*First*, the Wage Act does not bar an employee from agreeing to cover certain work-related expenses.[10] Section 148 of the Wage Act, the Section upon which Plaintiffs assert BTMI's liability for the work-related expenses exists, requires that:

> [e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him . . . . No person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty.[11]

What constitutes a "special contract" is not defined by the Wage Act. The Massachusetts Supreme Court in *Camara* accordingly looked to Black's Law Dictionary to define the term as "peculiar provisions that are not ordinarily found in contracts relating to the same subject matter."[12] Nothing is "peculiar" about the Agreements. Each contain provisions requiring the motor carrier to cover its

---

[9] Plaintiffs' First Amended Complaint references "fuel costs, vehicle maintenance costs, and payments to helpers" as other costs Plaintiffs incurred, although the lone Wage Act claim asserted lists workers' compensation and cargo insurance as the only business expenses they seek reimbursement for. Am. Compl. ¶¶ 22, 27. In response to Defendants' Interrogatories requesting the categories of expenses they are seeking reimbursement for, they list workers' compensation and cargo insurance and ostensibly have decided against trying to recover other out-of-pocket expenses. *AVX Corp. v. Cabot Corp.*, 251 F.R.D. 70, 77 (D. Mass. 2008) ("A party who breaches . . . the duty to supplement an interrogatory answer 'may not use any undisclosed material as evidence unless it proves that its failure to disclose was harmless or substantially justified.'") (quoting *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1229, n.2 (10th Cir. 1999)).

[10] *See Driscoll v. Worcester Telegram & Gazette Corp.*, 2009 WL 3839067, at *2 (Mass. Dist. Ct. Sept. 28, 2009) ("The Wage Act does not . . . prohibit an employer and employee from entering into an agreement in which the employee agrees to pay for certain job-related expenses or to sustain penalties for poor job performance.").

[11] Mass. Gen. Laws ch. 149, § 148.

[12] *Camara v. Attorney Gen.*, 941 N.E.2d 1118, 1122 (Mass. 2011).

business expenses and provide authorization for deductions, provisions that are typical in the transportation segment. *SOF* ¶ 37.[13] Cargo insurance, for example, was a requirement for motor carriers to maintain until 2011, still remains a type of insurance the FMCSA retains the right to mandate (49 U.S.C. § 13906(a)(3)), and is still a required form of insurance for motor carriers to carry in many states.[14] "Provisions for cargo insurance" in a broker and motor carrier agreement are in turn "standard terms that would likely be included in any transport contract."[15]

*Second*, neither the Wage Act nor other Massachusetts law requires *reimbursement* for business expenses; there can be no violation of the Wage Act without an offending *deduction from wages*.[16] While there are certain expenses the Massachusetts legislature has mandated the employer must cover, such as medical exams and mandatory uniform dry-cleaning costs, the expenses that Plaintiffs seek reimbursement for are not among them.[17] The axiom *expressio unius, est exclusio alterius*,

---

[13] *E.g.*, *Remington v. J.B. Hunt, Inc.*, 2016 WL 4975194 (D. Mass. Sept. 16, 2016) (addressing permissibility of expense chargebacks in context of motor carrier equipment leasing regulations); Response Letter from the Dep't of Justice to Am. Trucking Ass'ns, Inc. (Aug. 10, 2006) (2006 WL 2460184) (requesting and receiving from Department of Justice, pursuant to 28 C.F.R. § 50.6, approval of "Model Broker-Carrier Agreement"); Am. Trucking Ass'ns Model Motor Carrier/Broker Agreement § 2.2 ("As between Broker and Carrier, all costs of rendering the Services (including compensation of subcontractors as well as payment of all taxes or other governmental assessments imposed on Carrier) shall be borne solely and exclusively by Carrier."); *id.* § 1.3 (explaining that a broker shall not be "liable for any wages, fees, payroll taxes, assessments or other expenses relating to employees or agents of Carrier") (attached as Ex. EE to Butcher Decl.).

[14] *Cargo Ins. for Property Loss or Damage*, 75 FR 35319-01, 2010 WL 2481141 (June 22, 2010) (eliminating cargo insurance requirement in place since 1937 and responding to broker concerns about elimination of requirement with statement that "[r]esponsible transportation intermediaries generally screen potential carriers to ascertain which carriers would provide the best service to their clients. Cargo insurance monitoring and inspection can and should be part of the service intermediaries provide for their clients. . . . Responsible brokers and intermediaries should not be using motor carriers that are unable or unwilling to pay loss and damage claims."); *see also* Ala. Admin. Code r. 770-X-10-.04-.09 (requiring "[p]roof that a motor carrier has obtained the necessary insurance" including "proof a motor carrier has in force cargo insurance"); 52 Pa. Code § 32.13 (providing cargo liability insurance requirements for motor carriers); S.C. Code Ann. Regs. 103-173 (2018) (Cargo Insurance or Surety Bond Required of Motor Carrier).

[15] *Atlantis Exp., Inc. v. LL Transport Svc., Inc.*, 481 N.W.2d 79, 82 (Minn. Ct. App. 1992).

[16] *Fraelick v. PerkettPR, Inc.*, 989 N.E.2d 517, 523–24 (Mass. App. Ct. 2013) ("[T]he violation of a standard expense reimbursement arrangement would not constitute a violation of the Wage Act because reimbursement is not compensation 'earned' by 'labor, service, or performance.") (quoting *Mass. State Police Commissioned Officers Ass'n v. Commonwealth*, 967 N.E.2d 626, 632 (Mass. 2012)).

[17] Mass. Gen. Laws ch. 149, § 159B; *see also* 454 Mass. Code Regs. § 27.05(4)(a) (employer that requires employees to wear uniforms that require "dry-cleaning, commercial laundering, or other special treatment" must be "reimbursed for the actual costs of such service.").

7

defeats Plaintiffs' effort to use Massachusetts law to recover expenses that the Massachusetts legislature did not identify as being required to be borne by an employer.[18]

The Massachusetts Supreme Judicial Court's opinion in *Awuah v. Coverall* is not to the contrary. In that case, the court held "that *an employee* . . . may recover, as 'damages incurred,' any such [workers' compensation] insurance premiums that he was obliged *to pay to [the employer]* under the terms of *his contract*."[19] No Plaintiffs paid BTMI for workers' compensation premiums. Indeed, Massachusetts does not require members of an LLC such as DaSilva and Ferreira—like owners of sole proprietorships, partnerships, and corporations—to have workers' compensation policies.[20]

Despite having no obligation to purchase a workers' compensation policy for himself, DaSilva asserts his company, Alpha Logistics Trucking LLC, did so anyway. *SOF* ¶ 49. DaSilva has not produced copies of any workers' compensation policies purchased. *SOF* ¶ 50. Even if he had produced such information, that would not alter the conclusion that he was not obliged to pay for such polices; rather, his business purportedly incurred the expense ostensibly in furtherance of both Alpha Logistics Trucking LLC's work delivering for BTMI as well as its car delivery service. *SOF* ¶ 63. Not even *Awuah* gives DaSilva a reimbursement remedy for workers' compensation premiums on a policy his company paid for and that his alleged employer did not require him to purchase.

Plaintiff Ferreira likewise had no obligation to purchase workers' compensation coverage for himself as an LLC member, although a legal obligation existed for Father & Son Transporting LLC to have a workers' compensation coverage in place for its various workers. *SOF* ¶ 38. Like DaSilva, Ferreira contends Father & Son Transporting LLC purchased a workers' compensation policy. *SOF*

---

[18] *Police Comm'r of Boston v. Cecil*, 727 N.E.2d 846, 848 (Mass. 2000) ("a statutory expression of one thing is an implied exclusion of other things omitted from the statute.").

[19] *Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890, 899 (Mass. 2011) (emphasis added).

[20] Mass. Gen. Laws ch. 152, § 1(4); 452 Mass. Code Regs. § 8.07; *see also Workers' Compensation Insurance Requirements*, Mass.gov, https://www.mass.gov/service-details/workers-compensation-insurance-requirements (stating that "Members of a limited liability company (LLC), partners of a limited liability partnership (LLP), or sole proprietors of an unincorporated business aren't required to carry workers' compensation insurance for themselves").

¶ 52. And like DaSilva, Ferreira's business entity sustained "any damages incurred" for those policy premium payments, not Ferreira himself who was part-owner of the business. *SOF* ¶ 54.[21]

Moreover, the requirement to maintain workers' compensation coverage emanates from Massachusetts' Workers' Compensation Act, Mass. Gen. Laws ch. 152, which uses a different test to determine employment status than the one used by the Wage Act.[22] Plaintiffs' Amended Complaint does not allege that they are employees for purposes of the Workers' Compensation Act, and three years into the case they may not do so now.[23] Having failed to assert that they were employees under the Workers' Compensation Act precludes them from recovering any workers' compensation insurance premiums purportedly paid.

Nor is there evidence, beyond Plaintiffs' own contention that they want to disregard their business entities, that any class member wants to pierce his company's corporate veil or that they could do so in order to recover expenses their business entity paid. The Supreme Court in *Schenley Distillers Corp. v. United States* recognized "[o]ne who has created a corporate arrangement, chosen as a means of carrying out his business purposes, does not have the choice of disregarding the corporate entity."[24] Just so here.

_____

[21] Plaintiffs have not produced damage calculations as required by Rule 26(a)(1)(A)(iii) despite follow-up requests. *SOF* ¶ 65.

[22] *Fleming v. Shaheen Bros., Inc.*, 881 N.E.2d 1143 (Mass. App. Ct. 2008) (applying common-law "right to control" test in determining drivers entitlement to workers' compensation); *see also* Brief of *Amicus Curiae* Att'y General of the Commonwealth of Massachusetts in Supp. of the Plaintiff-Appellant at 7, *Sanchez v. Lasership, Inc.*, No. 13-1478 (4th Cir. July 24, 2013) (Doc. 25-1) (Massachusetts' Attorney General recognizing that "[t]he Massachusetts Workers' Compensation Law . . . provides a different definition of employee" from that in Mass. Gen. Laws ch. 149, § 148B).

[23] *Raposo v. Garelick Farms, LLC*, 288 F.R.D. 8, 10 (D. Mass. 2012) (denying plaintiff's motion for leave to file amended complaint to include two additional Wage Act claims where information upon which claims were based (whether they were paid for all hours worked) was readily available to plaintiffs at both the time of filing the original complaint and the first amended complaint).

[24] *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 437 (1946); *see also Wachovia Secs., LLC v. Loop Corp.*, 726 F.3d 899, 908 (7th Cir. 2013) (deciding under Illinois law that "the corporate veil is never pierced for the benefit of the corporation or its stockholders" and quipping that business cannot "have its cake and eat it to" by attempting to disregard business for some purposes but not others); *Gurry v. Cumberland Farms, Inc.*, 550 N.E.2d 127, 134 (Mass. 1990) (finding "highly persuasive" courts refusal "to allow corporations to assume the benefits of the corporate form and then disavow that form when it is to their and their stockholders' advantage.").

Belying Plaintiffs' own preference to disregard their business entities now are prior efforts to separate themselves and their business entities in tax filings, establishment of limited liability companies under Massachusetts law, setting up separate business bank accounts, obtaining federal motor-carrier authority, and purchase of insurance. *SOF* ¶¶ 12–13, 49, 52, 54, 58–61. Plaintiffs cannot both enjoy the liability protection of establishing separate business entities but when convenient pierce their own businesses to enjoy the benefits that may flow from simply wishing away the business entity veil. Same goes for the class members, for whom Plaintiffs have proffered no evidence that could provide a basis for piercing any of their company's corporate veils.[25]

### 2.   Plaintiffs' requested recovery of deductions for "damages claims" is preempted by the Carmack Amendment and FAAAA

BTMI deducted amounts from motor-carrier settlements for "damage claims" that fall into two categories: (1) claims submitted by a property owner related to damage to the property owner's home, and (2) claims for damage to product being transported by the motor carrier. *See SOF* ¶ 46. Plaintiffs reported these deductions were paid by their respective business entities, and—in the case of Father & Son Transporting LLC—passed along to its own workers. *SOF* ¶ 47–48. As an initial matter, Massachusetts will not allow individuals to recover sums they did not personally pay.[26] Even if Massachusetts did not have such a prohibition, the Carmack Amendment and the FAAAA preempt Plaintiffs attempt to recover for these damage claim deductions via a Wage Act claim.

The Carmack Amendment is a federal statute imposing strict liability on motor carriers for cargo losses and damages and "provides sweeping preemptive power over state or common law claims arising out of property loss or damage that occurred as a result of interstate transport."[27] "[T]he

---

[25] At the class certification hearing, Plaintiffs' lawyer represented to the Court that discovery had completed. *SOF* ¶ 57.

[26] *See Kattar v. Demoulas*, 739 N.E.2d 246, 258 (Mass. 2000) ("A fundamental principle on which the rule of damages is based is compensation. Compensation is that amount of money that reasonably will make the injured party whole. Compensatory damages may not exceed this amount. Anything beyond that amount is a windfall.").

[27] *Kashala v. Mobility Servs. Int'l, LLC*, 2009 WL 2144289, at *7 (D. Mass. May 12, 2009).

principal purpose of the [Carmack] Amendment was to achieve national uniformity in the liability assigned to carriers."[28] In doing so, Congress recognized that achieving "uniformity" requires the preemption of state laws that could be used to alter carriers' liability for damage to the goods they transport as well as the damage to property attending that transport. As the First Circuit in *Rini* recognized in a seminal decision on this issue, the Carmack Amendment has a "sweeping preemptive power" "over state law governing damages for the loss or damage of goods."[29] The Carmack Amendment would not preclude Plaintiffs from challenging the propriety of the *amount charged* for a damage claim—if, for example, the charge was greater than the value of the property damaged— but the Carmack Amendment does preclude Plaintiffs as owners of motor carriers from using state law to alter their *liability* for property damage claims.[30]

The *York*, *Ameriswiss*, and *Kashala* cases from this Circuit each applied the Carmack Amendment lessons from *Rini* in holding that claims against brokers for damage claims are preempted.[31] In *York*, the plaintiff sued several defendants, including a transportation broker, after his goods arrived at his home with mold.[32] The court found that the Carmack Amendment preempted claims against the broker because a contrary ruling would allow plaintiffs to "circumvent the Carmack Amendment."[33] The court further reasoned that a broker fell within the Carmack Amendment's definition of covered transportation services, which is defined as "services related to that movement, including arranging for receipt, delivery, elevation, transfer in transit, . . . storage, handling, packing, [and] unpacking."[34]

In *Ameriswiss*, the District Court of New Hampshire likewise held the Carmack Amendment preempted a claim against a broker seeking recovery of cargo damages. In that case, the court

---

[28] *Rini v. United Van Lines*, 104 F.3d 502, 504 (1st Cir. 1997).
[29] *Id.*
[30] *Ameriswiss Tech., LLC v. Midway Line of Illinois, Inc.*, 888 F. Supp. 2d 197 (D.N.H. 2012).
[31] *Kashala*, 2009 WL 2144289, at *7; *York v. Day Transfer Co.*, 525 F. Supp. 2d 289, 297–302 (D.R.I. 2007); *Ameriswiss Tech., Inc.*, 888 F. Supp. 2d 197.
[32] *York*, 525 F. Supp. 2d at 293.
[33] *Id.* at 294.
[34] *Id.* at 301 (quoting 49 U.S.C. § 13102(23)(B)).

determined that the First Circuit had already determined in *Rini* "that the Carmack Amendment impliedly preempts state regulations related to damages for loss or destruction of property during the course of interstate shipment."[35] The *Ameriswiss* court concluded that the far reach of the Carmack Amendment impliedly preempted any damage claim against a transportation broker as well as the carrier.[36] *Kashala* also holds that interstate shipments "and the parties rights, duties and liabilities with respect thereto are governed exclusively by the Carmack Amendment," which in turn preempted all state and common law claims against the broker and motor carrier.[37]

Both *Kashala* and *Ameriswiss* held the FAAAA would also preempt such damage claims against a broker, a conclusion other district courts in *Alpine Fresh, Inc. v. Jala Trucking Corp.* (D.N.J.) and *Non Typical, Inc. v. Transglobal Logistics Group, Inc.* (E.D. Wis.) have also embraced.[38] The FAAAA provides that a state may not "enact or enforce a law, regulation, or other provision having the force and effect of law relating to price, route, or service of any motor carrier . . . or any motor private carrier, broker, or freight forwarder with respect to the transportation of property."[39]

*Alpine*, *Ameriswiss*, and *Kashala* concluded the FAAAA expressly preempted Plaintiffs' negligence claims seeking money for goods lost or damaged in a move. In *Non Typical*, the Eastern District of Wisconsin likewise determined that negligence claims against the broker were FAAAA preempted, explaining the potential liability to a broker were it responsible under state law for product damage claims would "plainly have an economic effect on the rates it charges and how it provides its transportation brokerage services."[40] Just so here—the logical effect of permitting a motor carrier to use state law as a vehicle to unload damage claim costs onto a broker (in circumvention of the Carmack Amendment and the parties' Agreement) has (1) a connection with and reference to "the

---

[35] *Ameriswiss*, 888 F. Supp. 2d at 204.
[36] *Id.* at 205.
[37] *Kashala v. Mobility Servs. Int'l, LLC*, 2009 WL 2144289, at *7 (D. Mass. May 12, 2009).
[38] *Alpine Fresh, Inc. v. Jala Trucking Corp.*, 181 F. Supp. 3d 250, 257 (D.N.J. 2016); *Non Typical, Inc. v. Transglobal Logistics Grp., Inc.*, 2012 WL 1910076, at *3 (E.D. Wis. May 28, 2012).
[39] 49 U.S.C. § 14501(c)(1).
[40] *Non Typical, Inc. v. Transglobal Logistics Grp., Inc.*, 2012 WL 1910076, at *3 (E.D. Wis. May 28, 2012).

rates [BTMI] charges and how it provides its transportation brokerage services;" and (2) the services a broker provides in arranging for motor-carrier transportation.[41]

### 3.  Deductions for "unfinished deliveries" are not recoverable

As discussed above, before a deduction can be considered to have been made from "wages," the individual from whom the deduction was made must have *earned* the wage. The "No Bill" adjustments (sometimes referred to as "N/B") are accounting corrections made when services were either not rendered or not completed. *SOF* ¶ 45. When the individual from whom the adjustments are made has not earned the amounts adjusted "by labor, service, or performance," they cannot be a deduction of wages. *Id.*[42]

As the Massachusetts Supreme Judicial Court recognized in *Awuah* and *Massachusetts State Police*, it is only "[w]here an employee has *completed* the labor, service, or performance required of him, therefore, according to common parlance and understanding he has 'earned' his wage."[43] That comports with the various Agreements class members signed that predicate payment on the completion of the delivery. SOF ¶ 66.

As with attempts to impute liability onto BTMI for damage claim deductions, the FAAAA's broad preemptive scope likewise preempts Plaintiffs efforts to subvert the Agreement's service payment terms here. Brass tacks, Plaintiffs efforts to recover No Bill deductions are claims to enlarge or enhance the parties' bargain "based on state laws or policies external to the agreement" prohibited by the FAAAA.[44]

### B.  Chantre is not an Employee under Section 148B

BTMI is also entitled to summary judgment on class member Humberto Chantre's claim for the

---

[41] *Id.*; *see also Georgia Nut Co. v. C.H. Robinson Co.*, 2017 WL 4864857 (N.D. Ill. Oct. 26, 2017); *SOF* ¶¶ 42, 46–48.

[42] *See Camara v. Attorney Gen.*, 941 N.E.2d 1118, 1121 (Mass. 2011).

[43] *Mass. State Police Commissioned Officers Ass'n v. Commonwealth*, 967 N.E.2d 626 (Mass. 2012) (quoting *Awuah v. Coverall N. Am., Inc.*, 952 N.E.2d 890 (Mass. 2011)).

[44] *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 230 (1995); *see also Belnick, Inc. v. TBB* Glob. *Logistics, Inc.*, 106 F. Supp. 3d 551, 561–62 (E.D. Pa. 2015) (concluding FAAAA preempted claims against broker given claims "fundamentally relate to shipping and shipping rates").

alternative reason that he is not, as a matter of law, covered by the Wage Act.[45] Mr. Chantre is a class member—his company entered into a contract with BTMI, and, he personally transported product for BTMI between 2013 and 2016. *SOF* ¶¶ 18, 27; *see* ECF No. 95 (defining the certified class). After he stopped personally transporting product for BTMI, it is not clear whether he *remained* a member of the certified class or not; he was still running trucks that he owned and staffed and he could have worked on those trucks transporting product for BTMI at any time were he to decide that would be best for his business. *SOF* ¶¶ 19, 22–23, 26.

Regardless of the timeframe ambiguity for Mr. Chantre's class membership, the undisputed facts demonstrate he is not "an individual" covered by Section 148B, and, even if Section 148B applied, he does not qualify as an employee under Section 148B given the absence of control (Section B(2)) and his operation of Chantre Delivery as an independently established business (Section B(3)).[46]

### 1. Section 148B does not apply to Chantre Delivery or Chantre

Section 148B "is focused on the misclassification of individuals" and "applies only to individuals who have been misclassified as independent contractors—not companies."[47] Courts in similar transportation contexts have dismissed claims premised on the application of Section 148B because

[45] Consistent with the Supreme Court which dictates that class actions "neither change plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter only how the claims are processed," *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010), courts will consider summary judgment motions as to fewer than all members of a certified class. *See, e.g.*, *Pierce v. Visteon Corp.*, 843 F. Supp. 2d 936, 937 (S.D. Ind. 2011) (granting in part and denying in part a defendant's "Motion for Partial Summary Judgment as to the Claims of Certain Class Members" that sought summary judgment only as to certain individuals within the certified class); *Burdick v. Union Sec. Ins. Co.*, 2009 WL 6541608, at *14 (C.D. Cal. Apr. 2, 2009) (analyzing a defendant's motion for summary judgment as to four unnamed class members on the grounds that they have no liability).

[46] Mass. Gen. Laws ch. 149, § 148B(a). Prong 2 of Section 148B is preempted by the FAAAA and does not bear on the analysis in this case.. Class Cert. Order, p. 8 (ECF No. 95) (citing *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 438–40 (1st Cir. 2016); *Chambers v. RDI Logistics, Inc.*, 65 N.E.3d 1 (Mass. 2016)).

[47] *Weinberg v. Grand Circle Travel, LCC*, 891 F. Supp. 2d 228, 240 (D. Mass. 2012); Mass. Gen. Laws ch. 149, § 148B ((a) for the purposes of this Chapter and Chapter 151 an individual performing any service, except as authorized under this chapter, shall be considered to be an employee under those chapters unless . . . .); Advisory 2008/1, Attorney General's Fair Labor and Business Division on Mass. Gen. Laws ch. 149, § 148B (stating Section 148B "is focused on the misclassification of individuals" and that "business-to-business relationships . . . are important to the economic wellbeing of the Commonwealth").

the person bringing the claim provided services through a legitimate business and therefore could not qualify as an "individual" subject to Section 148B.

In *Cook v. Estes Express Lines, Corp.*, plaintiff Gary Cook's claim as an "individual" seeking redress under the Act was barred because the undisputed facts showed that "the work performed under [GCC Moving]'s contract with [defendant] involved far more than [Cook's] personal services."[48] Cook personally drove the truck when his company's contractual relationship with the defendant started, then stopped driving on a daily basis so he could run his company and oversee daily delivery services.[49] Cook continued to personally provide delivery services in order to fill in for drivers who were sick or on vacation.[50] His company, GCC Moving, operated a number of trucks out of different terminals and employed over twenty different drivers to operate those trucks.[51] The court held that "the evidence in this case conclusively establishes that Cook operated GCC Moving as a business of his own, taking him outside the scope of section 148B."[52]

*Debnam* similarly involved a delivery driver who operated multiple trucks and claimed to be an employee of the defendant under Section 148B.[53] The court held plaintiff Debnam fell outside the definition of an "individual" within the meaning of Section 148B given the scope of his business operation. In so holding, the court noted that "the work performed under Debnam's contract with FedEx Ground involved far more than his personal services."[54] Like Chantre and Cook, Debnam's company operated multiple trucks simultaneously, which required him to hire employees to operate the trucks. *SOF ¶¶* 19–23, 26. The court concluded that "the plaintiff's relationship with FedEx Ground was that of what the Massachusetts Attorney General's advisory terms a 'legitimate

---

[48] 2018 WL 1773742, at *2 (D. Mass. Apr. 12, 2018) (quoting *Debnam v. FedEx Home Delivery*, 2013 WL 5434142 (D. Mass. Sept. 27, 2013)).
[49] *Id.* at *2.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Debnam*, 2013 WL 5434142, at *1.
[54] *Id.*

independent contractor' in a 'business-to-business relationship.' On the undisputed facts, he cannot, as a matter of law, be considered an "individual" within the meaning of § 148B."[55]

The same is true of Chantre and Chantre Delivery—the work performed under Chantre Delivery's Agreement with BTMI involved "far more than [Chantre's] personal services."[56] Chantre, through his business Chantre Delivery, simultaneously owned and operated multiple trucks, hired drivers and helpers to operate his business, and ran multiple trucks not only under its contract with BTMI, but also under contract with XPO. *SOF* ¶¶ 19–23, 26. And like the plaintiff in *Cook*, even though Chantre stopped personally transporting product under his company's Agreement with BTMI, Chantre Delivery *nevertheless continued to transport products* to fulfill its contract with BTMI. *SOF* ¶ 27.

The conclusion in *Cook* and *Debnam* that an individual contracting through a business entity may expediently disregard his corporate form and sue as an individual is not unique among state wage and hour laws[57] and should be followed here.

## 2.    Prong 1—Chantre was free from BTMI's direction and control

Even if Section 148B applied to Chantre Delivery's relationship with BTMI, the undisputed facts demonstrate Chantre was free from BTMI's direction and control. The Massachusetts Attorney General states that the direction and control inquiry under Prong 1 turns on whether the "worker's activities and duties [were] actually . . . carried out with minimal instruction. For example, an independent contractor completes the job using his or her own approach with little direction and

---

[55] *Id.*

[56] *Cook*, 2018 WL 1773742, at *2; *Debnam*, 2013 WL 5434142, at *1, *SOF* ¶¶ 19–23, 26–27.

[57] *Reyes v. XPO Last Mile, Inc.*, 2016 WL 4063454, at *3 (E.D. Pa. July 26, 2016) (excluding "individuals who were paid through corporate entities" from case because a corporate entity did not qualify as an "employee" under Pennsylvania's Wage Payment Collection Law, and plaintiffs "could not ignore that corporate entity's existence . . . and assert a claim directly against" the defendant); *Stellar Ins. Grp., Inc. v. Cent. Cos., LLC*, 2006 WL 2862218 (W.D.N.C. Sept. 12, 2006) (dismissing North Carolina age and Hour Act claim brought by business entity, reasoning that "a corporation cannot be an 'employee'"); *Tvedt v. Farmers Ins. Grp. of Cos.*, 91 P.3d 1, 278 (Mont. 2004) (rejecting individual's request for business expense reimbursement under Montana law because individual's business contracted with defendant and "[i]t is simply axiomatic that one corporation cannot be an employee of another").

dictates the hours that he or she will work on the job."[58] Here, Chantre operated Chantre Delivery with no direction from BTMI and chose to work when, where, and how he wanted, both under the terms of the Agreement he signed on behalf of Chantre Delivery and in fact. *SOF* ¶¶ 28, 30–33, 35–36.

### a.   The Agreement between Chantre Delivery and BTMI evidences absence of control

Under the terms of the Agreement, Chantre Delivery retained absolute latitude, within the confines of federal law, to run his business as he saw fit. *SOF* ¶¶ 28, 30–33, 35–36.[59]

By signing the Agreement, Chantre acknowledged that Chantre Delivery's relationship with BTMI was that of an independent contractor and *not* an employee, and that Chantre was entitled to "exercise the discretion and judgment of an independent contractor in determining the manner and means of performing its obligations under [the] Agreement. . . ." *SOF* ¶ 36. Chantre Delivery's Agreement is nonexclusive and Chantre Delivery used its equipment "for the provision of services to shippers, brokers, and other [Chantre Delivery] clients not customers of [BTMI] without the need to obtain any consent from [BTMI]. . . ." *SOF* ¶ 30. Under the Agreement, Chantre Delivery is:

- responsible for providing employee drivers and ensuring all of its drivers meet safety standards in compliance with all laws;
- solely responsible for providing, equipping, maintaining, and covering all expenses associated with equipment used under the Agreement;
- solely responsible for maintaining necessary insurance coverages to insure against business losses, including, but not limited to, statutory workers' compensation coverage for its employees; and
- able to terminate the agreement upon ten days' written notice.

*SOF* ¶ 67.

---

[58] *Sebago v. Boston Cab Dispatch, Inc.*, 28 N.E.3d 1139, 1149 (Mass. 2015) (citing Advisory 2008/1, An Advisory from the Attorney General's Fair Labor Division in Mass. Gen. Laws ch. 149, § 148B); *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104 (D. Mass. 2015) ("Although an employment agreement can be instructive, the crux of the inquiry is in the *actual* relationship between the parties, and whether the plaintiff performs his work in fact 'with minimal instruction.'" (emphasis in original)).

[59] Such minimum qualification standards for motor carriers that brokers contract with are standard in the industry given rampant negligent hiring claims brought against brokers despite such claims ostensibly being FAAAA preempted. *E.g.*, Robert D. Moseley, Jr. & C. Fredric Marcinak, *Federal Preemption in Motor Carrier Selection Cases Against Shippers and Brokers*, 39 Transp. L.J. 77 (2012).

The record is devoid of any evidence of control indicative of an employment relationship.[60]

That the Agreement requires Chantre Delivery to satisfy customer requirements does nothing to alter this outcome. *SOF* ¶ 15.[61] As Professor Hubbard observed, many requirements that Plaintiffs identify as indicative of control—making deliveries pursuant to daily manifests and within certain delivery windows, logging the completion of deliveries, or having a truck that meets certain specifications[62]—constrain BTMI in "how it supplies services to Innovel" and in its selection of motor carriers that can meet Innovel's requirements. *SOF* ¶ 15. But a broker's selection of motor carriers that will meet those customer requirements does not support an employment finding.[63]

Suggesting that to provide services as an independent contractor the motor carrier must be free to perform deliveries when it chooses—whether that be at midnight, 3 a.m., or the next week—and not provide progress updates on the contracted for work demonstrates the inanity of concluding otherwise. No body of law suggests, let alone holds, that independent contractors are only rendered independent if they are unburdened by an obligation to perform their promise of service.

### b.    BTMI did not control Chantre Delivery's business

Chantre was also *in fact* free from such direction and control. The Massachusetts Attorney General advises that "[t]o be free from an employer's direction and control, a worker's activities and duties

---

[60] *Ruggiero*, 137 F. Supp. 3d at 117.

[61] *See Jan-Pro Franchising Int'l, Inc. v. Depianti*, 712 S.E.2d 648, 651 (Ga. Ct. App. 2011) ("Because some form of control—by a client or otherwise—is inherent in the performance of every service, such a strict reading of the [Massachusetts Independent Contractor] statute would yield the absurd result that every worker is an employee, no matter who exerts the control."); *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 39 F. Supp. 3d 112, 125–26 (D. Mass. 2014) (adopting Georgia court's ruling on federal claim preclusion grounds and noting that "*Depianti Georgia* appears to be consistent with Massachusetts law."), *aff'd* 2017 WL 4324323 (1st Cir. Sept. 29, 2017).

[62] Amended Compl. ¶ 12.

[63] *Layton v. DHL Express (USA), Inc.I*, 686 F.3d 1172, 1178 (11th Cir. 2012) (company's efforts to further the objectives of "having its packages delivered on time" and "serving its customers" may have "impacted Drivers' working conditions" but did not amount to "exert[ing] control as an employer would have"); *Penn v. Va. Int'l Terminals, Inc.*, 819 F. Supp. 514, 524–25 (E.D. Va. Apr. 12, 1993) (a delivery company could "hardly serve its customers' needs if this was left to the discretion of its drivers. If a shipper requested, say, a parcel delivery service, to pick up a package for delivery across the country the next day before a certain time, it could not be seriously argued that the delivery service became the employee of the shipper. Nor would that change if the shipper directed the delivery service to notify the consignee before making the delivery.").

should actually be carried out with minimal instruction."[64] Chantre did just that; during the time he personally operated a truck delivering product under his company's contract with BTMI, Chantre updated the system after each delivery stop but would not talk to anyone during the day from BTMI unless there was a problem. *SOF ¶ 28.*

Further evidence of his freedom of control over his business includes the selection of trucks used to service the account. The truck he uses for his BTMI contract has his company's name, he retains the sole right to determine how to use his trucks, and BTMI has no say in whether and which loads Chantre Delivery elects to accept. *SOF ¶ 24, 32, 35.* An example the Massachusetts Attorney General gives regarding evidence of freedom from direction and control is "an independent contractor completes the job using his or her own approach with little direction and dictates the hours that he or she will work on the job."[65] Chantre did just that; his approach initially was to drive a truck servicing BTMI, but that approach changed when Chantre decided to stop servicing the BTMI account personally and have others do so, thereby reducing "the hours that he [worked] on the job" while ostensibly profiting off of the workers Chantre Delivery selected to continue servicing the BTMI Agreement. *SOF ¶¶ 25–27.*

### 3.    Prong 3—Chantre operated an independently established business

Prong 3 of Section 148B asks whether the worker is customarily engaged in an independently established trade, occupation, profession, or business. The critical inquiry under this prong is whether "the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services."[66]

The fact that Chantre Delivery had the opportunity to provide delivery services for a company

---

[64] Advisory 2008/1, Attorney General's Fair Labor and Business Division on Mass. Gen. Laws ch. 149, § 148B, at 3.
[65] *Id.*
[66] *Sebago v. Boston Cab Dispatch*, 28 N.E.3d 1139, 1153 (Mass. 2015) (quoting *Athol Daily News v. Bd. of Review of the Div. of Emp't & Training*, 786 N.E.2d 365, 373 (Mass. 2003)).

other than BTMI also satisfies Prong 3. *SOF* ¶¶ 30–31.[67] Indeed, Chantre Delivery continued to transport property for BTMI even after Chantre stopped providing those services personally. *SOF* ¶ 26–27. To reach a contrary conclusion would mean that Chantre's status, as either business owner or "misclassified employee," turns solely on whether *he decided* to personally perform services for BTMI. Reaching such a conclusion would lead to absurd results and would ignore the irrefutable truth on which the inquiry rests—when the *individual* who claims to be misclassified retains the *sole discretion* whether to personally perform the work at all, the alleged employer cannot be said to exert any "control" over that individual.

## CONCLUSION

For the reasons stated herein, BTMI respectfully requests that the Court rule as follows: (a) That Plaintiffs and other members of the certified class are not entitled as a matter of law to recover deductions taken by BTMI from settlement compensation; (b) That Plaintiffs and other members of the certified class are not entitled as a matter of law to recover nondeduction, out-of-pocket business expenses purportedly incurred for workers' compensation insurance and cargo insurance; and (c) That Mr. Humberto Chantre does not qualify as an "individual" subject to Section 148B of the Wage Act, and, even if considered an "individual" covered by the Wage Act, Mr. Chantre does not qualify as an employee under Section 148B.

---

[67] *Ruggiero v. Am. United Life Ins. Co.*, 137 F. Supp. 3d 104, 123 (D. Mass. 2015) ("The critical inquiry under this prong is whether 'the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.") (internal citation to *Sebago*, 28 N.E.3d at 1153); *see Cook v. Estes Express Lines, Corp.*, 2018 WL 1773742 (D. Mass. Apr. 12, 2018).

Dated: October 8, 2018                    Respectfully submitted,

                                          */s/ Andrew J. Butcher*_____
                                          Adam C. Smedstad, Admitted *Pro Hac Vice*
                                          asmedstad@scopelitis.com
                                          Andrew J. Butcher, Admitted *Pro Hac Vice*
                                          abutcher@scopelitis.com
                                          Scopelitis Garvin Light Hanson & Feary, P.C.
                                          30 W. Monroe Street, Suite 600
                                          Chicago, IL 60603
                                          Phone: (312) 255-7200

                                          Paul D. Root, Admitted *Pro Hac Vice*
                                          proot@scopelitis.com
                                          10 W. Market Street, Suite 1400
                                          Indianapolis, IN 46204
                                          Phone: (317) 637-1777

                                          Attorneys for Defendant
                                          Border Transfer of MA, Inc. and Patrick McCluskey

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and

paper copies will be sent to those indicated as non-registered participants on October 8, 2018.


*/s/ Andrew J. Butcher*
Andrew J. Butcher

4829-9606-2046, v. 19