**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

MARCOS DaSILVA and MATTEUS )
 FERREIRA, on behalf of themselves )
and all others similarly situated, )
  )
Plaintiffs, )
  )
v. )
  )
BORDER TRANSFER OF MA, INC. )
and PATRICK McCLUSKEY, )
  )
Defendants. )
_____)

Case No. 16-cv-11205-PBS

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiffs hereby respond, in Section I, to Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, and state in Section II, additional material facts, as follows. Plaintiffs are not, in the interest of not duplicative filings of matters contained in the record, resubmitting exhibits, all of which are contained within the record on Plaintiffs' motion for partial summary judgment or Defendants' motion.

## I.    DEFENDANTS' STATEMENT OF MATERIAL FACTS

### A.  BTMI's Operations

1.    BTMI is a federally registered property broker licensed by the Federal Motor Carrier Safety Administration that organizes and coordinates delivery services for its customers. Butcher Decl. ¶ 4, Ex. A (Border Transfer of MA, Inc. Property Broker Registration from U.S. Department of Transportation, Federal Motor Carrier Safety Administration); *see also* McCluskey Dep. 33:13-34:1; Hubbard Rep. ¶ 53.

**Plaintiffs' Response**: Disputed. BTMI is a delivery company that arranges for deliveries of Sears merchandise. See BTMI-Sears Contract. In an analogous case, Judge Douglas Woodlock

rejected the argument that a company like BTMI was a mere "property broker," instead holding that "3PD is clearly a delivery company." Martins v. 3PD, Inc., 2013 WL 1320454, at *14 (D. Mass. Mar. 28, 2013)

2.    One of BTMI's customers is Innovel Solutions, Inc. ("Innovel"). Butcher Decl. ¶ 4, Ex. B (attaching the Home Delivery & Shuttle Logistics Agreement between Innovel Solutions, Inc. and BTMI from January 1, 2017) ("Innovel Agreement"); McCluskey Dep. 18:2-18.

**Plaintiffs' Response**:  Admitted in part.  BTMI's contract is actually with Sears.  Innovel used to go by the name of Sears Logistics and is merely a subsidiary of Sears.

3.    Prior to signing the Innovel Agreement on or about January 1, 2017, BTMI operated pursuant to an agreement with Sears Logistics Services, Inc. Butcher Decl. ¶ 4, Ex. C (attaching the Home Delivery & Shuttle Logistics Agreement between Sears Logistics Services, Inc. and BTMI from April 27, 2014 ("Sears Logistics Services Agreement").

**Plaintiffs' Response**:  Admitted in part.  Innovel is merely a subsidiary of Sears.  BTMI has been providing delivery services for Sears.

4.    Innovel contracts with retailers such as Sears, Costco, BJ's and Amazon to consolidate orders the retailers have received for delivery and arranges the orders for delivery (and installation as needed) into routes according to the retail customer's delivering location and preferred time window. See Matos Dep. 40:5-13; Hubbard Rep. ¶¶ 14-17; McCluskey Decl. ¶¶ 2-3.

**Plaintiffs' Response**:  Admitted in part.  BTMI's contract is actually with Sears.  Innovel used to go by the name of Sears Logistics and is merely a subsidiary of Sears.

5.    In constructing the route schedule, Innovel takes into account various factors, including capacity of individual trucks, the volume and weight of items to be delivered, the location of deliveries, and the delivery window promised to the retailers' customer.  Hubbard Rep. ¶ 15.

**Plaintiffs' Response**:  Disputed in part.  Plaintiffs have moved to strike Thomas Hubbard's

report.  Furthermore, while Sears develops each manifest, a Border Transfer employee prints out the manifests for the day and assigns them to particular drivers every morning.  Matos Dep. at 18.

6.    Based on the routes Innovel organizes (sometimes with BTMI's input), BTMI brokers the product set for delivery to motor carriers that have the trucks and can organize teams to physically deliver and install retailers' goods. Matos Dep. 19:15-20:8; Hubbard Rep. ¶ 19; Butcher Decl. ¶ 4, Ex. D (attaching Contract Carrier Agreement in use from June 23, 2013, to approximately April 1, 2017, ¶¶ II.1 (Broker Services), II.6 (Labor)), Ex. E (attaching Contract Carrier Agreement in use from approximately April 1, 2017, to the present, ¶¶ 2 (Broker Services), 7 (Carrier's Personnel and Delivery Teams)).

**Plaintiffs' Response**:  Disputed in part.  Plaintiffs have moved to strike Thomas Hubbard's report.  Furthermore, while Sears develops each manifest, a Border Transfer employee prints out the manifests for the day and assigns them to particular drivers every morning.  Matos Dep. at 18. Furthermore, Border Transfer does not broker the product, but instead assigns routes to delivery drivers it has hired and controls.

7.    After the motor carriers have agreed to deliver these products, BTMI provides updates about the delivery status to Innovel and the customers who will take delivery. Butcher Decl. ¶ 4, Ex. B (Innovel Agreement, Exhibit A☐Operations and Responsibilities, Part II: Delivery Responsibilities, Section 1☐Basic Delivery Procedures, Paragraph G); Matos Dep. 62:8-64:7.

**Plaintiffs' Response**:  Disputed in part.  The delivery drivers are not motor carriers, but are employees of Border Transfer.

8.    BTMI can provide these updates on the deliveries completed based on information the motor carrier inputs into an application on departure from the retail customer's house. Matos Dep. 56:6-57:2.

**Plaintiffs' Response**:  Disputed in part.  The delivery drivers are not motor carriers, but are employees who are required to log deliveries pursuant to Border Transfer's

instruction.  Matos Dep. at 56..

9.    BTMI then coordinates the delivery process during the day through updates to Innovel about delivery status, with updates to the respective retailer's customers regarding anticipated delivery time along with any necessary delivery rescheduling, and logging information about delivery problems reported by the motor carrier. Matos Dep. 56:6-57:2, 62:8-64:7, 79:11:80-6, 80:18-81:10; Hubbard Rep. ¶ 22; Butcher Decl. ¶ 4, Ex. B (Innovel Agreement, Exhibit A – Operations and Responsibilities, Part II: Delivery Responsibilities, Section 1- Basic Delivery Procedures, Paragraph G).

**Plaintiffs' Response**:  Admitted.

10.   BTMI's communications with motor carrier owners or other company representatives are related to product or in-home damage claims, problems with a delivery (such as Innovel's customer rejecting the delivery or not being home to accept the delivery), and delivery delays, all of which BTMI addresses with Innovel as required by the Innovel Agreement. Matos Dep. 63:15-64:3, 71:6-11, 81:4-10; Hubbard Rep. ¶ 22; Washington Decl. ¶ 7; Butcher Decl. ¶ 4, Ex. B.

**Plaintiffs' Response**:  Disputed in part.  BTMI is a delivery company and Plaintiffs are its delivery drivers.  BTMI fails to list all of the types of communications between the drivers and BTMI.  For example, BTMI requires drivers to attend morning meetings to discuss how to interact with customers and how to perform deliveries.  Matos Dep. 41.

11.   Terms of the relationship between BTMI and each motor carrier are set out in the Contract Carrier Agreements they sign. *See generally* Butcher Decl. ¶ 4, Ex. F (attaching the Contract Carrier Agreement Between BTMI and Chantre Delivery LLC ("Chantre Delivery Agreement")), Ex. G (attaching the Contract Carrier Agreement Between BTMI and Alpha Logistics Trucking LLC ("Alpha Logistics Trucking Agreement")), Ex. H (attaching the Contract Carrier Agreement Between BTMI and Father & Son Transporting LLC ("Father & Son

Transporting Agreement")), Ex. D (attaching Contract Carrier Agreement in use during the June 23, 2013 to approximately April 1, 2017, time period), Ex. E (attaching Contract Carrier Agreement in use from approximately April 1, 2017 to the present).

**Plaintiffs' Response**:  Disputed.  The entire premise of this statement is false.  Plaintiffs allege that they are misclassified as independent contractors.  Therefore, the terms of the relationship between BTMI and the contractors was governed by the Massachusetts Wage Act.

12.   Alpha Logistics Trucking LLC possessed the federal motor carrier authority needed to transport interstate freight. DaSilva Dep. 22:19-23:14; Butcher Decl. ¶ 4, Ex. G (Alpha Logistics Trucking Agreement, Recitals, Paragraph C), Ex. I (attaching printout of Alpha Logistics Trucking LLC's registration with the FMCSA as a motor carrier).

**Plaintiffs' Response**:  Disputed in part.  Plaintiffs allege that Marcos DaSilva, who contracted with BTMI under the name Alpha Logistics, is an employee of BTMI under the Massachusetts Wage Act.

13.   Father & Son Transporting LLC possessed the federal motor carrier authority needed to transport interstate freight. Ferreira Dep. 54:10-23; Butcher Decl. ¶ 4, Ex. H (Father & Son Transporting Agreement, Recitals, Paragraph C); Butcher Decl. ¶ 4, Ex. J (attaching printout of Father & Son Transporting LLC's registration with the FMCSA as a motor carrier).

**Plaintiffs' Response**:  Disputed in part.  Plaintiffs allege that Marcos DaSilva, who contracted with BTMI under the name Alpha Logistics, is an employee of BTMI under the Massachusetts Wage Act.

14.   Terms of the relationship between Innovel and BTMI are contained in the Home Delivery & Shuttle Logistics Agreement they sign. *See generally* Butcher Decl. ¶ 4, Ex. B (Innovel Agreement).

**Plaintiffs' Response**:  Disputed in part.  BTMI's relationship is with Sears, which Innovel is a mere subsidiary of.

15.    Certain requirements such as wearing uniforms, having certain forms of identification, making deliveries pursuant to daily manifests and within certain delivery windows, logging the completion of deliveries, attending "stand-up meetings," or having a truck that meets certain specifications are Innovel requirements, and BTMI is contractually required to provide Innovel with services consistent with these terms. Butcher Decl. ¶ 4, Ex. B (Innovel Agreement, Exhibit A, Operations and Responsibilities, Part II; Hubbard Rep. ¶ 42.

**Plaintiffs' Response**:  Disputed in part.  Plaintiffs have moved to strike the report of Thomas Hubbard.  Furthermore, Border Transfer exercise substantial control over its drivers, and it is no defense that some of that control is at the insistence of Sears.  Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1316 (11th Cir. 2013) ("inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control") (emphasis added).

### B.   Humberto Chantre

16.    Humberto Chantre first worked for a company called Father & Son Moving, LLC, but then decided he wanted to start his own trucking business. Chantre Decl. ¶ 3.

**Plaintiffs' Response**:  Disputed in part.  Chantre worked for BTMI, which had final approval over Chantre's hiring and controlled nearly all aspect of Chantre's work.  Matos Dep. 38-39; Ferreira Decl., ¶ 11; DaSilva Decl., ¶ 12.

17.    Chantre formed Chantre Delivery LLC in 2013, and obtained the federal motor carrier operating authority needed to transport interstate freight. Chantre Decl. ¶ 2; Butcher Decl. ¶ 4, Ex. F (Chantre Delivery Agreement, Recitals, Paragraph C); Butcher Decl. ¶ 4, Ex. S (attaching Certificate of Organization filed April 2, 2013, for Chantre Delivery LLC); Butcher Decl. ¶ 4, Ex. K (attaching printout of Chantre Delivery LLC's registration with the FMCSA as a motor carrier).

**Plaintiffs' Response**:  Disputed in part.  BTMI required all contractors to form a corporate entity prior to entering into a contract with BTMI.  Matos Dep. 31-33; Carrier File Requirements;

DaSilva CCA ¶ 6(C); Ferreira CCA ¶ 6(C).

18.   Chantre Delivery LLC entered into a Contract Carrier Agreement with BTMI on May 13, 2013. Chantre Decl. ¶ 2; Butcher Decl. ¶ 4, Ex. F (Chantre Delivery Agreement at 3).

**Plaintiffs' Response**:  Admission with qualification.  Mr. Chantre entered into a contract with BTMI as the owner of Chantre Delivery LLC.  Chantre CCA at p. 14 (ECF No. 110-6).  Mr. Chantre was required to form Chantre Delivery by BTMI.  Matos Dep. 31-33; Carrier File Requirements; DaSilva CCA ¶ 6(C); Ferreira CCA ¶ 6(C).  Moreover, Chante formed Chantre Delivery LLC solely "in order to begin contracting with BTMI."  Chantre Decl. at ¶ 2

19.   As of May 3, 2017, Chantre Delivery ran three trucks. Chantre Decl. ¶ 4.

**Plaintiffs' Response**:  Admitted.

20.   Chantre Delivery used one to three trucks to deliver property brokered by BTMI. Chantre Decl. ¶ 4.

**Plaintiffs' Response**:  Admitted in part.  BTMI did not broker property to its delivery drivers, but rather assigned them routes each day.  Rather, BTMI's contract with Sears expressly states "Neither [Border Transfer] nor [the contractor-drivers] has any right, title, interest, or claim in Merchandise transported under this Agreement."  SLS-BTMI Agreement at ¶ 14.

21.   Chantre deploys Chantre Delivery's two remaining trucks to provide delivery services for XPO, a competitor of BTMI. Chantre Decl. ¶ 4.

**Plaintiffs' Response**:  Admitted.

22.   Chantre owns all three of the trucks and switches them between his XPO and BTMI contracts. Chantre Decl. ¶ 4.

**Plaintiffs' Response**:  Admitted.

23.   If Chantre needs additional capacity to make deliveries his company accepts from BTMI, he uses two trucks for the BTMI contract and one truck for the XPO contract. Chantre Decl. ¶ 4.

**Plaintiffs' Response**:  Admitted in part.  BTMI assigns the routes, and in doing so, dictates how many trucks Chantre must use to satisfy BTMI's demand.  Matos Dep. 18-19, 21; Ferreira Dep. 75; Sample Manifests.

24.  The truck Chantre Delivery uses for its business with BTMI has Chantre's company's name on it rather than BTMI's. Chantre Decl. ¶ 7.

**Plaintiffs' Response**:  Admitted with qualification.  Border Transfer also retains the right to require that contractors display Sears signage on their trucks.  SLS-BTMI Contract at p. 5-6. Furthermore, Border Transfer cannot permit contractors to display their own logos without Sears' authorization.  Id.

25.  Chantre personally drives a truck for his company's operations under the XPO contract. Chantre Decl. ¶ 5.

**Plaintiffs' Response**:  Admitted with qualification.  A review of BTMI's records shows that Chantre personally performed delivery services for BTMI from approximately June 2013 to February 2016.  Supp. Shuford Decl. at ¶ 11.

26.  Chantre hires a driver and helper for the trucks Chantre Delivery uses to transport BTMI-brokered product. Chantre Decl. ¶ 5.

**Plaintiffs' Response**:  Denied in part.  While Chantre does not currently perform deliveries for BTMI, any secondary driver or helper used under his contract must be approved by BTMI and BTMI may refuse to allow a secondary driver or helper to delivery Sears' merchandise. DaSilva CCA ¶ 6(E); Ferreira CCA ¶ 6(E); Daniel Lopes CCA ¶ 7.5; Matos Dep. 54

27.  Chantre estimates that he had not personally driven one of Chantre Delivery's trucks for the BTMI contract for about eighteen months prior to May 3, 2017, and instead drove one of Chantre Delivery's trucks for the XPO contract during that time. Chantre Decl. ¶ 5.

**Plaintiffs' Response**:  Admitted in part.  A review of BTMI's documents shows that

Chantre did not drive a truck after February 2016, approximately 15 months prior to signing his declaration.  Supp. Shuford Decl. at ¶ 11.

28.  When driving a truck under his BTMI contract, Chantre updated a portable system after each delivery stop but would not talk to anyone during the day from BTMI unless there was a problem. Chantre Decl. ¶ 6.

**Plaintiffs' Response**:  Admitted.

29.  Chantre Delivery accepted property from BTMI pursuant to bills of lading. Matos Dep. 87:8-90:7; McCluskey Dep. 30:22-31:6.

**Plaintiffs' Response**:  Disputed.  Contractors such as Mr. Chantre had no property interest in the merchandise they delivered.  SLS-BTMI Agreement at ¶ 14.  Moreover, the bills of lading were assigned to specific delivery drivers, not the contractor.  Matos Dep. 99-100.

30. The Chantre Delivery Agreement is a nonexclusive agreement, meaning Chantre Delivery is free to use its equipment "for the provision of services to shippers, brokers, and other [Chantre Delivery] clients not customers of [BTMI] without the need to obtain any consent from [BTMI] . . . ." Butcher Decl. ¶ 4, Ex. F (Chantre Delivery Agreement, § II.3.A).

**Plaintiffs' Response**:  Disputed.   The fundamental premise of this statement is false. Plaintiffs claim that the individuals who personally provided delivery services for BTMI were its employees, regardless of how BTMI decided to couch its relationship with the drivers.  No plaintiff, including Mr. Chantre, is able to personally perform deliveries for BTMI and any other delivery company at the same time.  Sears prohibits BTMI from allowing drivers to co-load any non-Sears merchandise on their trucks while performing deliveries for Sears.  SLS-BTMI Contract at p. 8, ¶ 15 (BTM000548); Innovel-BTMI Contract at p. 8, ¶ 15 (BTM000597).  Because the delivery drivers worked full-time for Border Transfer and could not "co-load" their trucks with any other store's merchandise, Border Transfer made it impossible to perform deliveries for anyone else.  See Second Decl. of DaSilva at ¶ 12; Ferreira Decl. at ¶ 4; Alvarez Decl. at ¶ 4; Zuniga Decl. at ¶ 4-5.  Thus, as

a practical matter, individuals who were personally providing delivery services to BTMI did so on an exclusive basis.

31.  Chantre Delivery hauled freight for other transportation companies while it delivered property for BTMI. Chantre Decl. ¶ 4.

**Plaintiffs' Response**:  Disputed in part.  While Chantre personally performed delivery services for BTMI, he did so on an exclusive, full-time basis.  Supp. Shuford Decl. at ¶ 11.

32.  Chantre always had the option to either accept or turn down work offered to him. Chantre Decl. ¶ 10.

**Plaintiffs' Response**:  Disputed.  Chantre states in his declaration that he was permitted to refuse additional work beyond what was assigned to hi, on a given day.  Chantre Decl. ¶ 10.

33.  Chantre negotiated at times with BTMI about adding stops to routes that had already been accepted by Chantre Delivery. Chantre Decl. ¶ 10.

**Plaintiffs' Response**:  Admitted.

34.  When BTMI would ask Chantre Delivery to take on extra stops, Chantre would accept additional stops for the route if he could come to an agreement with BTMI on the extra stop pay his company would receive, and he would turn down the delivery if no agreement on the financial terms was reached. Chantre Decl. ¶ 10.

**Plaintiffs' Response**:  Disputed in part.  As Chantre's declaration states, BTMI would speak with Mr. Chantre individually about additional work.  Chantre Decl. ¶ 10.

35.  The Chantre Delivery Agreement provided Chantre Delivery "exclusive control and direction of the persons operating and/or loading the Equipment or otherwise engaged in such transportation services." Butcher Decl. ¶ 4, Ex. F (Chantre Delivery Agreement, § II.8).

**Plaintiffs' Response**:  Disputed in part.  While the agreement states what BTMI claims it does, the rest of the agreement calls for the contractor to work subject to BTMI substantial control.

Among other things, the agreement requires contractors to perform deliveries pursuant to BTMI's instructions, to meet Sears' strict demands for timely deliveries, to obtain BTMI's approval for any helpers the contractors wants to use, to attend daily standup meetings and to wear a uniform designated by BTMI.  <u>See</u>, <u>e.g.</u>, DaSilva CCA ¶¶ 6(E), 19, Appendix B; Ferreira CCA ¶¶ 6(E), 19, Appendix B

36.  The Chantre Delivery Agreement contains a provision under which Chantre acknowledges that Chantre Delivery's relationship with BTMI was that of an independent contractor and *not* an employee, and that Chantre is entitled to "exercise the discretion and judgment of an independent contractor in determining the manner and means of performing its obligations under [the] Agreement . . . ." Butcher Decl. ¶ 4, Ex. F (Chantre Delivery Agreement, § II.8).

**Plaintiffs' Response**:  Disputed in part.  While the agreement says what BTMI claims it says, in reality, Plaintiffs work exclusively for BTMI subject to substantial control and are employees under the Massachusetts Wage Act. See response to No. 35.

### C.  Plaintiffs' Motor Carrier Business Expenses and Settlement Deductions

37.  The Contract Carrier Agreement makes the motor carrier responsible for its business expenses and authorizes deductions from compensation. Butcher Decl. ¶ 4, Ex. G (Alpha Logistics Trucking Agreement, §§ II.3.B, IV), Ex. H (Father & Son Transporting Agreement, §§ II.3.B, IV).

**Plaintiffs' Response**:  Disputed in part.  As discussed above, the individual Plaintiffs are not motor carriers, but are employees of BTMI.  Furthermore, worker's compensation insurance and cargo insurance are not mere business expenses, rather BTMI requires Plaintiffs to pay for insurance to protect itself against future damages, which as discussed in Plaintiffs' briefing, violates the Wage Act.  Moreover, Massachusetts requires employers to provide employees with worker's compensation.

38.   The Agreement terms provide that motor carriers must maintain "all required worker's compensation policies." Butcher Decl. ¶ 4, Ex. G (Alpha Logistics Trucking Agreement, § II.11.E), Ex. H (Father & Son Transporting Agreement, § II.11.E).

**Plaintiffs' Response**:  Disputed in part.  As discussed above, the individual Plaintiffs are not motor carriers, but are employees of BTMI.

39.   Plaintiff DaSilva signed an Agreement with BTMI on behalf of his company Alpha Logistics Trucking LLC. Butcher Decl. ¶ 4, Ex. G (Alpha Logistics Trucking Agreement at 8); DaSilva Dep. 24:22-25:6.

**Plaintiffs' Response**:  Admitted.

40.   Plaintiff Ferrieira did not sign or otherwise enter an Agreement with BTMI; rather, Ferreira's father signed an Agreement with BTMI on behalf of Father & Son Transporting LLC, a company Ferreira and his father own. Butcher Decl. ¶ 4, Ex. H (Father & Son Transporting Agreement at 12 (signature page)); Ferreira Dep. 30:16-19, 33:25-34:5.

**Plaintiffs' Response**:  Admitted.

41.   Plaintiffs are requesting reimbursement of two categories of business expenses they allegedly incurred: (1) payments for workers' compensation premiums, and (2) payments for cargo insurance. Butcher Decl. ¶ 4, Ex. L (attaching Plaintiff Marcos DaSilva's Responses to Defendant's First Set of Interrogatories ("DaSilva Interrogatories"), at 7; Butcher Decl. ¶ 4, Ex. M (attaching Plaintiff Matteus Ferreira's Responses to Defendant's First Set of Interrogatories ("Ferreira Interrogatories"), at 7).

**Plaintiffs' Response**:  Disputed in part.  Plaintiffs seek worker's compensation and cargo insurance premiums that they were required to pay by BTMI, but these were not business expenses, but amounts that as an employer BTMI was required to pay.

42.   Plaintiffs are seeking recovery of deductions taken from settlements paid to Father & Son Transporting LLC (Ferreira's father's company) and Alpha Logistics Trucking LLC

(DaSilva's company) that Plaintiffs place in five categories: (1) noncompliance, (2) uniforms; (3) damage claims, (4) unfinished deliveries, and (5) performance bonds. Butcher Decl. ¶ 4, Ex. L (DaSilva Interrogatories at 6–7); Butcher Decl. ¶ 4, Ex. M (Ferreira Interrogatories at 6–7).

**Plaintiffs' Response**:  Admitted.

43.  These are the same reimbursement and deduction expenses Plaintiffs seek on behalf of other class members. Butcher Decl. ¶ 4, Ex. L (DaSilva Interrogatories at 7); Butcher Decl. ¶ 4, Ex. M (Ferreira Interrogatories at 7).

**Plaintiffs' Response**:  Admitted.

44.  Plaintiffs identify "unfinished deliveries" as those adjustments on a motor-carrier settlement labeled as either "N/B," or "No Bill." *See* Memorandum in Support of Plaintiffs' Motion for Class Certification, ECF No. 74, at 21.

**Plaintiffs' Response**:  Admitted with clarification.  Plaintiffs and the class members are not motor carriers, but are employees of BTMI under the Wage Act.

45.  "No Bill" or "N/B" adjustments—which are one in the same—arise in two situations: (1) when a delivery is removed from a manifest before any work is done on that delivery, in which case the No Bill reflects an adjustment on the settlement statement to reflect the delivery that was scheduled but did not occur (in other words, BTMI's accounting software pays the Motor-Carrier Owner for the delivery even though no work was done, but then deducts that payment as a "No Bill" deduction to zero out the Motor-Carrier Owner for the delivery), or (2) when a Motor-Carrier Owner's business loads the delivery on a truck, but does not complete the delivery because the customer is not home, the customer rejects the shipment, or the Motor-Carrier Owner's business delivered the product but, for example, did not hook it up properly, in which case the Motor-Carrier Owner whose business actually completes the delivery will end up getting paid on it. McCluskey Decl. ¶ 4.

**Plaintiffs' Response**:  Admitted.

46. Damage claims are settlement deductions made from amounts paid to motor carriers for damage to the brokered property in transit, damage to a retailer's customer's home resulting from the delivery process, or both. Butcher Decl. ¶ 4, Ex. G (Alpha Logistics Trucking Agreement, Appendix B, Claims Handling Procedures, Paragraphs 2.A. (Merchandise Claims), 2.B. (Damage to Customer's Property)); Butcher Decl. ¶ 4, Ex. H (Father & Son Transporting Agreement, Appendix B, Claims Handling Procedures, Paragraphs 2.A. (Merchandise Claims), 2.B. (Damage to Customer's Property)); Matos Dep. 71:6-14, 73:2-13, 120:3-24.

**Plaintiffs' Response**:  Disputed in part.   BTMI makes deductions from its driver's compensation for damage to Sears merchandise.

47. DaSilva testified that Alpha Logistics Trucking LLC paid damage claims. DaSilva Dep. 38:6-12, 67:17-23.

**Plaintiffs' Response**:  Disputed.  DaSilva testified that BTMI deducted damage clais from his pay and that he did not deduct any pay from his helper from that happened.  DaSilva Dep. at 67.

48. Deductions for damage claims were paid by Father & Son Transporting LLC, and those expenses were then passed along by Father & Son Transporting LLC to its own workers. Ferreira Dep. 142:19-143:16.

**Plaintiffs' Response**:  Disputed.  BTMI deducted damage claims from the compensation paid to Ferreira for the services he personally provided.  Matos Dep. 120; Sample Property Damage Claim Form.

49. DaSilva asserts Alpha Logistics Trucking LLC purchased a workers' compensation policy. DaSilva Dep. 74:3-18.

**Plaintiffs' Response**:  Admitted.

50. DaSilva has not produced copies of any workers' compensation policies purchased by his company, Alpha Logistics Trucking LLC. Butcher Decl. ¶ 2.

**Plaintiffs' Response**:  Admitted.

51.   Financial disclosures for Alpha Logistics Trucking LLC, do not reflect that a workers' compensation policy was ever purchased. Butcher Decl. ¶ 4, Ex. N (attaching Alpha Logistics Trucking LLC, 2016 Annual Report).

**Plaintiffs' Response**:  Admitted.

52.   Ferreira asserts Father & Son Transporting LLC purchased a workers' compensation policy. Ferreira Dep. 123:5-7.

**Plaintiffs' Response**:  Admitted.

53.   Ferreira has not produced copies of any workers' compensation policies Father & Son Transporting LLC purchased. Butcher Decl. ¶ 3.

**Plaintiffs' Response**:  Disputed.  Plaintiffs produced copies of worker's compensation policies purchased by Ferreira on behalf of Father & Son's.  See, e.g., Bates Nos. FERR008361-62 (attached to Weber Decl. at Ex. CC).

54.   Ferreira is part-owner of Father & Son Transporting LLC. Ferreira Dep. 22:23-23:1; Butcher Decl. ¶ 4, Ex. O (attaching Schedule K-1 Tax Form for Matteus Ferreira).

**Plaintiffs' Response**:  Father & Son no longer operates and did not contract to provide any delivery services after Mr. Ferreira stopped performing deliveries for BTMI.  Ferreria Dep. at 38.

55.   Ferreira's father, the other owner of Father & Son Transporting LLC, entered into the Agreement with BTMI on Father & Son Transporting LLC's behalf. Butcher Decl. ¶ 4, Ex. H (Father & Son Transporting Agreement at 12 (signature page)); Ferreira Dep. 30:16-19.

**Plaintiffs' Response**:  Admitted in part.  Matteus' father signed the agreement, but Matteus personally provided delivery services as a driver for BTMI on a full-time basis.  Ferreira Dep. at 32; Ferreira Decl. at ¶ 2.

56.   Ferreira did not sign a Contract Carrier Agreement with BTMI either individually or on behalf of Father & Son Transporting LLC. Butcher Decl. ¶ 4, Ex. H (Father & Son Transporting

Agreement at 12 (signature page)); Ferreira Dep. 30:16-19, 33:25-34:5.

**Plaintiffs' Response**:  Admitted with clarification.  Matteus Ferreira's father signed the agreement for his son.

57.  Plaintiffs have represented that they have completed discovery. Butcher Decl. ¶ 4, Ex. P (attaching transcript from Motion Hearing, DaSilva v. Border Transfer of Ma, Inc., September 20, 2017, at 3:24-4:4).

**Plaintiffs' Response**:  Disputed.  Plaintiffs have served their discovery on BTMI, but as BTMI has acknowledged, it has a duty to supplement its discovery following this Court's order granting class certification.

58.  Settlement payments to Father & Son Transporting LLC were deposited into a Father & Son Transporting LLC bank account separate from Ferreira's personal account. Ferreira Dep. 36:13-24.

**Plaintiffs' Response**:  Admitted.

59.  Settlement payments to Alpha Logistics Trucking LLC were deposited into an Alpha Logistics Trucking LLC bank account separate from DaSilva's personal account. DaSilva Dep. 35:21-36:8.

**Plaintiffs' Response**:  Admitted.

60.  Father & Son Transporting LLC reported its income on Form 1065 federal tax filings. Butcher Decl. ¶ 4, Ex. Q (attaching Form 1065 U.S. Return of Partnership Income for Father & Son Transporting LLC).

**Plaintiffs' Response**:  Admitted with clarification.  Matteus Ferreira was required to incorporate in order to work for BTMI and all of his income came from BTMI.  Ferreira Decl. at ¶ 5.

61.    Alpha Logistics Trucking LLC was formed October 9, 2014. Butcher Decl. ¶ 4, Ex. R

(attaching Certificate of Organization for Alpha Logistics Trucking LLC).

**Plaintiffs' Response**:  Admitted with clarification.  Alpha Logistics was formed by a BTMI manager so that DaSilva could work for BTMI.  Matos Dep. 31; DaSilva Dep. Tr. at p. 20, 24; DaSilva Decl. at ¶ 4.

62.  At the time of formation, Alpha Logistics Trucking listed the general character of the business as "APPLIANCE DELIVERY," the Resident Agent as Marcos Da Silva, the Manager as Marcos DaSilva, and the individual authorized to execute documents to be filed with the Corporations Division as Marcos Da Silva. Id.

**Plaintiffs' Response**:  Admitted.

63.  Alpha Logistics Trucking LLC's Annual Report for filing year 2015 listed the general character of its business as "CARS DELIVERY," the Resident Agent as Marcos Da Silva, the Manager as Macelo Junior Coelho, and the individual authorized to execute documents to be filed with the Corporations Division as Macelo Junior Coelho. Butcher Decl. ¶ 4, Ex. T (attaching Alpha Logistics Trucking LLC's Annual Report for filing year 2015).

**Plaintiffs' Response**:  Admitted.

64.  Alpha Logistics Trucking LLC changed the Resident Agent from Marcos Da Silva to Macelo Junior Coelho on May 10, 2016. Butcher Decl. ¶ 4, Ex. T (attaching Alpha Logistics Trucking LLC's Annual Report for filing year 2015), Ex. U (attaching Alpha Logistics Trucking LLC Statement of Change of Resident Agent/Resident Office filed May 10, 2016).

**Plaintiffs' Response**:  Admitted.

65.  Plaintiffs have not produced damage calculations as required by Rule 26(a)(1)(A)(iii) despite follow-up requests. Butcher Decl. ¶ 4, Ex. DD, ¶ 5.

**Plaintiffs' Response**:  Disputed.  Plaintiffs have provided damage calculations for the named Plaintiffs and have provided Defendants with the categories of damages they seek, which

are all in the possession of or known to Defendants.

66.  The various Agreements used during the class period predicate payment on the completion of the delivery. Butcher Decl. ¶ 4, Ex. D (attaching Contract Carrier Agreement in use from June 23, 2013, to approximately April 1, 2017, ¶ IV.A (Payment)), Ex. E (attaching Contract Carrier Agreement in use from approximately April 1, 2017, to the present, ¶ 5.1 (Rates, Charges and Payment to Carrier)).

**Plaintiffs' Response**:  Disputed.  BTMI actually pays contractors for deliveries that made, but that require a return visit due to a bad fit.  Matos Dep. 124.

67.  The Chantre Delivery Agreement provides that Chantre Delivery LLC is responsible for providing employee drivers and ensuring all of its drivers meet safety standards in compliance with all laws; solely responsible for providing, equipping, maintaining, and covering all expenses associated with equipment used under the Agreement; solely responsible for maintaining necessary insurance coverages to insure against business losses, including, but not limited to, statutory workers' compensation coverage for its employees; and able to terminate the agreement upon ten days' written notice. Butcher Decl. ¶ 4, Ex. F (Chantre Delivery Agreement, §§ 3 (Equipment & Supplies), 5 (Term), 6 (Labor), 11 (Insurance)).

**Plaintiffs' Response**:  Disputed in part.  While the agreement says what BTMI claims it does, in reality, BTMI exercises substantial control over so-called secondary drivers and helpers. The contract requires all secondary drivers and helpers to pass background checks and Border Transfer retains the right to prohibit any secondary driver or helper from making Sears deliveries. DaSilva CCA ¶ 6(E); Ferreira CCA ¶ 6(E); Daniel Lopes CCA ¶ 7.5.

## II.     PLAINTIFFS' COUNTERSTAMENT OF MATERIAL FACTS

1.      Plaintiffs incorporate herein the Statement of Material Facts being submitted in support of Plaintiffs' Motion for Partial Summary Judgment.

2.      Among these requirements, contractors must submit to a background check, obtain various kinds of insurance, and form a separate corporate entity.  Matos Dep. 31-33; Carrier File Requirements; DaSilva CCA ¶ 6(C); Ferreira CCA ¶ 6(C).

3.      Many of the class members did not have a corporate entity when they came to apply for a job with Border Transfer.  Matos Dep. 31; DaSilva Dep. Tr. at p. 20; Owusu-Ansah Decl. at ¶ 3; Zuniga Decl. at ¶ 3; Alvarez Decl. at ¶ 3; Ferreira Dep. 29.

4.      In fact, when Marcos DaSilva applied for a job, a Border Transfer manager named Damilton formed DaSilva's business entity himself by filling out the application online while DaSilva watched.  DaSilva Dep. 24; DaSilva Decl. at ¶ 4.

5.      A contractor who delivers an appliance is paid for that stop, even when a return visit is required due to, for example, there is a bad fit.  Matos Dep. 124.  The contractor sent for the return visit is generally different from the contractor who performed the initial delivery.  Matos Dep. 124-25.  In that case, both contractors are paid for the stop.  Id.

6.      Deductions for rescheduled deliveries or deliveries that were made, but require a return visit, are listed as "no bill" or "N/B" deductions.  Matos Dep 127; DaSilva Pay Statements.

7.      BTMI pays contractors a flat rate "per stop."  See, e.g., Ferreira CCA at Appendix C.

8.      Based on BTMI's records, Humberto Chantre personally performed deliveries for BTMI on 597 days from July 23, 2013 to February 1, 2016,, after which he stopped personally performing delivery services for BTMI.  Suppl. Decl. of Rebecca Shuford at ¶ 11 (attached to Weber Decl. Z).  Based on the fact that there were 131 weeks during that time span, Chantre worked an average of 4.56 days per week for BTMI from July 23, 2013 to February 1, 2016.

DATED:  November 19, 2018

Respectfully Submitted,
MARCOS DaSILVA, et al., individually
and on behalf of all others similarly
situated,
By their attorneys,


  /s/ Harold L. Lichten
Harold L. Lichten BBO# 549689
Benjamin J. Weber BBO# 673736
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994 5800
hlichten@llrlaw.com
bjweber@llrlaw.com




**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 19, 2018, the foregoing document was filed

electronically through the ECF System and is available for viewing and downloading from the ECF

System, that it will be sent electronically to counsel of record identified as registered participants

on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-

registered participants.


/s/ Harold L. Lichten
Attorney for Plaintiffs