### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
MARCOS DaSILVA and MATTEUS              )
 FERREIRA, on behalf of themselves      )
and all others similarly situated,      )
                                        )
Plaintiffs,                             )          Case No. 16-cv-11205-PBS
                                        )
v.                                      )
                                        )
BORDER TRANSFER OF MA, INC.             )
and PATRICK MCCLUSKEY,                  )
                                        )
Defendants.                             )
_____)

### PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY

**I.      INTRODUCTION**

In this now certified class action seeking relief under the Massachusetts Wage Act, Plaintiffs performed delivery services  exclusively for Border Transfer on a full-time basis out of a Sears facility in Westwood, Massachusetts.  Plaintiffs in this case now move for partial summary judgment on the question of their employment status. The court has previously certified a class consisting of full-time delivery drivers for the Defendants.  Because it is evident from all the papers submitted with this motion, as well as with the motion for class certification, that Plaintiffs' class must be classified as employees under prongs A and C of the Massachusetts Wage Act, M.G.L. c. 149, § 148B, partial summary judgment in Plaintiffs' favor is appropriate.  Simply stated, Plaintiffs in this case, during the time that they delivered for Border Transfer, arrived at the same terminal early each morning, exclusively performed deliveries for Border Transfer's customers, according to rules and specifications imposed by Border Transfer, wearing uniforms required by Border Transfer, and being subject performance ratings kept by Border Transfer, Defendants cannot meet their burden of satisfying any of the prongs which the Wage Act imposes on companies seeking to classify its

workers as independent contractors.  Moreover, the fact alone that Plaintiffs were prohibited from

having any other cargo on their vehicles, or making any other deliveries for any other company,

proves as a matter of law, that Plaintiffs did not have an independently established trade or business,

and that they were working under the control of Border Transfer.  Accordingly, based upon the

undisputed record, and the many other decisions granting summary judgment to plaintiffs under

similar facts, Plaintiffs request this Court to hold as a matter of law, that Plaintiffs were employees

under their Massachusetts wage act claims, and reserving the issue of damages for trial.

Under the Wage Act, this Court must apply an "A-C" test, which presumes an individual is

an employee unless the employer can show both that:

> (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
>
> (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed. [1]

M.G.L. c. 149, § 148B(a); Somers v. Converged Access, Inc., 911 N.E.2d 739, 747 (Mass.2009).  If

the employer fails to meet its burden of proof on either of these factors, the worker is an employee

entitled to the protection of the Wage Act.  Chambers v. RDI Logistics, Inc., 476 Mass. 95, 104

(2016) (A-C test for delivery drivers is "conjunctive"); Anderson v. Homedeliveryamerica.com, Inc.,

2013 WL 6860745, at *1 (D. Mass. Dec. 30, 2013) ("the burden is on HDA to establish each" prong

of the Wage Act).  "As such, for the defendants to defeat the presumption of employment, they must

prevail on both Prongs A and C. The plaintiffs can prevail by showing that either Prong A or C is not

---

[1]     The First Circuit, in Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 442 (1st Cir. 2016), held that the FAAAA preempted Prong B as applied to delivery drivers in Massachusetts.  As this Court and several others have held, Prongs A and C are not preempted and are enforceable for delivery drivers seeking relief under the Wage Act.  See Order dated Jan. 5, 2017 at p. 11-13 (ECF No. 49) (citing Chambers v. RDI Logistics, Inc., 2016 WL 7253568, at *7 (Mass. Dec. 16, 2016) ("Unlike prong two, there is nothing intrinsic to [Prongs 1 and 3] that prevents motor carriers from using independent contractors."); Khan v. E. Coast Critical, LLC, No. MICV 2015-2762-D (Mass. Sup. Ct. May 4, 2016), slip op. at 3 ("Prongs 1 and 3 of § 148B(a) on their face adopt wide-spread and apparently nationally uniform tests for determining the employer/employee relationship . . . .").

satisfied." Order dated Nov. 9, 2017 at p. 8 (ECF No. 95). Moreover, as this Court has already held, "Prong A itself contains a conjunctive test under which the plaintiffs need only prevail on one branch." Id. at p. 16. "Due to the conjunctive nature of this test, a company asserting that a worker is an independent contractor must show that the individual was free from its control both as a matter of contract and as a matter of fact." Id. Summary judgment in favor of Plaintiffs on their status as employees of Border Transfer is appropriate here because Border Transfer cannot meet its burden on either Prong A or C.

Finally, the Court should enter summary judgment in Plaintiffs' favor on the individual liability of Border Transfer' president and manager, Defendant Patrick McCluskey.

## II.    RELEVANT FACTUAL BACKGROUND

Plaintiffs have fully set forth the relevant undisputed facts in their accompanying statement of material facts. To briefly summarize, Sears operates a facility in Westwood, Massachusetts from which it delivers appliances and other items such as furniture to customers in Massachusetts. SOF, ¶ 1. To perform deliveries out the Westwood facility, Sears contracts with Border Transfer who provides the deliveries according to Sears' requirements. SOF, ¶ 2. Border Transfer is a Tennessee-based company that provides delivery services to Sears in Massachusetts, Ohio, and California. SOF, ¶ 3. Sears pays Border Transfer a set price per delivery, with an additional fixed amount per month and for fuel. SOF, ¶ 4. All of Border Transfer's income comes from the making of deliveries. SOF, ¶ 5. To manage deliveries out of the Westwood facility, Border Transfer maintains an office at the facility and employs two supervisors and four dispatchers to oversee the drivers. SOF, ¶6.

The named Plaintiffs, as well as the class members they represent, contracted with Border Transfer to perform delivery services out of the Westwood facility and personally performed delivery services on a full-time basis for extended periods from 2013 to the present  SOF, ¶ 7. All of the contractors working for Border Transfer execute identical delivery service contracts. SOF, ¶ 7.

3

Pursuant to the contracts, Plaintiffs and their helpers are required to wear a uniform, which included a shirt, pants, boots, jacket and hat.  SOF, ¶ 18-19.  Border Transfer inspects drivers and helpers to make sure they are wearing the uniform and will not permit them to leave the facility if they are not in compliance.  SOF, ¶ 20.  Border Transfer also requires its drivers to wear an armband with a photo ID.  SOF, ¶ 20.

Border Transfer requires that all secondary drivers and helpers utilized by a contractor be approved by Border Transfer.  SOF, ¶ 21-22.  Border Transfer retains the right to prohibit the use of a secondary driver or helper that it does not approve.  SOF, ¶ 22.  In fact, Border Transfer is obligated to retain that right pursuant to its contract with Sears.  SOF, ¶ 23.

Border Transfer requires contractors to obtain insurance, including general liability, umbrella, auto liability, cargo insurance, and worker's compensation at rates determined by Border Transfer.  SOF, ¶ 25-29.  In addition, Border Transfer requires that contractors list Border Transfer as an "additional insured" on their insurance policies and as a "loss payee" on their cargo insurance.  SOF, ¶ 30-31.

Border Transfer retains the right to terminate a contractor is they fail to perform deliveries pursuant to Border Transfer's instructions, or if the contractor changes its business structure (such as through corporate dissolution), without notifying Border Transfer 30 days prior to that happening.  SOF, ¶ 33.  Border Transfer may also terminate a contractor without cause.  SOF, ¶ 34.

Pursuant to their contracts, the drivers are required to attend daily stand-up meetings each morning at the Westwood facility.  SOF, ¶ 35-39.  At these meetings, drivers are instructed about new installation procedures, recent customer complaints, and drivers role play with Border Transfer and Sears managers regarding how to communicate with customers.  SOF, ¶ 36.  Border Transfer requires the drivers to follow detailed instructions about when and where to make deliveries.  SOF, ¶

40-46.  Furthermore, Border Transfer requires the contractors to make deliveries in 26-foot box trucks.  SOF, ¶ 47.

Border Transfer receives delivery routes from Sears and assigns the delivery routes to each individual driver,, in the morning.  SOF, ¶ 55-56.  Border Transfer determines the general area that drivers are assigned to.  SOF, ¶ 53.  Drivers are also provided with a Bill of Lading to complete at each stop and which tells the drivers which loading bay to report to.  SOF, ¶ 59.  The routes list deliveries in order and the deliveries must be performed within time windows designated on the manifest.  SOF, ¶ 55.  In addition to the instructions drivers have regarding performing deliveries and installations, manifests further include instructions from Sears based on customer requests.  SOF, ¶ 62.  Pursuant to their contracts, Border Transfer instructs that drivers are required to "meet [Sears'] strict demands for timely delivery of merchandise" by running "all delivery routes exactly as specified on the manifest."  SOF, ¶ 42.  Contractors are also provided with detailed instructions regarding how to make deliveries.  Drivers are told exactly how they must install appliances, electronics, and furniture.  SOF, ¶ 45.  For example, drivers are not permitted to remove moldings when trying to fit appliances through doorways.  SOF, ¶ 46.  Drivers are not permitted to enter a customer's home without an adult present.  SOF, ¶ 48.

Border Transfer keeps track of customer ratings for each individual driver.  SOF, ¶ 65-69.  Border Transfer uses the customer ratings to generate a Top Dog standings.  SOF, ¶ 66.  The top six drivers in the Top Dog standings can choose their own routes for the day.  SOF, ¶ 67.  The ratings are posted in the Border Transfer office at the Westwood facility.  SOF, ¶ 68.

Drivers are required to complete deliveries in the order they are listed in the manifest and within pre-set time windows.  SOF, ¶ 71-72. Drivers are required to call customers before they arrive.  SOF, ¶ 73.  Drivers must then log each delivery and Border Transfer tracks whether drivers make deliveries on time based on their assigned time windows.  SOF, ¶ 74-75.  If a driver is running late, a

Border Transfer dispatcher will call the customer and generate a report of the late delivery.  SOF, ¶ 76.  Drivers must obtain a signature from the customer for each delivery.  SOF, ¶ 77.  Drivers are also not permitted to present customers with a worn manifest for signature.  SOF, ¶ 79.

Drivers were not permitted to have any other store's merchandise in their trucks while making deliveries of Sears merchandise.  SOF, ¶ 80.  Indeed, Sears prohibits Border Transfer from permitted any contractor to "co-load" his truck with another store's merchandise while making deliveries.  SOF, ¶ 79.  Border Transfer personnel must give their approval before a driver can leave the dock.  SOF, ¶ 80.  Border Transfer assigns routes for its drivers that often average approximately 18-20 stops, require well over 100 miles of driving, and last over 10 hours a day.  SOF, ¶ 82-83.  Moreover, most contractors personally provide deliveries on a full-time basis, four to six days a week.  SOF, ¶ 88.  Thus, delivery drivers cannot perform deliveries for anyone else.  SOF, ¶ 85.  Indeed, for that reason, class members rely entirely on Border Transfer for their incomes.  SOF, ¶ 86.

Border Transfer requires each of the contractors to form a corporate entity and to contract with Border Transfer through that entity.  SOF, ¶ 12.  Many of Border Transfer's contractors did not have their own corporate entity prior to working for Border Transfer.  SOF, ¶ 13.  Such individuals would still be required to form a corporate entity.  SOF, ¶ 12-13.  In the case of named Plaintiff Marcos DaSilva, a Border Transfer manager formed the corporate entity for him in the Border Transfer office while DaSilva watched.  SOF, ¶ 14.  Border Transfer makes several recurring types of deductions from the pay of the contractors, including deductions for background checks, uniforms, performance deposits, unfinished deliveries, and damage claims related to damage to the merchandise being delivered and damage to the customers' property.  SOF, ¶ 91-105.

## III.    ARGUMENT

A.   **Plaintiffs Are Entitled to Summary Judgment on the Question of Their Employment Status.[2]**

For the purposes of this case, Border Transfer is presumed to employ each delivery contractor unless it can show that:

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. c. 149, § 148B(a).[3]  As this Court has already held, The test is conjunctive, therefore, "to rebut the presumption of employment, an employer must satisfy" both Prongs A and C.  DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 396–97 (D. Mass. 2017) (citing Chambers v. RDI Logistics, Inc., 476 Mass. 95, 65 N.E.3d 1, 8 (2016)).  Thus, "[t]he plaintiffs can prevail by showing that either Prong A or C is not satisfied."  Id.

Due to the prevalence of companies that misclassify workers particularly delivery drivers, there are now an abundance of court decisions holding that "contractors" like Plaintiffs, who are perform deliveries, are actually "employees" under the both Prongs A and C or that states equivalent provisions. .  See, e.g., Anderson, 2013 WL 6860745, at *2 (same); Amero v. Townsend Oil Co., 2008 WL 5609064, at *2 (Mass. Super. Dec. 3, 2008) (oil delivery drivers were employees where they were "required to deliver fuel oil to the customers [defendant] designated on the days [defendant] stipulated" and they "had no discretion regarding what price to charge…."); Oliveira v.

---

[2]      The standard for summary judgment is well-worn: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation."  Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir.2011) (citation omitted).

[3]      The First Circuit, in Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 442 (1st Cir. 2016), held that the FAAAA preempted Prong B as applied to delivery drivers in Massachusetts.

Advanced Delivery Sys., Inc., 2010 WL 4071360 (Mass. Super. Ct. July 16, 2010); Fucci v. Eastern Connection Operating, Inc., No. 08–2659, slip op. (Mass. Super .Ct. Sept. 21, 2009) (attached as Ex. A); Rainbow Development v. Com., 2005 WL 3543770 (Mass. Super. Ct. Nov. 17, 2005); Boston Bicycle Couriers v. Deputy Dir. of Div. of Employment and Training, 56 Mass. App. Ct. 473, 480 (2002); Driscoll v. Worcester Telegram and Gazette, 72 Mass. App. Ct. 709 (2008) (newspaper had sufficient control over delivery drivers where the drivers could be discharged because of customer complaints and  could not set the rates paid by the customers); Hargrove v. Sleepy's LLC, 2016 WL 8258865, at *1 (D.N.J. Oct. 26, 2016) (holding that delivery drivers were employees under all three prongs of the ABC test); Labor & Logistics Mgmt. v. Adm'r, Unemployment Comp. Act, 2012 WL 5205557 (Conn. Super. Ct. Oct. 3, 2012) (truck driver did not have independently established businesses under Connecticut "ABC" test); W. Ports Transp., Inc. v. Employment Sec. Dep't of State of Wash., 110 Wash. App. 440, 453, 41 P.3d 510, 517 (2002) (affirming finding that delivery driver was an employee under Washington unemployment law's ABC test).[4]

Plaintiffs anticipate that Border Transfer may first argue, even though this argument was rejected by the Massachusetts Supreme Judicial Court and this Court, as well as nearly every other court to consider the issue, that the Wage Act should not apply here because Border Transfer contracted with Plaintiffs' business entities and paid Plaintiffs through those business entities.  As this Court held in granting class certification, "incorporation cannot be a shield to prevent liability

---

[4]     There is an abundance of cases from other jurisdictions that further demonstrate that delivery drivers like Plaintiffs, are "employees" for purposes of various wage laws. See Ansoumana v. Gristede's Operating Corp., 255 F. Supp. 2d 184, 195 (S.D.N.Y. 2003) (holding that delivery workers were employees of Duane Reade pharmacy under the FLSA)Craig v. FedEx Ground Package Sys., Inc., 335 P.3d 66 (Kan. 2014) (FedEx drivers held to be employees under Kansas law); Slayman v. FedEx Ground Package Sys., Inc., 765 F.3d 1033 (9th Cir. 2014) (same under Oregon law); Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981 (9th Cir. 2014) (same under California law); In re FedEx Ground Package Sys., Inc., Employ. Prac. Litig., 758 F.Supp.2d 638 (N.D. Ind. 2010) (FedEx's New Hampshire drivers were employees based on their lack of "entrepreneurial opportunities", and Kentucky drivers were employees based on FedEx's control over its drivers and their routes).

under the Wage Act." See Order at p. 22 (ECF No. 95) (citing Martins I, 2013 WL 1320454, at *7, *9). The SJC expressly rejected such an argument due to the obvious incentive such an approach would give to employers to contract with intermediary companies in order to evade wage laws:

> Limiting the statute's applicability to circumstances where the parties have contracted with one another would undermine the purpose of the statute, as such limitation would permit misclassification where a putative employer, otherwise liable under the statute, is insulated from such liability by virtue of an arrangement permitting it to distance itself from its employees.

Depianti v. Jan-Pro Franchising Intern., Inc., 465 Mass. 607, 622 (2013). Many other Massachusetts courts have held that paying a worker through a corporate entity is no defense to liability under the Wage Act.[5] If such an argument "were to carry the day, an employer who wanted to avoid the requirements of the [wage laws] would simply require its employees to incorporate as a condition of employment." Amero, 2009 WL 1574229, at *3, n.4. Another court held that incorporation should not by itself defeat a claim for wages under the New York wage laws, holding that "[i]f any business could avoid the Fair Play Act by simply classifying their workers as independent contractors and compensating them through corporations rather than paying them directly, the Fair Play Act would be rendered useless." Padovano v. FedEx Ground Package Sys., Inc., 2016 WL 7056574, at *4 (W.D.N.Y. Dec. 5, 2016). There is nearly universal support for the proposition that an employer may not circumvent the wage laws by requiring workers to incorporate[6] See In re FedEx Ground Package

---

[5]     See, e.g., Vargas v. Spirit Delivery & Distribution Servs., Inc., 245 F.Supp.3d 268, 287 (D. Mass. 2017) ("[T]he issue of when/if the drivers created corporate entities and whether those corporate entities continued to exist after the relationship with Spirit ended is ultimately of minimal relevance to the proposed classes'[Wage Act] claim."); De Giovanni v. Jani-King Int'l, Inc., 262 F.R.D. 71, 86 (D. Mass. 2009) (certifying class of workers to pursue employment claims even where named plaintiff incorporated a corporation and hired his own employees); Martins I, 2013 WL 1320454, at *17 (holding that a driver was still covered by the Massachusetts wage law "even if he has incorporated his business and his putative employer's formal relationship is with the corporate entity"); Homedeliveryamerica.com, Inc., 2013 WL 6860745 at *2 ("a worker can qualify as an employee … even if he has incorporated his business, and the employer's formal relationship is with the entity and not the individual" because such a "formalistic distinction is precisely what Section 148B is intended to preclude.") (citation omitted) .

[6]     See FedEx Ground Package System, Inc., 712 F.Supp.2d at 793 ("if FedEx retains the right to control unincorporated [] drivers, it retains the right to control incorporated" drivers"); Phelps v. 3PD, Inc., 261 F.R.D. 548, 554, 562 (D. Or. 2009) (certifying a class of Oregon delivery drivers "who entered into a contract with

Sys., Inc., Employment Practices Litig., 712 F. Supp. 2d 776, 793 (N.D. Ind. 2010) ("if FedEx retains

the right to control unincorporated drivers, it retains the right to control incorporated" drivers");

Phelps v. 3PD, Inc., 261 F.R.D. 548, 554, 562 (D. Or. 2009) (certifying a class of Oregon delivery

drivers "who entered into a contract with 3PD either on his or her own behalf or on behalf of an

entity" for purposes of their Oregon state wage claims); Echavarria v. Williams Sonoma, Inc. et al.,

2016 WL 1047225, at *6 (D.N.J. Mar. 16, 2016) (a company may be an employer "even absent direct

remuneration").

Indeed, the SJC later held that the Wage Act would apply where a delivery company

"required [its drivers] to incorporate in order to misclassify them as independent contractors."

Chambers v. RDI Logistics, Inc., 476 Mass. 95, 109 (2016).  That is precisely what happened here.

Border Transfer required all of its drivers to incorporate.  SOF, ¶ 12-14.  Indeed, Border Transfer

informed contractors that they could be terminated for cause if they dissolved their corporation or

otherwise changed their business structure.  SOF, ¶ 33.

      **1.**      **Under Prong C, Border Transfer Cannot Show that Plaintiffs and the Other Class Members Customarily Engaged in an Independently Established Trade Occupation or Business.**

Border Transfer cannot satisfy Prong C of the ABC test.  To meet its burden, Border Transfer

must show that its contractors are "customarily engaged in an independently established trade,

---

3PD either on his or her own behalf or on behalf of an entity" for purposes of their Oregon state wage claims);
W. Ports Transp., Inc.,, 41 F.3d at 517 (finding of employment under ABC test even though the worker
contracted with his employer under his business's name); Ruiz v. Affinity Logistics Corp., 754 F.3d 1093,
1103 (9th Cir.) cert. denied, 135 S. Ct. 877 (2014) ("While 'purporting to relinquish' some control to the
drivers by making the drivers form their own businesses and hire helpers, [defendant] 'retained absolute
overall control' over the key parts of the business); Parilla v. Allcom Constr. & Install. Svcs., LLC, 2009 WL
2868432 (M.D. Fl. 2009) (plaintiff who incorporated was an employee; incorporation was a "façade"); Bell
Atlantic Corp., 171 F.Supp.2d 311 (S.D.N.Y. 2001) (finding employee status despite incorporation)); Meredith
v. Honeywell Inter., Inc., 245 Fed.Appx. 325, 328-29 (4th Cir. 2007) ("the fact that [the defendant] had a
contract with [a trucking company] the terms of which provided that [the trucking company] was an
independent contractor [and] that neither [the trucking company] nor its employees would be considered [the
defendant's] employees…[does not] alter the legal obligations of the respective parties"); Martin v. Shelby
Telecom, LLC, 2012 WL 2476400, *3-7 (N.D.Ala. June 26, 2012) (accord).

occupation, profession or business of the same nature as that involved in the service performed."
Oliveira v. Advanced Delivery Sys., Inc., 2010 WL 4071360, at *7 (Mass. Super. July 16, 2010)
(quoting G.L .c. 149, § 148B(3)). "'Whether the service in question could be viewed as an
independent trade or business because the worker is capable of performing the service to anyone
wishing to avail themselves of the services, or, conversely, whether the nature of the business
compels the worker to depend on a single employer for the continuation of the services.'" Id.
(quoting Athol Daily News v. Bd. Of Review Of Div. Of Employment And Training, 439 Mass. 171,
181 (2003)). "Ultimately, the question is 'whether the worker is wearing the hat of an employee of
the employing company or is wearing the hat of his own independent enterprise.'" Id. (quoting
Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56
Mass.App.Ct. 473 (2002)). Quite literally, Plaintiffs here are wearing the hat, shirt, pants, shoes, and
jacket of Border Transfer. SOF, ¶ 18-19. Thus, Prong C should be a closed question.

Moreover, the workers in question cannot merely be able to work independently in theory, but
rather, at the time they worked for the defendant, they must "be actively supplying the same kind of
services to third persons in order to be considered independent contractors." Labor & Logistics
Mgmt. v. Adm'r, Unemployment Comp. Act, 2012 WL 5205557, at *6 (Conn. Super. Ct. Oct. 3,
2012) (emphasis added). Courts in Massachusetts have applied Prong C in the same manner in
finding that delivery drivers who had no other "clientele" at the time they worked for the defendant,
were not operating independent businesses.[7] Coverall N. Am., Inc. v. Com'r of Div. of

---

[7]      As a result, courts in Massachusetts have held that an employer could not satisfy Prong C where the its
workers only work for one business. Boston Bicycle Couriers, Inc. v. Deputy Dir. of Div. of Employment &
Training, 56 Mass. App. Ct. 473, 481-82, 778 N.E.2d 964, 971 (2002) (defendant failed to satisfy prong 3
where the worker did not hold himself out as capable of performing delivery services for other potential
customers and worker did not have his own "clientele"); Oliveira, 2010 WL 4071360, at *7 (worker was not
independently established business where he "never solicited his services nor did he work for anyone other
than [defendant]" during the relevant period.); Fucci, No. 08–2659, slip op. at 10-11 (plaintiff delivery drivers
were not independently established businesses where plaintiffs depended on defendant "to provide them with
work," and plaintiffs had "no involvement with either customer billing or payments"); Rainbow Development,

Unemployment Assistance, 447 Mass. 852, 858 (2006) (flatly rejecting an employer's argument that Prong 3 merely presents a "capability" test that considers "what an individual is capable of doing as opposed to what an individual actually did"). See also Simmons v. Kilnapp Ent., No. 2013-00551-D (Mass. Super. Ct. June 13, 2014) (attached as Ex. B) ("Even assuming the [worker's] contracts . . . did not prohibit them from seeking outside work . . . and that [the defendant] permitted such outside work, the fact that the plaintiffs plied their trade exclusively for [the defendant] might well be sufficient to warrant summary judgment on their behalf on prong three."). Similarly, other courts have held that Prong C "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." Hargrove, 220 N.J. at 305. "[T]he employee must be engaged in such independently established activity at the time of rendering the service involved." Philadelphia Newspapers, Inc. v. Bd. of Review, 397 N.J. Super. 309, 323, 937 A.2d 318, 327 (App. Div. 2007) (emphasis added). See also Veterans Messenger Serv., Inc. v. Jordan, 393 Ill. App. 3d 715, 722 (2009) (delivery company failed to meet Prong Three because it presented no evidence that its "couriers could operate their delivery services without the solicitation of customers by [the company] or another similarly situated 'delivery brokerage service.'"). As one court noted in finding that delivery drivers were employees of Federal Express Ground – "[i]f 'lightning' were to strike so that there would be no [FedEx], there would in fact be nothing left for the [drivers] to do and they suddenly would be totally bereft of business." Estrada v Fed Ex Ground, 2004 WL 5631425 (Cal.Super. July 26, 2004), aff'd on appeal, 154 Cal.App.4th 1 (2007).

Similarly, courts have refused to find the existence of an independent business where, despite having the freedom to make deliveries for other companies, the drivers worked solely for the putative

---

2005 WL 3543770, at *2 (workers not "carrying on their own business" where they were merely assigned to dealership each day and showed up).

employer.[8]  See Chaves v. King Arthur's Lounge, 2009 WL 3188948, at *1 (Mass. Super. July 30, 2009) (exotic dancer did not operate independently established business where she was not able to ply her trade elsewhere do to lack of venues); N. Jersey Media Grp., Inc. v. Bd. of Review, 2014 WL 3537947, at *4 (N.J. Super. Ct. App. Div. July 18, 2014) (newspaper delivery worker worked solely for media company during relevant time period); Phila. Newspapers, 397 N.J.Super. at 323.

All of these factors weigh in favor of Plaintiffs.  During the time that Plaintiffs worked for Border Transfer, if they had suddenly arrived at the warehouse one day to find that Border Transfer or Sears no longer existed, Plaintiffs would have been completely without work and income, and without "customers," until they found new employment.  The class members worked solely for Border Transfer and were wholly reliant on Border Transfer for their income.  SOF ¶ 87.  Many of the class members did not have a corporate entity prior to working for Border Transfer.  SOF, ¶ 13. Indeed, class members often did not work in the delivery business after leaving Border Transfer. SOF, ¶ 90-92.  See Boston Bicycle Couriers, Inc., 778 N.E.2d at 971 (finding courier company could not meet Prong C in part where the courier's "relationship with BBC terminated, so did his work in the delivery business").

Moreover, a review of the daily delivery logs show that Plaintiffs  were personally driving their trucks approximately five days a week 12 hours a day, and  100 percent of the days that they operated a truck for Border Transfer.  SOF, ¶ 83, 89.  This made is impossible to work independently of Border Transfer.  SOF, ¶ 86.  Indeed, they earned no income from other sources, and were completely reliant on Sleepy's for their entire livelihood during the relevant period.  SOF, ¶¶ 87.

---

[8]    Moreover, other courts have held that merely because drivers form corporate entities does not alone support a finding that they operated independent businesses under Prong C.  See, e.g., Echavarria v. Williams Sonoma, Inc., 2016 WL 1047225, at *6 (D.N.J. Mar. 16, 2016) (company may be an employer under the NJWHL or NJWPL "even absent direct remuneration"); Carrow v. Fedex Ground Package Sys., Inc., 2017 WL 1217119, at *6 (D.N.J. Mar. 30, 2017) (FedEx drivers have New Jersey wage claims even where they contracted through their own corporate entities).

Perhaps most importantly, Border Transfer prohibited Plaintiffs from performing delivery services for any other entity while they made deliveries for Border Transfer.  SOF, ¶ 86.

When presented with identical facts the United States District Court for the District of New Jersey held that Sleepy's could not satisfy Prong C.  See Hargrove, No. 10-1138, Tr. of Order at p. 10-11(attached as Ex. C) (granting summary judgment in favor of delivery drivers on Prong C where "The plaintiffs contend they did not work for any other company; plaintiffs will rely on Sleepy's for their income. Some of the plaintiffs earned 100 percent of their income from Sleepy's.  The plaintiffs also note that they could not deliver other equipment or merchandise while they're working for Sleepy's. In light of these facts, the Court finds that at the time of the end of the relationship between plaintiffs and Sleepy's, the plaintiffs would join the ranks of the unemployed, and therefore, prong (C) is not met.").

Border Transfer "cannot have it both ways: that is, [it] cannot claim that [delivery drivers] are independent contractors, who would traditionally be free to use their skills wherever they please, and simultaneously prevent them from working for other [delivery companies]."  Harris v. Skokie Maid & Cleaning Serv., Ltd., 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013).  Based on all these considerations, Plaintiffs did not have anything that resembled an "independently established trade or business," and they are entitled to judgment as a matter of law on prong 3.

> **2.     Border Transfer Cannot Satisfy Prong A Because It Exercised Overwhelming Control Over Plaintiffs' Work.**

As this Court has already held, "Prong A itself contains a conjunctive test under which the plaintiffs need only prevail on one branch."  Order dated Nov. 9, 2017 at p. 16 (ECF No. 95).  "Due to the conjunctive nature of this test, a company asserting that a worker is an independent contractor

must show that the individual was free from its control both as a matter of contract and as a matter of fact." Id.  Border Transfer cannot satisfy either part of Prong A. [9]

Here, there is overwhelming evidence that Borer Transfer exercises substantial control pursuant to the terms of its standard CCA.  The contractors are required to wear uniforms and display Sears signage on their trucks if requested.  SOF, ¶ 18-20.  The contract requires drivers to perform the deliveries in the manner required by Border Transfer and Sears, including within time windows for each delivery as designated on their manifests.  SOF, ¶ 40-43.  Indeed, contractors are instructed that they must meet Sears' "strict demands for timely delivery" and that the driver "must run all delivery routes exactly as specified on the manifest."  SOF, ¶ 42.

The contractors have no input on how much they are paid per stop or what customers pay for deliveries.  SOF, ¶ 109.  The contractors are required to obtain insurance at levels dictated by Border Transfer and to list Border Transfer as an "additional insured" on the contractors' policies.  SOF, ¶ 25-30.  The contracts require the drivers to agree to a set of deductions form their compensation. SOF, ¶ 92, 96.  The contracts require drivers to attend daily stand-up meeting so they can receive further instruction regarding how to perform deliveries.  SOF, ¶ 35.  Border Transfer has the right to refuse any secondary driver or helper a contractor wants to use.  SOF, ¶ 21-22.  The contract specifies how to perform each type of delivery and how to handle the manifest.  SOF, ¶. 40-46, 54. And Border Transfer may terminate drivers for failing to perform deliveries pursuant to Border Transfer's instructions, for changing their business structure, or for no cause at all.  SOF, ¶ 33.

Furthermore, Border Transfer exhibits overwhelming control as a matter of fact.  Border Transfer decides which area a contractor may work in and assigns each route directly to the driver, not the contractor.  SOF, ¶ 53.

---

[9] Prong A should not be confused with the more restrictive common law control test which is associated with the respndeat superior doctrine.  Fleece on Earth v. Dep't of Employment & Training, 181 Vt. 458, 463, 923 A.2d 594, 598 (2007) (citations omitted).

Moreover, all contractors are required to form a corporate entity to work for Border Transfer. SOF, ¶ 12-14.  Border Transfer keeps track of each drivers' performance through its Top Dog ratings. SOF, ¶ 67-70.  This includes keeping track of whether the driver is performing deliveries on time. SOF, ¶ 75-76.  Border Transfer does not permit drivers to load any other business' merchandise on their truck when performing deliveries and inspects the trucks before they are allowed to leave the dock in the morning.  SOF, ¶ 80.  In addition, drivers are scheduled work on a full-time basis with routes lasting 10-12 hours each day.  SOF, ¶ 82-93

Courts, including those in Massachusetts, have routinely found that delivery drivers are employees under Prong A, or similar "right to control" tests, on these types of facts.  See Driscoll v. Worcester Telegram and Gazette, 72 Mass. App. Ct. 709, 714-18 (2008) (affirming employee status under control prong where newspaper delivery drivers could be discharged based on customer complaints and drivers could not set the rates paid by the customers); Rainbow Dev., LLC v. Com., Dep't of Indus. Accidents, 2005 WL 3543770, at *2 (Mass. Super. Nov. 17, 2005) (employer failed to satisfy Prong A where it monitored job performance of workers and would terminate workers if performance was not adequate); Amero, 2008 WL 5609064, at *2 (Mass. Super. Dec. 3, 2008) (oil delivery drivers were employees where they were "required to deliver fuel oil to the customers [defendant] designated on the days [defendant] stipulated" and they "had no discretion regarding what price to charge…."); Fucci, slip op. at 7-8 (granting summary judgment under the first prong because the delivery company controlled the uniforms the drivers wore and the drivers' delivery schedules, and the company required the drivers to carry cell phones so that they could be contacted at any time about deliveries, even though the employee's contract purported to grant the employee complete control over his work, the employee could hire and supervise helpers, and the employee was free to work for others in his spare time);  Craig v. FedEx Ground Package Sys., Inc., 335 P.3d 66, 92 (Kan. 2014) (holding that FedEx delivery drivers were employees under Kansas "right to

control" test) (later adopted in In re FedEx Ground Package Sys., Inc. Employment Practices Litig., 792 F.3d 818, 820 (7th Cir. 2015); Hargrove v. Sleepy's, No. 10-1038 (Oct. 26, 2016 D.N.J.) (holding Sleepy's could not meet Prong A for its delivery drivers under New Jersey ABC test).

In Amero v. Townsend Oil, the court held "as to the first prong, the undisputed facts clearly demonstrate Townsend's control over Amero's activities…. He was required to deliver fuel oil to the customers Townsend designated on the days Townsend stipulated. Amero had no discretion regarding what price to charge…." Id. at 4. Similarly, in Fucci v. Eastern Connection, the court found that summary judgment was warranted for the plaintiff drivers on Prong 1 because the "undisputed facts demonstrate the plaintiffs were not sufficiently free from Eastern Connection's control and direction in the performance of their delivery services." Fucci v. E. Connection, No. 08–2659, slip op. at 7. There, the defendant delivery company provided the plaintiff drivers with a daily manifest with scheduled deliveries, required drivers to use trucks meeting certain specifications, could determine whether "helpers" were qualified to work, and required drivers to wear uniforms and carry cell phones to track their progress.  Id. at 7.  In Driscoll v. Worcester Telegram and Gazette, 72 Mass. App. Ct. 709, (2008), the Appeals Court affirmed a finding that the newspaper had sufficient control over their delivery drivers where the drivers could be discharged because of customer complaints and the drivers could not set the rates paid by the customers. Id. at 714-18. See Meier v. Mastec N. Am., Inc., No. 13-00488 at p. 8 (Mass. Sup. Ct. April 9, 2015) (requiring uniforms and service within a four-hour time window demonstrated control) (attached as Ex. D).

Under the Illinois ABC test, the United States District Court held that a putative employer exercised control over a janitor by setting his "work schedule, monitoring the quality of his work, and disciplining him when his work did not meet [the employer's] expectations." Bulaj v. Wilmette Real Estate and Management, 2010 WL 4237851, at *6 (N.D. Ill. Oct.21, 2010).  Similarly, the United States District Court for New Jersey held that Sleepy's could not satisfy Prong A where the drivers

were required to sign uniform contracts, the drivers were not permitted to work for other businesses while performing deliveries for Sleepy's, the contract required the drivers to purchase insurance and list Sleepy's as an additional insured, the contracts required the drivers to wear a uniform, the drivers were told when to start work each day, Sleepy's required deliveries be performed pursuant to its own rules, and drivers were given specific routes to follow in making their deliveries, which Sleepy's could track through scanners used by the drivers. Hargrove, No. 10-1138, Tr. of Court's Opinion at p. 8-9. The facts here are identical.

Other courts have held that the "strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because the power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities." Ayala v. Antelope Valley Newspapers, Inc., 327 P.3d 165, 171 (2014) (quotation marks and citations omitted); see also Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 988 (9th Cir. 2014) ("The right to terminate at will, without cause, is '[s]trong evidence in support of an employment relationship.'").

Additionally, courts have held that a company exerts control if, as happened here, it furnishes the putative employee with the contractor agreement. Bennett v. Department of Employment Security, 175 Ill. App. 3d 793, 797 (1988) (in a regular independent contractor-employer relationship, the independent contractor furnishes the contract); Craig, 335 P.3d at 81 (right to control shown where FedEx required drivers to enter into identical working agreements without the power to negotiate terms). Indeed, that is precisely what happened here.

Furthermore, courts have routinely held that the mere fact that contractors exercised some control over the work of their helpers, does not preclude a ruling against an entity such as Border Transfer under Prong A. Echavarria, 2016 WL 1047225, at *7. Indeed, when applying the Washington unemployment law's ABC test, one court held that sufficient control was present under Prong A even where the driver "owned his own truck, paid for his own truck repairs, fuel and

insurance, chose his own routes and could have hired another driver to operate his equipment." W. Ports Transp., Inc., 41 P.3d at 517.

Border Transfer will likely argue that the Court should excuse its substantial quality control and supervision because it merely arose from the nature of making deliveries to customer's homes for Sears. When faced with a similar argument in a worker misclassification case, the Eleventh Circuit responded that the "inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control. Business needs cannot immunize employers from [statutory] requirements. If the nature of a business requires a company to exert control over workers to the extent that [Defendants have] allegedly done, then that company must hire employees, not independent contractors." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1316 (11th Cir. 2013) (emphasis added). Accordingly, Border Transfer cannot evade compliance with the Wage Act simply because it believes it is required to control the work performed by Plaintiffs.

## C.   Patrick McCluskey Is Individually Liable for Any of Border Transfer's Violations of the Wage Act

Pursuant to G.L. c. 149, § 148, "[t]he president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section." The plain language of the Wage Act imposes strict liability on the president of a corporation regardless of how much control the president has over the corporation. Wiedmann v. The Bradford Group, 444 Mass. 698, 711 (2005). According to the Border Transfer's corporate filings both in Michigan, the state where it is incorporated, and in Massachusetts, McCluskey served as Border Transfer's president in 2014 and has served as its director every year since it was formed in 2013. SOF, ¶ 107.

As the SJC explained in Wiedmann, beyond the "president and treasurer," any manager "who controls, directs, and participates to a substantial degree in formulating and determining policy of a corporation" is liable under Chapter 149. 444 Mass. at 711. In addition to serving as president,

McCluskey has had substantial control over the way Border Transfer classifies and pays its delivery contractor. McCluskey testified that, as president, he has "full responsibility over the entire operation" of Borer Transfer out of the facility in Westwood, Massachusetts. SOF, ¶ 108. McCluskey helped decide which categories of deductions to Border Transfer made from the delivery contractors' compensation and what to pay the drivers per stop. SOF, ¶¶ 109-10. Furthermore, McCluskey testified that he "had a role in preparing" the uniform contract Border Transfer executes with each delivery contractor. SOF, ¶ 111. Thus, even if McCluskey was not the titular president of Border Transfer, he qualifies as a manager who participates to a substantial degree in determining the company's pay policies, and is, therefore, individually liable under the Wage Act. Wiedmann, 444 Mass. at 711.

## IV.   CONCLUSION

For all the reasons stated above, this Court should enter summary judgment as to 1) Plaintiffs' status as employees of Border Transfer; and 2) that Defendant Patrick McCluskey is individually liable for the Wage Act violations at issue in this case.


DATED:  November 20, 2018                    Respectfully Submitted,
                                             MARCOS DaSILVA, et al., individually
                                             and on behalf of all others similarly
                                             situated,
                                             By their attorneys,


                                               /s/ Harold L. Lichten
                                             Harold L. Lichten BBO# 549689
                                             Benjamin J. Weber BBO# 673736
                                             LICHTEN & LISS-RIORDAN, P.C.
                                             729 Boylston Street, Suite 2000
                                             Boston, MA 02116
                                             (617) 994 5800
                                             hlichten@llrlaw.com
                                             bjweber@llrlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2018, the foregoing document was filed electronically through the ECF System and is available for viewing and downloading from the ECF System, that it will be sent electronically to counsel of record identified as registered participants on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.

/s/ Harold L. Lichten
Attorney for Plaintiffs