UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARCOS DaSILVA and MATTEUS FERREIRA, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-cv-11205-PBS |
| v. | ) ) ) | |
| BORDER TRANSFER OF MA, INC. and PATRICK MCCLUSKEY, | ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Local Rule 56.1, plaintiffs present the following statement of undisputed material facts in support of their partial motion for summary judgment.

**A.   Border Transfer's Delivery Business**

1. Sears operates a facility in Westwood, Massachusetts from which it delivers appliances and other items to customers in Massachusetts.

2. To perform these deliveries in Massachusetts, Sears contracted, with Border Transfer to hire and manage delivery drivers. See SLS-BTMI Contract (attached to Weber Decl. as Ex. A).

3. Border Transfer is a Tennessee-based company that provides delivery service to Sears in Massachusetts, Ohio, and in California. McCluskey Dep. 20-21 (attached to Weber Decl. as Ex. B).

4. Sears pays Border Transfer a price per delivery, plus a fixed amount per month and an additional amount for fuel. McCluskey Dep. 30.

5.     All of Border Transfer's income is earned through the making of deliveries. McCluskey Dep. 33.

6.     To manage the deliveries, Border Transfer maintains an office at the Westwood facility and employs approximately two supervisors and four dispatchers to dispatch, supervise, and pay delivery drivers.  Dep. Tr. of Rogerio Matos ("Matos Dep.") at 10 (attached to Weber Decl. as Ex. C).

7.     To perform the deliveries, Border Transfer relies entirely upon individuals, including the named Plaintiffs, who Border Transfer classifies as independent contractors pursuant to standard Contract Carrier Agreements ("CCA").  Marcos DaSilva CCA (attached to weber Decl. as Ex. D); Matteus Ferreira CCA (attached to Weber Decl. as Ex. E); Matos Dep. 33, 75, 86.

8.     Border Transfer elected to classify its delivery contractors as independent contractors, Sears does not require Border Transfer to classify them as independent contractors. McCluskey Dep. 35.

9.     Dating back to June 2013, Border Transfer has contracted with approximately 59 individuals to perform delivery services out of the Westwood facility.[1]  See Shuford Aff. at ¶ 5 (attached to Weber Decl. as Ex. F).

10.    Pursuant to the Contract Carrier Agreement ("CCA"), the drivers are classified as independent contractors.  DaSilva CCA at ¶ 8; Ferreira CCA at ¶ 8.

---

[1]     In response to interrogatories, Border Transfer stated that since June 23, 2013, it has contracted with approximately 57 contractors in Massachusetts since June 23, 2013.  See Def.'s Reps. to Ints. At p. 4 (attached as Ex. G).

11.     Every so-called contractor who applies for a job at the Westwood facility is provided with a uniform list of requirements.  Matos Dep. 32; Carrier File Requirements (attached to Weber Decl. as Ex. G).

12.     Among these requirements, contractors must submit to a background check, obtain various kinds of insurance, and form a separate corporate entity.  Matos Dep. 31-33; Carrier File Requirements; DaSilva CCA ¶ 6(C); Ferreira CCA ¶ 6(C).

13.     Many of the class members did not have a corporate entity when they came to apply for a job with Border Transfer.  Matos Dep. 31; DaSilva Dep. Tr. at p. 20 (attached to Weber Decl. as Ex. H); Owusu-Ansah Decl. at ¶ 3 (attached to Weber Decl. as Ex. I); Zuniga Decl. at ¶ 3 (attached to Weber Decl. as Ex. J); Alvarez Decl. at ¶ 3 (attached to Weber Decl. as Ex. K); Ferreira Dep. 29 (attached to Weber Decl. as Ex. L).

14.     In fact, when Marcos DaSilva applied for a job, a Border Transfer manager named Damilton formed DaSilva's business entity himself by filling out the application online while DaSilva watched.  DaSilva Dep. 24; DaSilva Decl. at ¶ 4 (attached to Weber Decl. as Ex. M).

        **B.**     **Border Transfer's Control Over the Drivers' Work.**

15.     Border Transfer keeps its standard contract on file in Tennessee.  Matos Dep. 30-31.

16.     All of the contracts that drivers enter into with Border Transfer are substantively the same.  Matos Dep. 33.

17.     The standard contracts require that contractors incorporate, be subject to deductions that are taken out of the contractors' pay, and lists the reasons for termination.  McCluskey Dep. 36, 42.

18. Pursuant to the CCAs, Border Transfer requires each of its delivery drivers to wear a uniform. Matos Dep. 45; DaSilva Dep. 41; Ferreira Dep. 126; DaSilva CCA, Appendix B, Part II(2)(D); Ferreira CCA, Appendix B, Part II(2)(D).

19. The uniform consisted of dark blue pants, black boots, dark blue polo shirt, and dark blue jacket. The shirts said "Delivery Pro" on it in yellow. Border Transfer would also provide drivers a hat and winter wear. Ferreira Dep. 126.

20. Border Transfer inspects drivers and helpers to make sure they are wearing a uniform, and if they are not wearing a uniform, they are not permitted to leave the facility. Matos Dep. 45-46. Border Transfer also requires drivers to wear an armband that identifies them as an authorized carrier. Matos Dep. 107-08; Sample of ID Badge (Ex. N).

21. The contract requires all secondary drivers and helpers to pass background checks and Border Transfer retains the right to prohibit any secondary driver or helper from making Sears deliveries. DaSilva CCA ¶ 6(E); Ferreira CCA ¶ 6(E); Daniel Lopes CCA ¶ 7.5 (attached to Weber Decl. as Ex. O).

22. In fact, Border Transfer routinely prohibits contractors from using secondary drivers or helpers that they want to use to make Sears deliveries. Ferreira Decl. ¶ 20-21; Ferreira Dep. 49; Matos Dep. 54; Zuniga Decl. at ¶ 21.

23. In addition, pursuant to the contract between Border Transfer and Sears, Border Transfer must retain the right to remove secondary drivers and helpers that contractors want to use. See SLS-BTMI Contract at p. 2 (Bates No. 542).

24. Border Transfer, not Sears, determines what rate to pay the contractors per stop. McCkluskey Dep. 31.

25.     The CCAs further require drivers to obtain insurance at levels set by Border Transfer and Sears. See DaSilva CCA ¶ 11; Ferreira CCA ¶ 11; BTMI Carrier File Requirements; SLS-BTMI Contract at p. 3-4 (Bates No. 543-44).

26.     Contractors are required to obtain general liability insurance with limits of $1,000,000 per claim and an aggregate limit of $2,000,000. Id.

27.     Contractors are required to obtain umbrella insurance with a limit of $2,000,000 per claim. Id.

28.     Contractors are required to obtain auto liability insurance with a limit of $1,000,000 per claim. Id.

29.     Contractors are required to obtain cargo insurance with a limit of $50,000 per claim and a deductible of no more than $1,000. Id.

30.     Contractors are required to list Border Transfer as an "additional insured" on their insurance policies. DaSilva CCA ¶ 11(G); Ferreira CCA ¶ 11(G); BTMI Carrier File Requirements.

31.     The drivers are required to list Border Transfer as a "loss payee" in their cargo insurance. Id.

32.     In addition, the contract requires drivers to obtain worker's compensation insurance. DaSilva CCA ¶ 11(E); Ferreira CCA ¶ 11(E); Daniel Lopes CCA ¶ 12, Schedule D.

33.     Furthermore, Border Transfer can terminate a driver's contract if they fail to perform deliveries pursuant to Border Transfer's instructions or even if they change the structure of their business entity without informing Border Transfer. DaSilva CCA ¶ 17; Ferreira CCA ¶ 17; Daniel Lopes CCA ¶ 17.

34. Border Transfer may also terminate a contractor without cause. Daniel Lopes CCA ¶ 18

35. The contracts require drivers to attend daily stand-up meetings, and indeed such meetings were held each morning in the warehouse. DaSilva CCA, Appendix B ¶ 2(A); Ferreira CCA, Appendix B ¶ 2(A); SLS-BTMI Contract at p. 16 (Border Transfer must require drivers to attend daily stand-up meetings); DaSilva Decl., ¶ 11; Ferreira Decl., ¶ 10; Moring Recaps (Bates No. 2290, 3397, 3786) (attached to Weber Decl. as Ex. P).

36. At these meetings, drivers are instructed about new installation procedures, recent customer complaints, and the drivers role-play with Border Transfer or Sears personnel regarding how to communicate with customers. Matos Dep. 106; Ferreira Dep. 105-06; DaSilva Decl., ¶ 11; Ferreira Decl., ¶ 10.

37. Border Transfer would take attendance at the meetings and contractors could be put on standby the following day if they did not attend the meeting. Ferreira Dep. 108-09.

38. Border Transfer kept notes of the morning meetings. For example, on November 5, 2013, the morning meeting was held at approximately 6:10 a.m. and a Border Transfer manager "Addressed all of the teams in regards to being on time, in full uniform, with badges on which everyone was and that it just makes for a smoother morning drng handing out manifests in the morning. And thanked all teams for there [sic] efforts in staying in compliance." BTMI Bates No. 2231 – Morning Recaps.

39. The notes from the morning meeting on July 24, 2015 state that a Border Transfer manager "went over checkin that teams are still having issues not doing what they should, so we are going back to basic's [sic] no more short cuts." Morning Recap, Bates No. BTMI2903.

40. Under the CCA, drivers must perform deliveries pursuant to Border Transfer's instructions. DaSilva CCA ¶ 19; Ferreira CCA ¶ 19.

41. The CCAs include detailed "Basic Delivery Procedures" the contractors are required to follow. DaSilva CCA, Appendix B, Part II; Ferreira CCA, Appendix B, Part II.

42. Among these delivery procedures, the contractors are required to "meet [Sears'] strict demands for timely delivery of merchandise" by running "all delivery routes exactly as specified on the manifest." DaSilva CCA, Appendix B, Part II(1)(A); Ferreira CCA, Appendix B, Part II(1)(A).

43. The delivery procedures are required as part of Border Transfer's contract with Sears. See SLS-BTMI Contract at p. 17-22.

44. Contractors must be knowledgeable about all of Sears' delivery requirements and may be asked to speak with Sears' personnel to demonstrate their knowledge of those procedures. DaSilva CCA, Appendix B, Part II(2)(E); Ferreira CCA, Appendix B, Part II(2)(E).

45. Border Transfer contractors are provided with detailed instructions about how to install appliances, electronics, and furniture. DaSilva CCA, Appendix B, Part II(3)-(4); Ferreira CCA, Appendix B, Part II(3)-(4); Matos Dep. 85; SLS-BTMI Contract at p. 23-27.

46. Drivers are prohibited from removing moldings when trying to fit appliances through doorways. Matos Dep. 81; DaSilva CCA, Appendix B, Part II(1)(F, I); Ferreira CCA, Appendix B, Part II(1)(F, I). Drivers are not permitted to remove sliding doors or windows, and are not permitted to hoist merchandise to upper floors. Matos Dep. 82-83.

47. The drivers are required to have 26-foot box trucks. Matos Dep. 83; DaSilva CCA, Appendix B, Part II(2)(A); Ferreira CCA, Appendix B, Part II(2)(A).

48.  Border Transfer prohibits contractors from entering customer's homes without an adult present.  DaSilva CCA, Appendix B, Part II(1)(D); Ferreira CCA, Appendix B, Part II(1)(D); Matos Dep. 79.  If an adult is not present, Border Transfer will contact the customer and reschedule the delivery.  Matos Dep. 80.  If a customer is not at home, drivers must leave a "Not-at-Home" tag on the customer's door.  DaSilva CCA, Appendix B, Part II(1)(E); Ferreira CCA, Appendix B, Part II(1)(E); Matos Dep. 80.

49.  Border Transfer also retains the right to require that contractors display Sears signage on their trucks.  SLS-BTMI Contract at p. 5-6.  Furthermore, Border Transfer cannot permit contractors to display their own logos without Sears' authorization.  Id.

50.  The "trucks were supposed to have a walk-around every day make sure the lights were all functioning and not broken.  You didn't have a headlight out, a tail light, your turn signals were working properly."  Ferreira Dep. at p. 58.

**C.   Border Transfer's Assigns and Tracks Each Contractor's Deliveries.**

51.  To make deliveries, Border Transfer provides each driver with a manifest, showing the order deliveries must be made in and the time windows drivers must arrive in for each delivery.  See Sample Manifests (attached as Ex. Q); Matos Dep. 16, 77; Ferreira Dep. 99-100.

52.  The manifests are printed on paper and, more recently, drivers are also provided with manifests on an application on their phones.  Matos Dep. 39, 103.

53.  Border Transfer determines the general area that drivers are assigned to and rotates the drivers from one area to another.  Matos Dep. 21; Ferreira Dep. 75-76.

54.  Manifests must be protected from the elements and drivers are not permitted to present Sears' customers with "folded, crinkled, weather-beaten, etc. manifests."  Ferreira CCA Appendix B, Part II.1.A.

55. Every evening, Sears produces delivery manifests, with routes and time windows, electronically to Border Transfer. Matos Dep. 17, 24, 61.

56. Border Transfer assigns each route to an individual driver by typing the driver's first and last name into the manifest. Matos Dep. 18-19, 21; Ferreira Dep. 75; Sample Manifests.

57. The manager then prints out the routes and distributes them to the drivers. Matos Dep. 17-18.

58. The drivers' names are type into the delivery manifest, and drivers fill out a bill of lading at the end of each route listing their name. See Matos Dep. 18-19, 21; Sample Manifests, Sample Bills of Lading (attached to Weber Decl. as Ex. R)

59. The drivers are also provided with a "bill of lading" to fill out at the end of the day, showing who performed the deliveries, how many deliveries were completed, and list any issues that arose regarding the deliveries. Sample Bills of Lading (attached as Ex. M).

60. Border Transfer uses the bill of lading to pay contractors for each completed stop. Matos Dep. 90.

61. The manifests and the bills of lading also tell the drivers what bay they must go to in order to load their trucks. Matos Dep. 99-100.

62. Manifests also include "instructions" and "comments" from Sears based on what the customers or Sears wants the driver to do with the appliance. Matos Dep. 95-96.

63. Border Transfer requires drivers to leave the warehouse by 7:00 a.m. or 7:30 a.m., depending on what area they are assigned to. Matos Dep. 101-02, 116.

64. The manifests include the estimated times of arrival at customers' homes. Matos Dep. 100.

65. Border Transfer keeps track of customer ratings for each individual driver, which includes ratings for "timeliness," "friendly and courteous," and "recommend to friend." Matos Dep. 22, 54; Sample Customer Ratings (attached as Ex. S); Sample Top Dog Ratings (attached as Ex. T).

66. Border Transfer uses those ratings to generate a Top Dog standings. Matos Dep. 22, 54; Sample Customer Ratings; Top Dog Standings.

67. The top six rated drivers can choose their own routes for the day. Matos Dep. 22.

68. Border Transfer posts all of the ratings for all the drivers to see in its office in the Westwood facility. Matos Dep. 22; Sample Top Dog Ratings.

69. Being late to morning stand-up meetings can negatively impact a drivers' Top Dog score. Top Dog Criteria (attached to Weber Decl. as Ex. U).

70. Drivers are required to make the deliveries in the order they are listed on the manifest. Matos Dep. 77; Ferreira Dep. 103-04; DaSilva Dep. 63.

71. If the drivers wanted to make deliveries out of the order they were printed on the manifest, they were required to clear it with Border Transfer. Ferreira Dep. 104-05l; DaSilva Dep. 56.

72. The drivers must arrive at the customer's location within the time windows listed on the manifests. Matos. Dep. 61, 103; Ferreira Dep. 13. If drivers failed to arrive within the time window, Border Transfer would sometimes not pay them for the delivery. Ferreira Dep. 142.

73. Drivers are required to call customers before they arrive to let them know when they will be there. Matos Dep. 104; Digital Manifest Driver Guide ("30 Minute Ahead Call" (attached to Weber Decl. as Ex. V).

74. Drivers must log each delivery by either calling into a 1-800 number or logging it on their phones. Matos Dep. 57; Digital Manifest Driver Guide (drivers are required to log each delivery using their "unique driver ID").

75. Border Transfer keeps track of whether the drivers perform each delivery within the time window or outside it. Matos Dep. 62; Top Dog Ratings.

76. If a driver is running late, the dispatcher will call the customer and generate a daily email reporting any late deliveries. Matos Dep. 63; Email re Late Deliveries (attached as to Weber Decl. as Ex. W).

77. Drivers are required to obtain a signature when each delivery is completed and return the paper manifest at the end of the day. Matos Dep. 67-68.

78. If a driver missed a signature, he would be sent back to the customer's home to get a signature. Matos Dep. 68.

**D. Contractors Cannot Perform Outside Work While Making Deliveries for Broder Transfer.**

79. Contractors cannot deliver any other store's merchandise while making deliveries for Border Transfer. Border Transfer's contract with Sears states that Border Transfer cannot allow a contractor to "co-load" any other store's merchandise in the same truck with Sears merchandise in it without Sears authorization. SLS-BTMI Contract at p. 8, ¶ 15 (BTM000548); Innovel-BTMI Contract at p. 8, ¶ 15 (BTM000597) (attached to Weber Decl. as Ex. X).

80. Border Transfer personnel must give their approval before a driver can leave the dock. Matos Dep. 38-39; Ferreira Decl., ¶ 11; DaSilva Decl., ¶ 12.

81. The drivers cannot have any merchandise on their trucks other than what was assigned to them by Border Transfer. Matos Dep. 40.

82.     Borer Transfer kept track of the start time, the number of stops and total routed miles of each driver each day.  See, e.g., Sample Route Reviews (attached to Weber Decl. as Ex. Y).  The Route Reviews show that most drivers were assigned approximately 18-20 stops per day and routinely had routes that ranges from 100-200 miles in a single day.  Id.

83.     More recently, Border Transfer has recorded the routed hours for each driver, and the average routed hours exceeds 10 hours per day.  Id.  See also Alvarez Decl. ¶ 7-8 (typically worked 5:30 a.m. to 9 p.m.); Ferreira Decl. at ¶ 8 (worked 10 to 15 hours a day, six days a week); DaSilva Decl. at ¶ 9 (worked approximately 12 hours per day).

84.     On July 24, 2015, during a morning meeting, a representative of Sears told the drivers that they would "fix issues fast to make sure there are no more low stop counts." Morning Recap, Bates No. BTMI2903.

85.     Because the delivery drivers worked full-time for Border Transfer and could not "co-load" their trucks with any other store's merchandise, Border Transfer made it impossible to perform deliveries for anyone else.  See Second Decl. of DaSilva at ¶ 12; Ferreira Decl. at ¶ 4; Alvarez Decl. at ¶ 4; Zuniga Decl. at ¶ 4-5.

86.     Plaintiffs Marcos DaSilva, Mattheus Ferreira, Cesar Zuniga, Henry Alvarez, and Alfredo Owusu-Ansah were entirely reliant on Border Transfer for their income during the time that they personally performed deliveries for Border Transfer.  DaSilva Decl. at ¶ 5-6; Ferreira Decl. at ¶ 5; Alvarez Decl. at ¶ 5; Zuniga Decl. at ¶ 5; Owusu-Ansah Decl. at ¶ 4.

87.     So-called absentee contractors were rare.  Matos Dep. 27-28 (From approximately 2014 to the present, Border Transfer's assistant manager could remember only two so-called absentee contractors).

88.     A review of Border Transfer's daily logs shows that most contractors personally performed deliveries on a full-time basis each day. Suppl. Decl. of Rebecca Shuford at ¶ 7-8 (attached to Weber Decl. at ¶ Z).

89.     When Alfred Owusu-Ansah stopped working for Border Transfer, he went to work as a nurse. Owusu-Ansah Decl., ¶ 21.

90.     When Matteus Ferreira left Border Transfer, he went to work delivering pizza for Dominos and then as a manager at Dunkin Donuts. Ferreira Decl. ¶ 23 (attached to Weber Decl. as Ex. AA).

91.     When Marcos DaSilva left Border Transfer, he tried to work delivering cars for a few months, but then went back to the job he held prior to working for Border Transfer, which was as a cook. DaSilva Dep. at 9-11, 13.

E. **Border Transfer's Policy of Making Deductions From Its Contractors' Compensation**

92.     Border Transfer, not Sears, decides what categories of deductions to make from the contractors' compensation. McCluskey Dep 36-37.

93.     Border Transfer makes deductions for damage claims, including when the damage is to the merchandise being delivered and damage to the customer's property cause during a delivery. Matos Dep. 120; Sample Property Damage Claim Form (attached to Weber Decl. at ¶ BB); Suppl. Decl. of Rebecca Shuford at ¶ 3-4.

94.     These deductions are shown on the contractors' pay statement. Matos Dep. 120.

95.     Border Transfer makes deductions for non-compliance with Border Transfers rules for making deliveries. See Suppl. Shuford Decl. at ¶ **.

96.     Border Transfer logs deductions as follows:

N/B – No Bill

>Perf Dep – Performance Deposit
>Perf Dep We – Performance Deposit Weekending
>Perf Bond Release – Performance Deposit/Bond Release
>Final Perf Dep Release – Final Performance Deposit/Bond Release
>Truck Rental – Truck Rental
>Claim – Claim Deduction
>Claim Deduction – Claim Deduction
>Uniform – Uniform Deduction
>Uniform Deduction We – Uniform Deduction Weekending
>Truck Deduction – Truck Deduction
>Truck Deduction We – Truck Deduction We
>Background CK – Background Check

97.	Def.'s Resp. to Pls.' First Set of Ints. at No. 17 (attached to Weber Decl. as Ex. **).

98.	Border Transfer makes deductions from the compensation paid to the contractors for uniform purchases and background checks. McCluskey Dep. 36.

99.	Border Transfer made deductions from the contractors' compensation for a performance deposit. McCluskey Dep. 36; Matos Dep. at 121.

100.	Border Transfer deducts approximately $200 per week from the contractors' compensation until Borer Transfer has collected $3,000 for each truck the contractor operates for Border Transfer. Matos Dep. 121; Supp. Shuford Decl. at ¶ **.

101.	The performance deposit deduction shows up as "perf dep" on their pay stubs. Matos Dep. 128; DaSilva Pay Statements (attached to Weber Decl. at ¶ **).

102.	The performance bond is not used while the contractor is working for Border Transfer. Matos Dep. 121. Rather, the performance bond is kept to pay for damage claims that may come up after the contractor has been terminated. Matos Dep. 121-22.

103.	The CCA states that performance bond deductions are "independent of the collection of monies owed to [Border Transfer] for any damage or cargo claims . . .." Daniel Lopes CCA ¶ 5.5; Ferreira CCA ¶ 4.E.

104. Contractors are paid a flat rate "per stop." See, e.g., Ferreira CCA at Appendix C.

105. A contractor who delivers an appliance is paid for that stop, even when a return visit is required due to, for example, there is a bad fit. Matos Dep. 124. The contractor sent for the return visit is generally different from the contractor who performed the initial delivery. Matos Dep. 124-25. In that case, both contractors are paid for the stop. Id.

106. Deductions for rescheduled deliveries or deliveries that were made, but require a return visit, are listed as "no bill" or "N/B" deductions. Matos Dep 127; DaSilva Pay Statements (attached to Weber Decl. as Ex. DD).

**F.    Patrick McClusky's Personal Involvement With Border Transfer's Operations.**

107. According to the Border Transfer's corporate filings both in Michigan, the state where it is incorporated, and in Massachusetts, McCluskey has served as Border Transfer's president and has served as its director every year since it was formed in 2013. Border Transfer Incorporation Documents (attached to Weber Decl. as Ex. EE).

108. As president of Border Transfer, McCluskey has "full responsibility over the entire operation" out of the facility in Westwood, Massachusetts. McCluskey Dep. 40.

109. McCluskey oversaw the process Border Transfer used to determine how much to pay the contractors per stop. McCluskey Dep. 32.

110. McCluskey helped Border Transfer decide which categories of deductions to make from the delivery contractors' compensation. McCluskey Dep. 37.

111. McCluskey "had a role in preparing" the uniform contract Border Transfer executes with each delivery contractor. McCluskey Dep. 37.

DATED:  November 19, 2018

Respectfully Submitted,
MARCOS DaSILVA, et al., individually and on behalf of all others similarly situated,
By their attorneys,

 /s/ Harold L. Lichten
Harold L. Lichten BBO# 549689
Benjamin J. Weber BBO# 673736
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994 5800
hlichten@llrlaw.com
bjweber@llrlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2018, the foregoing document was filed electronically through the ECF System and is available for viewing and downloading from the ECF System, that it will be sent electronically to counsel of record identified as registered participants on the Notice of Electronic Filing, and that paper copies will be sent to those indicated as non-registered participants.

/s/ Harold L. Lichten
Attorney for Plaintiffs