|  |  |  |
|---|---|---|
| MARCOS DASILVA and MATTEUS FERREIRA, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action |
| v. | ) ) | No. 16-11205-PBS |
| BORDER TRANSFER OF MA, INC., and PATRICK MCCLUSKEY, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER

May 1, 2019

Saris, C.J.

## INTRODUCTION

Plaintiffs Marcos DaSilva and Matteus Ferreira worked as delivery drivers for Defendant Border Transfer of MA, Inc. ("Border Transfer"). They claim Border Transfer improperly treated them as independent contractors when they were, in fact, employees and that, as a result, Border Transfer unlawfully deducted certain business expenses from their pay. Plaintiffs bring claims under the Massachusetts Wage Act against Border Transfer and its former president Patrick McCluskey on behalf of a certified class of individuals who entered into contracts with Border Transfer to provide delivery services, personally provided such services for Border Transfer for at least forty

1

hours per week, and were classified as independent contractors. Defendants move for summary judgment on the class claims on the basis that, even if Border Transfer misclassified its drivers as independent contractors, they are not entitled to recover the various deductions they seek. Defendants also move for summary judgment on the individual claims of class member Humberto Chantre. Finally, Plaintiffs seek summary judgment on whether Border Transfer misclassified the class members as independent contractors and whether McCluskey is individually liable for Border Transfer's alleged Wage Act violations.

After hearing, the Court **DENIES** Defendants' motion for summary judgment (Docket No. 108) and **ALLOWS IN PART** and **DENIES IN PART** Plaintiffs' motion for partial summary judgment on liability (Docket No. 122). The Court also **DENIES** as moot Plaintiffs' motions to strike the testimony of Thomas N. Hubbard (Docket No. 115 and Docket No. 145) because resolution of the motions for summary judgment does not depend on his expert opinion.

**FACTUAL BACKGROUND**

The following facts are undisputed except where otherwise stated.

## I.    **The Parties**

Headquartered in Hendersonville, Tennessee, Border Transfer is a property broker registered with the Federal Motor Carrier

Safety Administration ("FMCSA"). See 49 U.S.C. § 13102(2). As a broker, Border Transfer arranges home delivery services for large retail stores like Sears.[1] Border Transfer itself does not deliver goods. Instead, it contracts with FMCSA-authorized motor carriers to perform home deliveries. See 49 U.S.C. § 13102(14). It has around fourteen motor carriers working at any given time out of its Westwood, Massachusetts facility. It runs between fifteen and twenty delivery routes per day and a few more around the holidays.

Border Transfer contracts with its motor carriers through "Contract Carrier Agreements" ("CCAs"). It has used two standard CCAs during the period at issue in this case, one until early 2017 and the other since. Each CCA states that the motor carrier is an independent contractor of Border Transfer and that none of the motor carrier's personnel are Border Transfer employees. The motor carriers must own their own trucks and are responsible for all operating expenses. The CCAs permit Border Transfer to deduct from its payments to the motor carriers for any liability it incurs for property loss or damage. The motor carriers must

---

[1] Border Transfer's current contract is with Innovel Solutions, Inc. ("Innovel"), which used to be known as Sears Logistics Services, Inc. Innovel manages deliveries for a number of retailers. There is no evidence that Border Transfer's relationship with its drivers differs depending on which retailer's products they are delivering. Thus, for the sake of simplicity, the Court refers throughout this opinion to deliveries made on behalf of Sears.

carry certain types of insurance, including for cargo damage and workers' compensation for all of their workers. The motor carriers cannot subcontract deliveries. The CCA in use through early 2017 includes detailed instructions on how drivers are to perform their deliveries, but the newer CCA does not.

Border Transfer only enters into CCAs with corporate entities. Some drivers formed corporate entities specifically to contract with Border Transfer. Others did so before contracting with Border Transfer. New drivers must submit their company name, information on their compliance with Department of Transportation requirements, and proof of insurance.

In some cases, Border Transfer contracts with motor carriers that consist of a single driver who personally performs the delivery services. That was the case with class representative Marcos DaSilva, who entered into a CCA with Border Transfer through Alpha Logistics Trucking, LLC ("Alpha Logistics") and worked for Border Transfer between November 2014 and July 2015. He formed Alpha Logistics because Border Transfer told him he needed a corporate entity to work for it; a Border Transfer representative even helped him fill out the paperwork to form his LLC and get FMCSA approval. DaSilva worked five to six days a week as a driver during his time with Border Transfer. He did not work for any other company, and all of his income came from Border Transfer deliveries.

In other cases, Border Transfer contracts with motor carriers that employ multiple drivers. That was the case with Matteus Ferreira, the other class representative. Ferreira was the joint owner of Father & Son Transporting LLC ("Father & Son") with his father, Marcos Ferreira. Ferreira worked full-time for Border Transfer from May 2012 until November 2015, during which he did not do work for any other company. Ferreira worked as a driver for the duration of the contract, and Father & Son operated two other trucks during this period.

## II. Working for Border Transfer

### A. Daily Schedule

Drivers perform their deliveries from Sears' Westwood, Massachusetts warehouse. Each day, Border Transfer calls its motor carriers to offer routes for the following day. Motor carriers can accept or decline a route. Some drivers are assigned to standby shifts and will only receive a route if there is an issue with another driver. Sometimes Border Transfer gives a driver a different route than the one he signed up for the prior day. The parties dispute whether a carrier is charged for declining a shift. Border Transfer often offers drivers extra deliveries in the middle of the day. Drivers can turn down these deliveries or negotiate for additional pay beyond the regular per-stop rate.

Most mornings when drivers arrive for their routes, Border Transfer holds a short "stand-up" meeting. At the meeting, Sears and Border Transfer personnel go over new products, give demonstrations on how to install products, provide delivery instructions, and discuss safety. Drivers must attend these meetings, but the parties dispute whether there are consequences for not doing so. Some drivers claim they were assigned to standby shifts as punishment for missing the meetings. Drivers also receive a penalty on their customer ratings scores if they are late to the meetings. However, according to other drivers and Rogerio Matos, an assistant manager for Border Transfer, Border Transfer does not take attendance and does not impose any consequences if a driver misses a meeting.

After the meeting, Border Transfer gives each driver a manifest with his delivery route. Sears prepares the manifests, and Border Transfer assigns them to specific drivers. After loading packages into the truck and receiving a signoff from Border Transfer, the driver leaves on his route. The manifest contains the order of deliveries and time windows for each delivery, which the driver must follow. Border Transfer dispatchers monitor each driver's progress throughout the day. If a driver is not making his deliveries on time, a dispatcher will check in with him and notify Border Transfer managers. Because some deliveries involve replacing old products, drivers

must return to the Westwood facility at the end of the day to return the "haulaway" products.

It is disputed whether there are consequences for failing to follow the manifest. According to Matos and DaSilva, there are not, though DaSilva testified that he did not deviate from the manifest because it always gave the most efficient route. On the other hand, Ferreira was chastised for making deliveries out of order and said Border Transfer did not pay for a stop if a customer complained that he missed a delivery window. There is also conflicting evidence about how easy it is to switch routes. Some drivers reported that, although they can switch routes, they generally do not because Border Transfer attributes any issue to the originally assigned driver. But two drivers that worked for Father & Son said the Ferreiras decided which routes each driver got and always gave the easy route to Matteus.

The CCA Border Transfer used before early 2017 provides detailed guidelines for how to deliver and install various products. Drivers must call each customer thirty minutes before arrival. They must log when they arrive at and complete each delivery and secure a signature from the customer. Beyond logging their progress, drivers only have to contact Border Transfer if there is a problem with a delivery. The parties dispute whether drivers can contact a customer directly if they are running late for a delivery.

A route consists of fifteen to twenty stops and takes at
least ten hours to complete. Drivers work between four to six
days per week. They generally remain available every day of the
week since they only learn one day in advance of a shift.
However, some motor carriers that own multiple trucks have
contracts with other delivery companies and assign some of their
trucks to other routes. Border Transfer's contract with Sears
forbids it from allowing the drivers to "co-load" their trucks
with deliveries for other companies while they are on a route
for Border Transfer without Sears' permission. It is unclear
whether Border Transfer enforces this prohibition.

### B.   Other Aspects of the Job

Border Transfer requires its drivers to wear a uniform
consisting of a blue shirt, blue pants, a blue jacket, and an
armband containing an ID. The uniform says "Delivery Pro" on it.
Motor carriers order their uniforms from Border Transfer.
Delivery teams cannot leave the warehouse without the uniform.

Many motor carriers hire workers of their own as helpers to
assist with delivery routes and/or as secondary drivers to drive
additional trucks. The CCA gives Border Transfer "the right to
request that any personnel of [a motor carrier] not perform
Carrier Services" on its behalf. Dkt. No. 110-4 ¶ 6(E). Any
secondary driver or helper must pass a background check and drug
test. Motor carriers generally make hiring, firing, and pay

decisions for their secondary drivers and helpers on their own. The parties dispute, however, whether Border Transfer requires motor carriers to run hires by it for approval or has ever told a carrier it could not hire someone. One driver picked up and dropped off his helper outside the warehouse after Border Transfer told him not to use that helper

Motor carriers own their own trucks, which must be at least twenty-six feet long. Although the CCA requires trucks to be white, Border Transfer does not enforce this requirement. Motor carriers can put only their own names, not Border Transfer's, on their trucks. Drivers can park their trucks wherever they want overnight, though many park at the warehouse with Border Transfer's permission. They can also take their trucks anywhere for maintenance.

After each delivery, Sears asks the customer to rate the driver. Sears sends ratings on each driver to Border Transfer, which posts them daily at the warehouse. The top six drivers are called the "Top Dogs," and their carriers can choose their routes for the next day. Matos stated that drivers do not have to maintain high ratings to receive routes, but one driver claimed that Border Transfer assigns standby shifts or no route at all for low ratings.

Border Transfer does not limit the amount of vacation its drivers may take. A driver taking time off can either hire

another driver to cover his routes or notify Border Transfer
that he will not pick up routes for a certain period.

### C.    Payments

Border Transfer pays the motor carriers a flat, non-
negotiable rate per stop. It makes a number of deductions from
these payments. First, when a motor carrier starts driving for
Border Transfer, Border Transfer deducts $200 weekly until it
has a $3,000 "performance bond" per truck. Border Transfer keeps
the bond until the motor carrier terminates its contract, uses
the bond to cover any remaining property damage claims, and
eventually returns the remainder to the motor carrier. Second,
if a customer complains about product or property damage, Border
Transfer pays her and then deducts the amount from its payment
to the motor carrier whose driver performed the delivery. Third,
Border Transfer makes "No Bill" ("N/B") deductions to its motor
carrier payments if a scheduled delivery is cancelled or a
driver does not complete a delivery because the customer is not
home, the customer rejects the shipment, or the driver does not
install the product properly. Finally, Border Transfer deducts
the costs of uniforms.

<u>**PROCEDURAL HISTORY**</u>

Plaintiffs filed a proposed class action complaint on June
23, 2016. The original complaint named Border Transfer as the
sole defendant and contained claims for violation of the

10

Massachusetts Wage Act and unjust enrichment. Border Transfer moved to dismiss both claims. On January 5, 2017, the Court held that the Wage Act claim was not preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c), but dismissed the unjust enrichment claim because the Wage Act provided an adequate remedy at law. DaSilva v. Border Transfer of MA, Inc., 227 F. Supp. 3d 154, 155 (D. Mass. 2017) (DaSilva I).

Plaintiffs filed an amended complaint on May 1, 2017, which names Patrick McCluskey as an additional defendant and contains a single count for violation of the Wage Act. In substance, Plaintiffs allege that their misclassification as independent contractors resulted in unlawful deductions from their pay for uniforms, property damage claims, performance bonds, and N/B adjustments, as well as unlawful requirements that they pay for workers' compensation and cargo insurance. On November 9, 2017, the Court certified the following class for liability: "[a]ll individuals who 1) entered into a Contract Carrier Agreement (or similar agreement) directly or through a business entity; 2) personally provided delivery services for Border Transfer on a full-time basis in Massachusetts (at least 40 hours per week); and 3) who were classified as independent contractors, at any time since June 23, 2013." DaSilva v. Border Transfer of MA, Inc., 296 F. Supp. 3d 389, 407 (D. Mass. 2017) (DaSilva II).

On October 8, 2018, Defendants moved for summary judgment. Plaintiffs filed their own partial motion for summary judgment on November 20, 2018.

## DISCUSSION

### I. Legal Framework

#### A. Standard of Review

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). A material fact is one with the "potential of changing a case's outcome." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018). "The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." Carlson v. Univ. of New Eng., 899 F.3d 36, 43 (1st Cir. 2018). When the parties cross-move for summary judgment, the court must evaluate each motion "separately, drawing inferences against each movant in turn." Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 21 (1st Cir. 2018) (quoting EEOC v. Steamship Clerks Union, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

The burden on a summary judgment motion first falls on the movant to identify "the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the movant meets this "modest threshold," the burden shifts to non-movant to "point to materials of evidentiary quality" to demonstrate that the trier of fact could reasonably resolve the issue in its favor. Id. The court must deny summary judgment if the non-movant "adduces competent evidence demonstrating the existence of a genuine dispute about a material fact." Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

**B. Massachusetts Wage Act**

The Massachusetts Wage Act "requires prompt and full payment of wages due." Camara v. Attorney Gen., 941 N.E.2d 1118, 1121 (Mass. 2011). To receive protection under the Wage Act, an individual must "provide services to an employer as an employee (rather than as an independent contractor)." Sebago v. Bos. Cab Dispatch, Inc., 28 N.E.3d 1139, 1146 (Mass. 2015) (quoting Somers v. Converged Access, Inc., 911 N.E.2d 739, 748 (Mass. 2009)). The Massachusetts Independent Contractor Statute governs

whether an individual qualifies as an employee or an independent contractor:

> [A]n individual performing any service, except as authorized under this chapter, shall be considered to be an employee . . . unless:
>
> > (1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
> >
> > (2) the service is performed outside the usual course of the business of the employer; and,
> >
> > (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a); Chambers v. RDI Logistics, Inc., 65 N.E.3d 1, 7 (Mass. 2016). The statute presumes that a worker is an employee and requires the employer to satisfy all three prongs by a preponderance of the evidence to show that the worker is an independent contractor instead. See Chambers, 65 N.E.3d at 7-8; Somers, 911 N.E.2d at 747. The three prongs are referred to as Prongs A, B, and C (or sometimes Prongs 1, 2, and 3) in the caselaw. The statute aims "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." Sebago, 28 N.E.3d at 1146 (quoting Depianti v. Jan-Pro Franchising Int'l, Inc., 990 N.E.2d 1054, 1066 (Mass. 2013)). Courts interpret the statute in a manner consistent with this purpose. Id.

The First Circuit has held that Prong B is preempted by the FAAAA as applied to entities such as Border Transfer that arrange product deliveries. Mass. Delivery Ass'n v. Healey, 821 F.3d 187, 189 (1st Cir. 2016); Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 442 (1st Cir. 2016). Thus, for Defendants to defeat the presumption of employment, they must prevail on both Prongs A and C. Plaintiffs can prevail by showing that either Prong A or C is not satisfied. See Sebago, 28 N.E.3d at 1146 ("The failure to satisfy any prong will result in the individual's classification as an employee.").

## II.  Threshold Issue of Incorporation

Defendants emphasize throughout their briefing that drivers contract with Border Transfer through corporate entities. As a consequence, they contend that that 1) the drivers are not "individuals" protected by the Wage Act and Border Transfer is not their "employer," and 2) Border Transfer cannot be liable for deductions to payments to drivers' corporate entities or expenses those corporate entities paid. But "incorporation cannot be a shield to prevent liability under the Wage Act." DaSilva II, 296 F. Supp. 3d at 402. The Court defined the class to include only drivers who contracted with Border Transfer themselves and drove personally full-time, and incorporation does not bar these drivers from recovering under the Wage Act.

The Massachusetts Supreme Judicial Court ("SJC") has held that the mere fact of incorporation does not defeat a Wage Act claim. See Chambers, 65 N.E.3d at 14; cf. Depianti, 990 N.E.2d at 1065 (holding that "the lack of a contract between the parties does not itself, without more, preclude liability under the independent contractor statute"). The Court therefore need not entertain Defendants' arguments that the plain meaning of "individual" and "employer" excludes workers who incorporate from Wage Act protection. These formalistic arguments run headlong into the Wage Act's purpose of classifying workers as employees based on the circumstances of their employment.

Courts ignore a worker's corporate form for purposes of the Wage Act when incorporation aims "to prevent the classification of workers as employees" instead of representing "a legitimate business-to-business relationship" initiated "at the worker's behest." Chambers, 65 N.E.3d at 14. Factors relevant to this determination include:

> [Whether] the services of the alleged independent
> contractor are not actually available to entities
> beyond the contracting entity, even if they purport to
> be so; whether the business of the contracting entity
> is no different than the services performed by the
> alleged independent contractor; or the alleged
> independent contractor is only a business requested or
> required to be so by the contracting entity.

Id. (alteration in original) (quoting Advisory 2008/1, Attorney General's Fair Labor and Business Division on Mass. Gen. Laws

ch. 149, § 148B) (denying the defendant's motion for summary judgment on a misclassification claim where the plaintiffs created corporate entities only to contract with the defendant, did not perform services for any other company, and were forbidden from doing so).

The class members' incorporation does not preclude their Wage Act claims. It is undisputed that Border Transfer only contracts with corporate entities, has the right to terminate a CCA if a driver dissolves his corporate entity, and imposes a nonnegotiable CCA on its drivers. Border Transfer and its motor carriers are all in the delivery business, and the class is limited to drivers who personally provided full-time delivery services for Border Transfer. While class members formed their corporate entities for a variety of reasons, this fact is "of minimal relevance" because Border Transfer only contracts with corporate entities. Vargas v. Spirit Delivery & Distrib. Servs., Inc., 245 F. Supp. 3d 268, 287 (D. Mass. 2017). Under such circumstances, the class members are not in legitimate business-to-business relationships with Border Transfer.

The cases Defendants cite in which courts have rejected Wage Act claims due to incorporation are inapposite because they involved individuals offering much more than their own personal services through legitimate delivery businesses. See Cook v. Estes Express Lines, Corp., No. 1:16-cv-11538-RGS, 2018 WL

1773742, at *2 (D. Mass. Apr. 12, 2018) (thirteen trucks and over twenty drivers); Debnam v. FexEx Home Delivery, No. 10-11025-GAO, 2013 WL 5434142, at *1 (D. Mass. Sept. 27, 2013) (nine delivery routes and sixty drivers over the course of five years). Here, the class members by definition performed deliveries for Border Transfer full-time and therefore provided significant personal services. Individuals who hired secondary drivers to cover Border Transfer routes but did not drive full-time themselves are not part of the class. An individual like Ferreira whose LLC employed other drivers but who also drove full-time for Border Transfer is a class member, but only for deductions Border Transfer made to payments for his deliveries.

For these reasons, the fact that Border Transfer contracted with the class members through corporate entities does not bar them from employee status under the Wage Act. They can recover expenses paid by their corporate entities and deductions made by Border Transfer to payments to their corporate entities.

## III. **Defendants' Motion for Summary Judgment**

### A. **Recovery of Deductions and Expenses**

Defendants advance a number of reasons why, even if class members were misclassified as independent contractors, they cannot recover some or all of the deductions and expenses they seek as a matter of law: 1) drivers agreed in their CCAs to bear the expenses they now seek to recover; 2) drivers paid expenses

for workers' compensation and cargo insurance to third parties, not via deductions by Border Transfer; 3) the Carmack Amendment and the FAAAA preempt claims for deductions for property damage; and 4) class members cannot recover "No Bill" or "N/B" deductions for unfinished deliveries.

### 1. Expenses Drivers Authorized in Their Agreements

Defendants argue that the Wage Act does not preclude Border Transfer from making deductions drivers authorized in their CCAs. An employer may not, however, exempt itself from the Wage Act via "special contract with an employee or by any other means." Mass. Gen. Laws ch. 149, § 148. A "special contract" is one that "contains 'peculiar provisions that are not ordinarily found in contracts relating to the same subject matter.'" Camara, 941 N.E.2d at 1122 (quoting Special Contract, Black's Law Dictionary (9th ed. 2009)). Because the Wage Act prohibits employers from exempting themselves via "special contract . . . or by any other means," Mass. Gen. Laws ch. 149, § 148 (emphasis added), an employer cannot exempt itself, Crocker v. Townsend Oil Co., 979 N.E.2d 1077, 1086 n.15 (Mass. 2012). Accordingly, the Wage Act "prohibit[s] an employer from deducting, or withholding payment of, any earned wages," even if the employee assents. Camara, 941 N.E.2d at 1121.

Defendants cannot avoid liability simply because the CCAs authorize the deductions. Defendants contend that CCA provisions

19

requiring its drivers to bear certain costs are not special contracts because they are common in the delivery industry. Even if so, the Wage Act also prohibits employers from exempting themselves via any other means. See Crocker, 979 N.E.2d at 1086 n.15. The class members' consent to these deductions is no defense to Defendants' Wage Act liability.

2. *Expenses Drivers Paid Directly*

Defendants next challenge the class's ability to recover workers' compensation and cargo insurance premiums. The SJC held that these premiums are recoverable in Awuah v. Coverall North America, Inc., 952 N.E.2d 890 (Mass. 2011). Under Awuah, an employee may recover workers' compensation insurance premiums his employer requires him to pay. Id. at 898-99. Border Transfer's practice of requiring its drivers to pay workers' compensation insurance premiums falls afoul of this clear mandate. See Martins v. 3PD, Inc., No. 11-11313-DPW, 2014 WL 1271761, at *7-8 (D. Mass. Mar. 27, 2014) (holding that Awuah barred a property broker from deducting workers' compensation insurance premiums from payments to its drivers). As the class is suing as purported employees of Border Transfer, not as officers of their corporate entities, it is irrelevant that Massachusetts law does not require an LLC to cover its members with a workers' compensation policy. Border Transfer cannot

avoid liability for a workplace injury by foisting the cost of workers' compensation onto its drivers.

In addition, "an employer may not deduct insurance costs from an employee's wages where those costs are related to future damages that may never come to pass, and even if they do, may not be the responsibility of the employee." Awuah, 952 N.E.2d at 900. Such insurance costs include coverage for "the risk of injury to the person or property of a third party for which an employer may become financially responsible." Id. at 899. An employee may be liable for such damage if he causes the damage "intentionally, recklessly, or even negligently," but he "must be afforded the right to an adjudication of his responsibility in a manner that is procedurally fair." Id. at 899-90. Border Transfer's requirement that its drivers purchase cargo insurance is unlawful because it forces them to bear the cost of protecting against property damage for which they ultimately may not be responsible. See Martins, 2014 WL 1271761, at *7-8 (holding that Awuah barred a property broker from deducting cargo insurance premiums from payments to its employees).

Defendants argue the class cannot recover these insurance premiums because they paid these expenses out of pocket, not as deductions from wages like the plaintiff in Awuah. Because the holding in Awuah aims to prevent an employer from shifting expenses onto an employee that it is or might be obliged to

bear, 952 N.E.2d at 898-99, the fact that the class members paid premiums directly to an insurance company is not dispositive.

Fraelick v. PerkettPR, Inc., 989 N.E.2d 517 (Mass. App. Ct. 2013), also does not support Border Transfer's argument. For starters, Fraelick involved a retaliation claim under the Wage Act, not a claim for unpaid wages. See Martins, 2014 WL 1271761, at *7 (distinguishing Fraelick on this ground). More importantly, "the facts of Fraelick are readily distinguishable from the facts of misclassification cases like Awuah and the instant case." Id. Fraelick suggested that "violation of a standard expense reimbursement arrangement would not constitute a violation of the Wage Act because the reimbursement is not compensation 'earned' by 'labor, service or performance.'" 989 N.E.2d at 523-24 (quoting Mass. State Police Commissioned Officers Ass'n v. Commonwealth, 967 N.E.2d 626, 632 (Mass. 2012)). Unlike a standard expense reimbursement scheme, Border Transfer forces its drivers not just to "front many of [its] ordinary costs of doing business," but instead to "bear them entirely." Martins, 2014 WL 1271761, at *7.

3. *Carmack Amendment and FAAAA Preemption*

Defendants argue that the Carmack Amendment, 49 U.S.C. § 14706, and the FAAAA preempt the class's use of state law to recover for property damage deductions. The Carmack Amendment provides that:

22

> A carrier providing transportation or service . . .
> shall issue a receipt or bill of lading for property
> it receives for transportation under this part. That
> carrier and any other carrier that delivers the
> property and is providing transportation or
> service . . . are liable to the person entitled to
> recover under the receipt or bill of lading. The
> liability imposed under this paragraph is for the
> actual loss or injury to the property caused by (A)
> the receiving carrier, (B) the delivering carrier, or
> (C) another carrier over whose line or route the
> property is transported in the United States . . . .

49 U.S.C. § 14706(a).

The Carmack Amendment aims "to achieve national uniformity in the liability assigned to carriers" for lost or damaged goods. Rini v. United Van Lines, Inc., 104 F.3d 502, 503-04 (1st Cir. 1997). It ensures that shippers do not shoulder "the burden of determining which of the several carriers handling interstate shipments bears the blame for loss or damage under diverse state laws," N. Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc., 89 F.3d 452, 457 (7th Cir. 1996), and that "[c]arriers in turn acquire reasonable certainty in predicting potential liability," Exel, Inc. v. S. Refrigerated Transp., Inc., 807 F.3d 140, 148 (6th Cir. 2015). To this end, it preempts "all state laws that impose liability on carriers based on the loss or damage of shipped goods." Rini, 104 F.3d at 506 (emphasis omitted). In other words, all states laws that "in any way enlarge the responsibility of the carrier for loss or at all affect the ground of recovery, or the measure of recovery," are preempted.

Id. at 505 (quoting Charleston & W.C. Ry. Co. v. Varnville Furniture Co., 237 U.S. 597, 603 (1915)). The Carmack Amendment does not preempt liability for "an injury separate and apart from the loss or damage of goods." Id. at 506.

The Carmack Amendment does not preempt Plaintiffs' claim for property damage deductions, which does not concern the loss of or damage to shipped goods and would not increase liability for damaged goods. The class's injury relates to the payment of wages and is "separate and apart from the loss or damage of goods." Id. Plaintiffs' Wage Act claim does not affect a shipper's ability to recover from a carrier or a carrier's ability to determine its liability for property damage. For good reason, Defendants cite to no case in which a court has held that the Carmack Amendment preempted a state labor law.

Recognizing that Carmack Amendment preemption generally applies only to claims brought by shippers, Defendants argue that Border Transfer, as a property broker, stands in the shoes of the shipper. See, e.g., R.E.I. Transp., Inc. v. C.H. Robinson Worldwide, Inc., No. 05-57-GPM, 2007 WL 854005, at *5 (S.D. Ill. Mar. 16, 2007) (permitting a property broker to bring a claim under the Carmack Amendment against a carrier for damage to property), aff'd, 519 F.3d 693 (7th Cir. 2008). This lawsuit involves claims by drivers against Border Transfer for Wage Act

violations, however, not claims by Border Transfer against the
drivers for property damage.

The Court has already held that Plaintiffs' claims are not
preempted by the FAAAA, see DaSilva I, 227 F. Supp. 3d at 155,
and Defendants' arguments that the Court should reconsider this
holding are unpersuasive. As the Court has explained, FAAAA
preemption applies if a state law "expressly references, or has
a significant impact on, carriers' prices, routes, or services."
Mass. Delivery Ass'n v. Coakley, 769 F.3d 11, 17-18 (1st Cir.
2014). To trigger preemption, this impact must be more than
"tenuous, remote, or peripheral." Schwann, 813 F.3d at 436
(quoting Rowe v. N.H. Motor Transp. Ass'n, 552 U.S. 364, 371
(2008)). Defendants do not explain how allowing the class to
recover these deductions would alter Border Transfer's prices or
services more directly than any other economic regulation that
affects the market forces implicated in pricing decisions. See
DiFiore v. Am. Airlines, Inc., 646 F.3d 81, 89 (1st Cir. 2011)
(rejecting the argument that the ADA preempts a state regulation
simply because it imposes costs on an airline and thus affects
its fares). The effect of this claim on Border Transfer's
services and prices is too remote to trigger FAAAA preemption.

Defendants cite to cases in which courts have held that the
FAAAA preempts claims by shippers against property brokers or
motor carriers for damage to their goods. See, e.g., Ameriswiss

Tech., LLC v. Midway Line of Ill., Inc., 888 F. Supp. 2d 197, 207 (D.N.H. 2012). Unlike here, such claims threaten to directly increase the exposure to damages that brokers or carriers face. See id.

### 4. *Unfinished Delivery Deductions*

Finally, Defendants contend that class members cannot recover for unfinished delivery ("No Bill" or "N/B") deductions because they never "earned" those wages. See Mass. Gen. Laws ch. 149, § 148 (ensuring timely payment to employees of wages they have "earned"). An employee earns his wages when he has "has completed the labor, service, or performance required of him." Awuah, 952 N.E.2d at 896. Determining what labor an employee must complete to earn his wages requires an analysis of his employment contract. Cf. Clee v. MVM, Inc., 91 F. Supp. 3d 54, 62-63 (D. Mass. 2015) (finding a Wage Act claim to be completely preempted by the Labor Management Relations Act because a court would have to examine the collective bargaining agreement to determine what work was required of the employee).

Contract interpretation is a question of law for the court. Balles v. Babcock Power Inc., 70 N.E.3d 905, 911 n.12 (Mass. 2017).[2] If "the language of a contract is clear, it alone

---

[2]    The two standard CCAs Border Transfer has used contain Tennessee and Michigan choice-of-law provisions. Given the unequal bargaining power between Border Transfer and the class, it is unclear whether a Massachusetts court would enforce these

determines the contract's meaning." Id. at 911. A contract is
ambiguous if it "can support a reasonable difference of opinion
as to the meaning of the words employed and the obligations
undertaken." Id. (quoting Bank v. Thermo Elemental Inc., 888
N.E.2d 897, 907 (Mass. 2008)). When faced with an ambiguous
standardized contract that "the nondrafting party had no ability
to influence," a court must "construe it against the party that
drafted it" and "seek to effectuate . . . the meaning an
objectively reasonable person in the nondrafting party's
position would give to the language." James B. Nutter & Co. v.
Estate of Murphy, 88 N.E.3d 1133, 1139-40 (Mass. 2018).

Border Transfer makes N/B deductions in two circumstances:
1) when a scheduled delivery is cancelled before the driver does
any work; and 2) when a delivery is unsuccessful because the
customer is not home or rejects the shipment or the driver does
not install the product properly. Under the CCA Border Transfer
used until early 2017, a motor carrier is entitled to payment
"based on stop count" at a specified rate "per Stop." Dkt. No.
110-4 at 25. A "Stop" could reasonably be construed to include
an unsuccessful delivery. However, the payment is due within two
weeks of when the driver "completes delivery," Id. ¶ 4(A), which

provisions. See Taylor v. E. Connection Operating, Inc., 988
N.E.2d 408, 411 n.8 (Mass. 2013). In any event, the same
principles of contract law govern this issue regardless of which
state's law applies.

suggests that the delivery must be successful for the driver to earn payment. The contractual language is therefore ambiguous as to when a driver earns a payment.[3]

Given this ambiguity and the fact that Border Transfer did not negotiate its CCAs with its drivers, the term "Stop" should be construed against Border Transfer in accordance with the meaning a reasonable driver would give to it. A reasonable driver would believe he would be paid each time he arrives at a home regardless of whether he successfully delivers the product. Otherwise, through no fault of his own, he would risk driving for hours and receiving no pay if multiple customers are not home or ordered products that do not fit. Under this construction, class members can recover for at least the second category of N/B deductions, i.e., unsuccessful deliveries.

Defendants' argument that the FAAAA preempts claims to recover N/B deductions because they aim to expand the wages the class members agreed to in their CCAs is without merit. Defendants cite to <u>American Airlines, Inc. v. Wolens</u>, which states that ADA or FAAAA preemption "confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies

---

[3]     Although the standard CCA Border Transfer has used since early 2017 contains slightly different payment terms, it is similarly ambiguous on when a driver earns a per stop payment.

external to the agreement." 513 U.S. 219, 232-33 (1995). As an initial matter, these claims seek to recover only wages class members have earned according to the terms of the CCAs. Additionally, the class consists of purported employees seeking to enforce an obligation of an employer. See Martins v. 3PD, Inc., No. 11-11313-DPW, 2013 WL 1320454, at *11 (D. Mass. Mar. 28, 2013). As with the claims for property damage deductions, the only connection between N/B deductions and Border Transfer's prices and services is the pressure to raise prices that comes from any cost a service provider bears. Such a tenuous connection does not suffice to trigger FAAAA preemption.

**B.   Chantre's Individual Claims**

Defendants also seek summary judgment on the individual claims of class member Humberto Chantre on two grounds. First, they point out that he contracted with Border Transfer through an LLC, Chantre Delivery. Second, they contend he was an independent contractor, not an employee. Under Prong A of the Independent Contractor Statute, they note that Chantre decided which loads to accept, provided drivers and ensured they met safety standards, secured and maintained equipment, and bought insurance. Under Prong C, they emphasize that Chantre Delivery had the opportunity to provide deliveries for other companies and did in fact do so after Chantre stopped driving personally.

The class is limited to drivers who personally performed deliveries for Border Transfer on a full-time basis. See DaSilva II, 296 F. Supp. 3d at 407. While Chantre may have been engaged in a legitimate business-to-business relationship with Border Transfer when he did not personally drive a truck and instead employed other drivers to perform his deliveries, he is not a class member during that period. Defendants put forth no evidence about Chantre's relationship with Border Transfer that is specific to the period during which he drove personally. Furthermore, Chantre contracted with Border Transfer under the first CCA, which, as discussed below, renders him an employee as a matter of law for any period in which he drove personally on a full-time basis. Defendants are not entitled to summary judgment on Chantre's claims.

IV. **Plaintiffs' Motion for Summary Judgment**

A. **Independent Contractor Analysis**

Plaintiffs seek summary judgment on whether Border Transfer misclassified the class as independent contractors. Defendants respond that there are disputed material facts that prevent the Court from determining as a matter of law that it cannot meet its burden of satisfying both Prong A and C of the Independent Contractor Statute.

Additionally, Defendants suggest that, although they must prove proper classification of a single worker, Plaintiffs bear

the burden of showing that misclassification occurred on a class basis. This is incorrect. Federal Rule of Civil Procedure 23 places the burden of proof on Plaintiffs on the issue of class certification, but it does not shift Defendants' burden of proof on the merits of a class-wide Wage Act claim. See Marlo v. United Parcel Serv., Inc., 639 F.3d 942, 947 (9th Cir. 2011).

### 1. *Prong A: Freedom from Control*

#### a. Legal Standard

To satisfy Prong A, a defendant must show that the worker "is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact." Mass Gen. Laws ch. 149, § 148B(a)(1) (emphasis added). The worker need not "be entirely free from direction and control from outside forces" to qualify as an independent contractor. Athol Daily News v. Bd. of Review of Div. of Emp't & Training, 786 N.E.2d 365, 371 (Mass. 2003) (internal quotation omitted). Instead, Prong A focuses on "the right to control the details of the performance and the freedom from supervision 'not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work.'" Id. (citation omitted) (quoting Maniscalco v. Dir. of Div. of Emp't Sec., 97 N.E.2d 639, 640 (Mass. 1951)).

"Prong A itself contains a conjunctive test under which the plaintiffs need only prevail on one branch." DaSilva II, 296 F. Supp. 3d at 400. Accordingly, "a company asserting that a worker is an independent contractor must show that the individual was free from its control both as a matter of contract and as a matter of fact." Id. The Court first discusses Border Transfer's contractual right to control its drivers' performance and then evaluates Border Transfer's actual level of control.

      b.    Analysis of Right to Control Under the CCAs

Border Transfer has used two standard CCAs, switching from the first to the second in early 2017. The first CCA gives Border Transfer the right to control many details of its drivers' performance. Drivers must use white trucks of a certain size. They must wear a uniform consisting of a light blue shirt with navy stripes, navy blue pants, a black belt, black shoes, a navy blue jacket, and an ID badge stating "Sears-Authorized." Any secondary driver or helper must be employees of the motor carrier and pass a background check. Border Transfer can bar a secondary driver or helper from working on its deliveries. Drivers may not subcontract their delivery routes. Motor carriers must obtain certain types of insurance, including workers' compensation and cargo insurance, and must name Border Transfer or Sears as the beneficiary of some policies.

The first CCA also requires that drivers attend a daily "stand-up" meeting at which Sears and Border Transfer provide instructions. Drivers must make deliveries in the order and time windows specified in their manifests. See <u>Driscoll v. Worcester Tel. & Gazette</u>, 893 N.E.2d 1239, 1243 (Mass. App. Ct. 2008). They must call each customer thirty minutes before arrival to verify the address and confirm the delivery. Otherwise, except to resolve property damage claims or update delivery times, carriers cannot contact customers directly. When a delivery is complete, a driver must secure a signature from the customer. The CCA bars drivers from presenting folded or torn manifests to customers for signature.

Finally, the CCA provides extensive details on how drivers must install various products. With refrigerators and freezers, for example, drivers must turn on the icemaker; run the water dispenser; insert all racks, ice trays, and door handles; and turn the machine to a "mid-range cold setting." Dkt. No. 110-4 at app. B, pt. II, ¶ 3. For bedroom furniture, they must attach mirrors to the dressers; assemble headboards, and insert and adjust levelers on door chests and armoires. During delivery, drivers cannot remove spring-loaded, folding, or sliding glass doors; remove windows; or hoist merchandise. They cannot allow a customer to carry merchandise or assist with merchandise hookup.

Class members who contracted with Border Transfer using the first CCA are employees. The CCA gives Border Transfer the right to control far more than just "the result to be accomplished" by its drivers, i.e., the completion of deliveries. Athol Daily News, 786 N.E.2d at 371 (quoting Maniscalco, 97 N.E.2d at 640). It dictates what drivers must wear and what types of trucks they can use. By requiring certain types of insurance and giving Border Transfer the ability to bar secondary drivers and helpers, it gives Border Transfer control over how drivers run their motor carriers. Most importantly, it specifies in extensive detail how drivers are to perform their deliveries: they must attend daily meetings, follow a preordained manifest route, call the customer to announce their arrival, install each product in a specific manner, and secure the customer's signature on the manifest. Through this CCA, Border Transfer retained the right to control "the means and methods that are to be utilized in the performance of the work." Id. (quoting Maniscalco, 97 N.E.2d at 640); see also Driscoll, 893 N.E.2d at 1246 (upholding an agency determination that newspaper delivery carriers were employees of the publisher under the unemployment statute where the carriers had to follow a set delivery route and detailed delivery instructions and the publisher retained the authority to reject substitute delivery carriers).

Defendants emphasize that the CCA designates the motor carriers as "independent contractors," gives them "exclusive control and direction of the persons operating and/or loading the Equipment or otherwise engaged in such transportation services," and permits them "to exercise the discretion and judgment of an independent contractor in determining the manner and means of performing its obligations." Dkt. No. 110-4 ¶ 8. But misclassification does not turn on how the parties contractually label their relationship. See Somers, 911 N.E.2d at 749; Bos. Bicycle Couriers, Inc. v. Deputy Dir. of Div. of Emp't & Training, 778 N.E.2d 964, 972 (Mass. App. Ct. 2002).

Defendants also blame the level of control in the CCA on requirements in Border Transfer's own contract with Sears. Why Border Transfer controls its drivers, however, is irrelevant to the inquiry under Prong A. Defendants cite no case in which a Massachusetts court has excused a level of control sufficient to make a worker an employee simply because the requirements of the employer's customers or the nature of its business necessitated that control. See Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1316 (11th Cir. 2013) (noting in the context of an FLSA claim that, if "the nature of a business requires a company to exert control over workers" to a certain degree, "then that company must hire employees, not independent contractors").

Finally, Defendants point out that Border Transfer did not exercise its right to control its drivers' performance in all the ways allowed under the CCA. It is disputed, for example, whether drivers had to show up at daily "stand-up" meetings and stick to their manifests and whether Border Transfer actually prevented its motor carriers from utilizing specific secondary drivers or helpers. Defendants argue that, when all inferences are drawn in its favor, it did not exercise as much control over its drivers as the CCA suggests.

A worker does not qualify as an independent contractor merely because his employer declines to exercise an extensive right to control reserved in an employment contract. The SJC has focused the Prong A analysis on evidence of actual control, see Sebago, 28 N.E.3d at 1149, and has noted that "the terms of an employment contract are not, on their own, dispositive" on the question of control, Machado v. System4 LLC, 28 N.E.3d 401, 411 (Mass. 2015). But the focus on the actual relationship between the worker and his employer aims to avoid use of "artful contract drafting . . . as a subterfuge to avoid liability . . . when the agreement lacks any real foundation in the facts of the actual working relationship." Bos. Bicycle Couriers, 778 N.E.2d at 972. While the Independent Contractor Statute expanded the control inquiry to include an analysis of the parties' actual relationship, it did not eliminate the common-law rule that a

worker qualifies as an employee when the employer retains "the right to control the details of the performance." <u>Athol Daily News</u>, 786 N.E.2d at 371. The plain language of the statute bolsters this interpretation, as it requires the employer to prove that the worker is free from control "<u>both</u> under his contract of the performance of service and in fact." Mass. Gen. Laws ch. 149, § 148B(a)(1) (emphasis added).

The second CCA Border Transfer began using in early 2017 is a different story. Unlike the first CCA, it does not include detailed instructions on how drivers are to perform their deliveries. For example, it does not explain the specific steps for installing various types of products, provide rules on when driver can communicate with customers, require attendance at a daily meeting, or specify the type of truck drivers must use. Accordingly, for class members who signed the second CCA, the Court cannot conclude they are employees based solely on Border Transfer's contractual right to control their performance.

c.    Analysis of Control in Fact

For class members who signed the second CCA, Plaintiffs can still prevail on the misclassification issue if they show that Border Transfer controlled the details of their performance as a matter of fact. In Plaintiffs' favor, Border Transfer controls much of the daily routine of its drivers. As required by the CCA, Border Transfer provides them with a daily manifest that

lays out the order and times for their deliveries, and drivers
must wear uniforms and attend regular stand-up meetings. After a
carrier accepts a route, Border Transfer sometimes changes the
assignment. Drivers must log their progress via an app, and
Border Transfer dispatchers monitor them throughout the day.
Drivers must call Border Transfer about any issue with delivery.
Border Transfer reviews the customer ratings it receives from
Sears and provides an incentive to drivers to improve those
ratings by offering the "Top Dogs" their choice of route.

On the other hand, Border Transfer leaves certain aspects
of the job to drivers' discretion. Drivers own their own trucks
and can park and maintain them where they like. Border Transfer
does not in practice require trucks to be white, and drivers can
put their motor carriers' names on the trucks. The uniforms do
not say "Border Transfer" on them. Drivers do not have to accept
the routes Border Transfer offers them. See Sebago, 28 N.E.3d at
1150 (determining that taxi drivers' ability to choose their
shifts and decline dispatches meant the cab owners, radio
associations, and garages did not control their work). They can
also accept or reject new deliveries Border Transfer offers
throughout the day or negotiate for more pay for those new
deliveries. Border Transfer does not limit how many days drivers
can take off and permits drivers to either send replacement
drivers to cover their routes or simply not take routes for

those days. Drivers can hire and fire helpers and secondary drivers and decide how much to pay them.

In light of these conflicting factors, the factual disputes over other indicia of control are dispositive of this inquiry. It is unclear, for example, whether Border Transfer penalizes drivers for rejecting a route, failing to make deliveries in conformance with the manifest, receiving low customer ratings, or not attending the morning stand-up meeting. Although swapping routes appears to be allowed, some drivers said it is impractical because of Border Transfer's policies. The parties dispute whether drivers have to clear their hires with Border Transfer and whether Border Transfer has ever told a carrier not to hire anyone and enforced that prohibition. In addition, while Border Transfer promised Sears it would not allow its drivers to "co-load" other companies' products, it is unclear whether Border Transfer enforces this requirement. <u>See</u> <u>Athol Daily News</u>, 786 N.E.2d at 371 (reversing an agency's decision that newspaper delivery carriers were employees under the unemployment statute in part because the carriers could deliver for other customers at the same time). Because of the factual disputes on these indicia of control, Plaintiffs are not entitled to summary judgment on the issue of control in fact.

2. *Prong C: Independently Established Business*

a. Legal Standard

To prevail on Prong C, a defendant must show that the worker "is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." Mass. Gen. Laws ch. 149, § 148B(a)(3). The parties dispute the legal standard for Prong C: Plaintiffs argue that an employer must show the worker actually and simultaneously provided the same services to a third party. Defendants read Prong C to focus instead on "entrepreneurial opportunity."

The SJC has described the "critical inquiry under this prong [as] whether 'the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business compels the worker to depend on a single employer for the continuation of the services.'" Sebago, 28 N.E.3d at 1153 (quoting Athol Daily News, 786 N.E.2d at 373). In other words, Prong C "seeks to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise." Athol Daily News, 786 N.E.2d at 373 (quoting Bos. Bicycle Couriers, 778 N.E.2d at 970).

In practice, courts have not adopted a clear way to apply this standard. The SJC appears to have rejected Defendants'

"entrepreneurial opportunity" test by refusing to focus solely on "what an individual is capable of doing as opposed to what an individual actually did." Coverall N. Am. v. Comm'r of Div. of Unemployment Assistance, 857 N.E.2d 1083, 1088 (Mass. 2006) (finding that an employer did not satisfy Prong C of the identical unemployment statute simply by showing that its contract with a worker allowed her "to expand her business by hiring employees and directly soliciting new customers"). This emphasis on the worker's actual provision of services aligns with the statute's requirement that the worker be "customarily engaged in an independently established trade." Mass. Gen Laws ch. 149, § 148B(a)(3) (emphasis added). Rejecting a "rigid" test, the SJC has also cautioned that Prong C does not focus solely on the individual circumstances of a specific worker but also "on the nature of the services performed." Athol Daily News, 786 N.E.2d at 374 n.14.

The Court need not determine the precise analysis under Prong C. The nature of the services performed and the actual and customary conditions of employment of the workers are relevant to the inquiry, and there are material factual disputes as to key aspects of Border Transfer's relationship with its drivers.

b.   Analysis

As with Prong A, there are undisputed facts that point in both directions on Prong C. In Plaintiffs' favor, Border

Transfer provides a detailed manifest that drivers must follow, leaving them little flexibility to manage their own time. See Coverall, 857 N.E.2d at 1088. Drivers have no control over the price Sears charges customers for delivery, and they are paid a per stop rate set by Border Transfer. Compare Athol Daily News, 786 N.E.2d at 374 (finding Prong C satisfied where newspaper delivery carriers could set their own prices for the newspaper they sold), with Coverall, 857 N.E.2d at 1088 (upholding an agency finding that a worker was an employee for the purposes of unemployment where her employer controlled the prices she charged). Drivers must wear uniforms, which makes it difficult to work simultaneously for another company.

On the other hand, drivers own and maintain their own trucks, which they can use to deliver for other companies because the trucks cannot say "Border Transfer" on them. See Athol Daily News, 786 N.E.2d at 374. Drivers are free to advertise their motor carriers, including by painting the names onto their trucks. See Sebago, 28 N.E.3d at 1153. The CCAs do not bar drivers from contracting independently with other delivery companies. See Coverall, 857 N.E.2d at 1088. Some drivers worked in the delivery industry before and/or after contracting with Border Transfer. See id. (upholding an agency decision that a worker was an employee where her cleaning business ended once her relationship with her employer

42

terminated). Many companies provide delivery services, and there is nothing inherent in the industry that suggests drivers could not find work with multiple companies if permitted.

Two of the factual disputes relevant to Prong A are also relevant to Prong C: 1) whether drivers are penalized for declining routes and 2) whether Border Transfer bars drivers from "co-loading" their trucks with deliveries for other companies. Given that the undisputed facts point in both directions on Prong C, these two disputed issues are key to the inquiry. If drivers must work full-time and cannot deliver products for other companies simultaneously, they cannot operate an independent business. On the other hand, if drivers can decline routes and co-load other products, they have flexibility to provide delivery services to other companies. See Sebago, 28 N.E.3d at 1153 (holding that taxicab drivers were not employees of the cab owners, radio associations, and taxicab garage in part because they were free to work as much or as little as they wanted for different cab and medallion owners each day); Athol Daily News, 786 N.E.2d at 374 (finding Prong C satisfied where newspaper delivery carriers could simultaneously delivery products for other companies besides the newspaper publisher). These factual disputes preclude summary judgment on Prong C.

## B.    Patrick McCluskey's Individual Liability

Plaintiffs also seek summary judgment on Defendant Patrick McCluskey's individual liability for Border Transfer's alleged Wage Act violations. "The president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation . . . ." Mass. Gen. Laws ch. 149, § 148. An officer or agent qualifies as "having the management" of the corporation if he "controls, directs, and participates to a substantial degree in formulating and determining policy." Wiedmann v. Bradford Grp., 831 N.E.2d 304, 314 (Mass. 2005), superseded by statute on other grounds, 2008 Mass. Legis. Serv. Ch. 80 (S.B. 1059) (West), as recognized in Lipsitt v. Plaud, 994 N.E.2d 777 (Mass. 2013). In other words, the officer or agent must have "significant management responsibilities over the corporation similar to those performed by a corporate president or treasurer, particularly in regard to the control of finances or payment of wages." Segal v. Genitrix, LLC, 87 N.E.3d 560, 568 (Mass. 2017). A corporate director is not liable under the Wage Act merely by virtue of his position. See id. at 567. Instead, the plaintiff must show that the director was an agent of the corporation with significant management responsibilities. See id. at 567–68.

McCluskey's role at Border Transfer is unclear from the record. Public filings from 2013, 2015, and 2016 and a declaration signed in October 2018 indicate he was a director, but in a 2014 public filing and at his May 2017 deposition he stated he was the president. McCluskey is individually liable as president, regardless of his actual control of the corporation. For the periods in which he has been merely a director, however, Plaintiffs must show that he was an agent of Border Transfer with significant management responsibilities. Plaintiffs point out that McCluskey was involved in a market study to determine how much to pay drivers, drafted the standard CCAs, and reviews the company's financials and tracks its performance. Plaintiffs do not differentiate, however, between his time as director and president. They also provide no evidence that McCluskey was an agent of Border Transfer during the periods in which he served as a director. See Segal, 87 N.E.3d at 570-71 (noting that, except in unique circumstances, a director is not an agent of the corporation). Plaintiffs are therefore not entitled to summary judgment on McCluskey's individual liability.

## ORDER

Accordingly, the Court **DENIES** Defendants' motion for summary judgment (Docket No. 108). The Court also **ALLOWS IN PART** Plaintiffs' motion for partial summary judgment on liability (Docket No. 122) as to class members subject to the first CCA

and **DENIES IN PART** the motion as to class members subject to the second CCA and as to Defendant Patrick McCluskey's individual liability. Finally, the Court **DENIES** as moot Plaintiffs' motions to strike the testimony of Thomas N. Hubbard (Docket No. 115 and Docket No. 145).

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge